UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**04 - 2 1 4 0 2**

CASE NO.: _____ -CIV ( _____ / _____ )

------------------------------------------------------------



Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance Company, and Northbrook Indemnity Company,

      Plaintiffs,

vs.

Mikhail Palterovich, Jake Palter, a.k.a. Jacob Palterovich, Dmitry Shteyman, a.k.a. Dmitry Grinberg, Vladimir Trintcher, Irina Shteyman, a.k.a. Irina Perekorenko, Isabelle Roig, a.k.a Isabelle Losardo, Pinchas Shapiro, Grigory Kliger, M.D., Mario LaPlume a.k.a Maria LaPlume Garbarino, M.D., Pierre M. Tallerie, D.C., Robert Piasio, D.C., Virginia Planas, D.C., William J. Moran, D.C., Alexander S. Fishman, Esq., S.H.P. Medical Rehabilitation Center, Inc., Sun State Diagnostic, Inc., Med Services Group, Inc., NMB Medical Group, Inc., Continental Consulting, Inc., Statewide Collections, Inc., Jack Byron, David Guenon a.k.a David Guenoun, Justo Devilla, John Does 1 through 20, Jane Does 1 through 20 and ABC Corporations 1 through 20

      Defendants.

_____ /

# COMPLAINT

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance

Company, and Northbrook Indemnity Company ("Plaintiffs") by their attorneys Stern &

Montana, LLP, for their complaint against Defendants Mikhail Palterovich, Jake Palter, a.k.a.

Jacob Palterovich, Dmitry Shteyman, a.k.a. Dmitry Grinberg, Vladimir Trintcher, Irina



Shteyman, a.k.a. Irina Perekorenko, Isabelle Roig, a.k.a Isabelle Losardo, Pinchas Shapiro, Grigory Kliger, M.D., Mario LaPlume a.k.a Maria LaPlume Garbarino, M.D., Pierre M. Tallerie, D.C., Robert Piasio, D.C., Virginia Planas, D.C., William J. Moran, D.C., Alexander S. Fishman, Esq., S.H.P. Medical Rehabilitation Center, Inc., Sun State Diagnostic, Inc., Med Services Group, Inc., NMB Medical Group, Inc., Continental Consulting, Inc., Statewide Collections, Inc., Jack Byron, David Guenon a.k.a David Guenoun, Justo Devilla, John Does 1 through 20, Jane Does 1 through 20 and ABC Corporations 1 through 20, allege, on information and belief, as follows:

## PRELIMINARY STATEMENT

1.      For nearly four years, from 2000 through the filing of this Complaint, Defendants Mikhail Palterovich ("Palterovich"), Jake Palter ("Palter") Dmitry Shteyman ("Shteyman"), Irina Shteyman ("Irina"), Vladimir Trintcher, ("Trintcher"), Pinchas Shapiro ("Shapiro") and Isabelle Roig, a.k.a Isabelle Losardo ("Roig") (individually referred to by name and collectively referred to as the "Ringleaders") presided over an expanding organization that billed Plaintiffs in excess of $3,000,000.00 and systematically stole hundreds of thousands of dollars per year from automobile insurance companies -- activity that continues unabated to this day.

2.      The Ringleaders, save for Defendant Roig who is a licensed massage therapist, are laypeople, who are not licensed to practice any profession in the State of Florida and accomplished their theft through various nefarious illegal means, including paying "runners" to stage accidents for the referrals of "patients" who were involved in staged accidents. In addition, they implemented their massive scheme to defraud through the use of compliant doctors, who in exchange for ostensibly being paid to provide medical services, allowed their names and licenses

2

to be used by the Ringleaders to fraudulently bill insurance companies for services that were either never rendered or were medically unnecessary.

3.      The Ringleaders implemented their massive scheme to defraud through the use of compliant and complicit doctors and other licensed professionals, who in exchange for ostensibly being paid to provide medical services, allowed their names, signatures and licenses to be used to fraudulently bill insurance companies for services that were either never rendered or were medically unnecessary

4.      The Defendant licensed professionals who sold their names and licenses for use by the Ringleaders include, but are not limited to, medical doctors Mario LaPlume a.k.a Mario LaPlume Garbarino ("Garbarino") and Grigory Kliger ("Kliger") and chiropractic physicians Pierre M. Tallerie ("Tallerie"), Robert Piasio ("Piasio"), William J. Moran ("Moran") and Virginia Planas ("Planas"), each of whom allowed fictitious bills to be submitted under their names in association with one or more of the defendant clinics named herein, including S.H.P. Medical Rehabilitation Center, Inc. ("S.H.P. Medical"), Sun State Diagnostic, Inc. ("Sun State"), Med Services Group, Inc. ("MSG"), N.M.B. Medical Group, Inc. ("N.M.B. Medical"). Said providers are collectively referred to herein as the "Defendant Clinics."

5.      The Ringleaders also routinely and as a matter of practice submitted bills on behalf of the Defendant Clinics for physical therapy services and Range of Motion ("ROM") testing purportedly rendered by Yefim Griner ("Griner"), an individual, who, on information and belief, is not licensed in the State of Florida to provide such services.

6.      At all times mentioned herein, the Ringleaders operated, controlled and owned the Defendant Clinics.

7.     On information and belief, at all times mentioned herein, the Defendant Clinics were multidisciplinary medical practices created in violation of Chapter 621 of the Professional Service Corporations and Limited Liability Companies Act, which, among other things, governs the corporate practice of medical services in the State of Florida and requires any corporation that provides physician medical services to do so as a professional association owned and controlled exclusively by physicians.  The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician are felonies pursuant to Fla. Stat. § 458.327.

8.     The billing for professional services by an entity that is not owned and controlled exclusively by physicians is a violation of Fla. Stat. § 458.327.

9.     On information and belief, the patients who were treated and otherwise examined at the Defendant Clinics were never informed that their medical provider was a medical assistant or physician assistant, and more importantly, that they were entitled to see a medical doctor if they had any questions.  Instead, as a matter of practice and procedure, Defendants utilized medical and physician assistants, statutorily and commonly known as "physician extenders" to perform the initial examinations, prescribe the course of therapy, and make referrals for expensive neurological testing, including Nerve Conduction Velocity testing (NCVs) and electromyography studies (EMGs), as well as provide referrals for diagnostic imaging.

10.     To the extent the Defendant Clinics employed one or more licensed physician assistants, in violation of Fla. Stat. § 458.347, the physician assistants were not supervised by a medical doctor, nor did they consult, discuss or otherwise review their medical findings, initial evaluations, referrals, recommendations, or prescriptions for medical equipment with the supervision of a physician as required by Florida Law and, therefore, Defendants were not

entitled to reimbursement under the No-fault law for services performed by said physician assistants.

11.     To the extent the Defendant Clinics employed one or more medical assistants, in violation of Fla. Stat. § 458.3485, said medical assistants were not under the direct supervision and responsibility of a physician, nor did they consult, discuss or otherwise perform their duties with the supervision of a physician as required by Florida Law and, therefore, Defendants were not entitled to reimbursement under the No-fault law for services performed by said medical assistants.

12.     On information and belief, to the extent the Defendant Clinics employed one or more Physician Extenders (medical and physician assistants), in violation of Fla. Stat. § 458.331, the medical records submitted by Defendants failed to identify the physician extender and supervising physician by name and professional license.

13.     On information and belief, as a matter of practice, procedure and protocol, Defendants permitted massage therapists to render medical services that were beyond the massage therapists' permitted scope of practice, and billed for services purportedly performed by massage therapists, even though they were not licensed as a "massage establishment" as required by Fla. Stat. § 480.046, *et seq.,* and, therefore, Defendants were not entitled to reimbursement for said services under the No-fault law.

14.     As a matter of practice, procedure and protocol, Defendants billed for services purportedly performed by a licensed massage therapist acting under the supervision of a chiropractor, who, pursuant to Fla. Stat. § 460.413  is prohibited from delegating such services to a licensed massaged therapist.

15.     In the process of carrying out their scheme to defraud, Defendants concocted a billing scheme that was predictable in its randomness.  While the individual symptoms varied slightly from "patient" to "patient," by the conclusion of their treatment, each "patient" would receive virtually identical examinations and referrals for expensive diagnostic tests, including but not limited to NCVs, EMGs, somatosensory evoked potentials ("SSEP") and Magnetic Resonance Imaging ("MRI").

16.     Through the Defendant Clinics, the Defendants, as a matter of practice, procedure and protocol fraudulently billed for diagnostic tests that were never rendered, including EMGs, NCVs and SSEPs.  On information and belief, the reported results associated with the foregoing electro-diagnostic tests were fictitious, meaning that Defendants routinely submitted fabricated reports, findings and data to insurance companies, in general and Plaintiffs, in particular, to substantiate their fraudulent claims and induce payment.

17.     On information and belief, as a matter of practice, procedure and protocol, Defendants fraudulently presented NCV reports that were, in part or wholly, fictitious in that the supporting data values were at least, in part, incompatible with the diagnostic machines that were purportedly used to perform the tests, meaning that Defendants routinely submitted fabricated reports, findings and data to insurance companies, in general, and Plaintiffs, in particular, to substantiate their fraudulent claims and induce payment.

18.     On information and belief, as a matter of practice, procedure and protocol, Defendants engaged in upcoding and unbundling of EMG, SSEP and NCV testing.

19.     In numerous instances, the NCV studies submitted by Defendants were routinely interpreted by Defendants Garbarino and Kliger, among other Defendant Clinic doctors, to be

within normal limits.   However, the data submitted by the Defendants, upon which these interpretations were based, fell well outside normal limits and, in fact, reflected abnormal data values, suggestive or diagnostic of an underlying systemic neuropathy, which was further supported by the symptoms and physical examination findings ascribed to the patients by Defendants Garbarino and Kliger and other Defendant Clinic doctors.

20.     Were the reported abnormal data values true and the cause of the apparent neuropathy not diagnosed and treated, the "patient" would be placed at risk for progressive neurological disorders and/or underlying disease.

21.     In not seeking to determine the cause of the abnormal data values, the Defendant doctors either committed gross criminal negligence and reckless endangerment, in which they demonstrated a knowing and reckless disregard for their patients' health, or else they fabricated the medical and electro-diagnostic findings to justify further expensive treatment and diagnostic tests, and, in doing so, committed countless acts of insurance fraud.

22.     On information and belief, these abnormal electro-diagnostic results required emergent diagnostic work-ups to identify the cause of said neuropathy.  In each instance, the claimant did not receive the required follow-up or diagnostic testing consistent with the abnormal findings. Rather, the abnormal findings, which were often reported as being within normal limits, were repeatedly ignored while the "patients" continued receiving the same standardized treatments and referrals as every other "patient."

23.     If the abnormal medical histories, physical findings, test results and data values reported by Defendants were true and went untreated, the "patients" would have been left to potentially grave neuropathy or neuropathy causative disorder, including frequently fatal diseases such as

Guillaume-Barre disease, neuropathy due to cancer, auto-immune neuropathy and AIDS related neuropathy.

24.     In addition to submitting phony medical documentation and paying for staged accidents to procure patients for whom they would then bill insurance companies for services that were never rendered or were medically unnecessary, on information and belief, the Defendant Clinics were used to generate kickbacks from radiological and diagnostic entities.   In turn, these diagnostic facilities billed for magnetic resonance imaging ("MRI") that were the product of an illegal kickback and were either medically unnecessary or never rendered.

25.     Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Defendant Clinics, holding themselves out as being legitimate health care providers when, in fact, they were not. On information and belief, the Ringleaders built their fraudulent enterprise as a profit center, which included kickback schemes with every provider of health services to which the Ringleaders referred patients, but which the Ringleaders did not own or control.

26.     The Defendant Clinics, which held themselves out as being operated and controlled by properly licensed professionals, were engaged in the unlicensed practice of medicine and were in violation of the proscription against the illegal corporate practice of medicine.   In doing so, the Ringleaders perpetrated a fraud upon the public, the Plaintiffs and upon any other professional who relied upon their fictitious medical reports.

27.     The fraudulent criminal enterprise described herein not only is an imminent and ongoing threat to consumers' health, but it drains the limited health care resources of this state, resources which are already under strain to meet legitimate health care needs.   In the Second Interim

Report of the Fifteenth Statewide Grand Jury, Case No. 95,746, the Grand Jury Report addressed the problems plaguing the Florida No-fault system, and the personal injury protection ("PIP") benefits afforded therein.   In particular, the report noted that a "number of greedy and unscrupulous legal and medical professionals have turned that $10,000 coverage into their personal slush fund." In response to the Grand Jury Report and the recommendations made therein, the Florida Legislature, on October 1, 2001, enacted an omnibus anti-fraud insurance fraud measure to counteract the tax imposed by organized rings, such as the one alleged herein, upon consumers in the State of Florida.

28.    The Florida Department of Insurance estimates that insurance fraud is costing Florida consumers in excess of $6.5 billion a year and that "every insurance consumer family in the State of Florida pays over $1,414 in additional insurance premiums each year as a result of insurance fraud." The devastating impact and economic harm caused by this crime is so injurious that in a resolution issued on May 9, 2000, the Department of Insurance noted that insurance fraud is one of the most costly economic crimes in Florida, second only to purposeful tax evasion.

29.    Fraudulent schemes, such as the one described herein, also subject legitimate patients to treatment by non-physicians, masquerading as medical doctors, who are seeking to circumvent the laws enacted by the legislature of Florida to protect consumers.  Additionally, medical clinics that are treating such consumers are not owned and controlled in accordance with Chapter 621 of the Professional Service Corporations and Limited Liability Companies Act, which requires that the owners be subject to the jurisdiction of the licensing authority governing their particular profession.

30.     In contravention of the strong public policy concerns of the Florida State Legislature in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, the Defendants have circumvented the laws of the State of Florida and imperiled the welfare of the public by engaging in the wholesale purchase and misuse of medical licenses.  In so doing, the Defendants have facilitated the transfer of the right to control the practice of medicine to the Ringleaders.

31.     Moreover, through their criminal solicitation, sanctioning and sponsoring of staged accidents to recruit a patient population for the Ringleaders, Defendants jeopardized the integrity and safety of the public streets and highways of the State of Florida and thereby exposed innocent, unsuspecting victims to potentially life threatening conditions.

32.     These repeated violations of the laws established by the State of Florida to protect the public are serious in their nature and include repeated felonies that have created and will continue to create a grave danger to the public if the Defendants' wholesale practice of buying and misusing medical licenses and paying for staged accidents is not brought to an immediate end.  These practices were conducted willfully with the sole object of converting money, in disregard of their impact on the premium-paying public.

33.     In carrying out their scheme to defraud, Defendants stole hundreds of thousands of dollars from the Plaintiffs by submitting fraudulent medical claims for persons who allegedly sustained injuries covered by the Florida Motor Vehicle No-fault Law (the "No-fault Law"), as codified in Fla. Stat. §§ 627.730 through 627.7405, and Personal Injury Protection ("PIP") benefits provided under Fla. Stat. § 627.736.  Under that law, policyholders and others who suffer bodily injuries in automobile accidents can obtain payments from the policyholders'

automobile insurance companies for, among other things, reasonable and necessary medical care, including treatments, tests and medical equipment ordered by the patients' physicians. Patients can also assign those benefits to doctors and other licensed health care providers, enabling them to bill insurance companies directly for their services. Defendants created their organization to exploit that system by obtaining such assignments, and billing insurers for fictitious or unnecessary services, which were supplied by sham entities.

34.    In furtherance of their grand scheme and to ensure a steady stream of patients to the Defendant Clinics, the Ringleaders enlisted the services of runners who the Ringleaders paid to stage accidents for which the participants would be paid for treating at one or more of the Defendant Clinics. The referral to the Defendant Clinics also triggered a series of self-referrals for treatment within one or more of the Defendant Clinics and to MRI facilities, which, on information and belief, paid kickbacks to the Ringleaders for referrals from the Defendant Clinics.

35.    With respect to procuring patients for the Defendant Clinics, the Ringleaders forged relationships with runners operating on the streets of Dade and Broward Counties within the State of Florida. The Ringleaders solicited runners to stage accidents and, on information and belief, even trained participants as to how to carry them out.

36.    On information and belief, and as particularized below, Defendant Attorney Alexander S. Fishman and his paralegals, including but not limited to Defendants Jack Byron a.k.a. Jay Byron, Justo Devilla, and David Guenon a.k.a David Guenoun, are runners for one or more of the Defendant Clinics.

37.     On information and belief, in violation of Fla. Stat. §§ 817.234(9) and 877.02 Defendant Alexander S. Fishman individually and through his employees and agents, including but not limited to his paralegals, Defendants Jack Byron a.k.a. Jay Byron, Justo Devilla and David Guenon a.k.a David Guenoun solicited persons for the purpose of representation in motor vehicle tort claims or claims for personal injury protection benefits required by Fla. Stat. § 627.736.

38.     On information and belief, in violation of Fla. Stat. § 817.234(3) and, in concert with the Defendant Clinics and Ringleaders, Defendant Alexander S. Fishman knowingly and willfully assisted and conspired with claimants to file fraudulent insurance claims with insurance companies, in general, and Plaintiffs, in particular.

39.     Acting pursuant to their standard operating procedure, Defendant Shteyman, on a routine basis, met with and paid runners, either by cash or check, for staging accidents on behalf of the Defendants.

40.     The Ringleaders controlled their organization through a number of unknown co-conspirators and one known co-conspirator: Isabelle Roig, a.k.a. Isabelle Losardo, and at least six essential and complicit health care professionals:  Grigory Kliger and Mario LaPlume a.k.a Mario LaPlume Garbarino, both of whom are medical doctors licensed in the State of Florida; and Pierre M. Tallerie, Robert Piasio, Virginia Planas, and William J. Moran, who are chiropractors licensed in the State of Florida.

41.     Each member of this seven-person control group played well-defined and essential roles in Defendants' illegal scheme to defraud.

42.     To carry out their scheme, Defendants used the Defendant Clinics to generate bills for physical examinations, medical tests, medical treatments, physical therapy and chiropractic treatments that were purportedly rendered to persons involved in automobile accidents.   In addition to being used to provide self-referrals and treatment within the Defendant Clinics, the Defendant Clinics were used to provide fee-for-service referrals or kickbacks to other health care providers, such as the MRI facilities.   But, in fact, the persons purportedly treated at, and through, referrals from the Defendant Clinics were generally not injured; were involved in staged accidents; were involved in actual accidents but were uninjured; and were paid fees by runners for allowing Defendants to bill insurance companies for medical services under their names. Moreover, these persons were lured into the scheme by the additional prospect of a monetary settlement from their personal injury claim pursued by their attorneys, many of whom were assigned to them by the Defendant Clinics.   The Defendants, in turn, paid the runners an unspecified amount per staged accident.

43.     With respect to persons represented by Defendant Attorney Alexander S. Fishman, on information and belief, he either paid the clinics for referrals of patients or he referred patients whom he illegally solicited to the Defendant Clinics for treatment.

44.     The bills that Defendants generated included bills for examinations and treatments that were never rendered and other costly tests that were rarely, if ever, needed, and for medical equipment that was neither needed nor supplied.   To the extent that services and medical equipment were actually supplied, the services, by definition, were medically unnecessary and not covered, since the billed for services were rendered to persons whom the Defendants knew were involved in staged accidents or otherwise uninjured and therefore not covered under the No-fault Law.

45.    The services that Defendants purported to provide, and for which they billed the Plaintiffs, did not vary from patient to patient, or reflect any changes in the patient's condition. Instead, Defendants created a billing apparatus that was designed to exploit the No-fault Laws, and in the process, drain the maximum amount of dollars from insurance companies for each and every patient, regardless of whether treatment was required at all.

46.    The Defendant Clinics that the Ringleaders created and controlled were part of a well-organized illegal enterprise (the "Medical Network Enterprise" or the "Enterprise") that engaged in systemic and pervasive fraudulent practices that distinguished them from legitimate healthcare providers.  On information and belief, the components of that enterprise followed practices that were part of a racketeering scheme dictated by the Ringleaders and others:

- Unlike legitimate medical practices, Defendants paid people, known as "runners," to supply a steady stream of persons who allegedly had been involved in traffic accidents.  Defendants paid unspecified amounts in cash for each "patient" who was recruited, knowing that Defendants could recover that amount many times over through fraudulent billing.

- Unlike legitimate medical practices, Defendants misrepresented the existence or severity of any injuries that the patient may have had, and the course of any required treatments.

- Unlike legitimate medical practices, Defendants submitted medical reports and bills in the names of the Defendant doctors and chiropractors that in fact had not been reviewed and signed by such licensed professionals.

- Unlike legitimate medical practices, Defendants routinely submitted claims for follow-up visits that did not occur, and submitted false medical reports in support of those claims.

14

- Unlike legitimate medical practices, as part of a self-referral scheme to increase profits, Defendants routinely referred patients for NCVs, EMGs, SSEPs and spinal ultrasounds that were medically unnecessary.

- Unlike legitimate medical practices, when one of the main diagnoses was radiculopathy, Defendants frequently failed to order an EMG, which is the definitive test for the diagnosis of radiculopathy.

- Unlike legitimate medical practices, rather than perform a valid test according to national standards as they must, or refer to a legitimate practitioner, Defendants performed invalid and bogus tests that willfully misrepresented medical fact and potentially endangered the patients.

- Unlike legitimate medical practices, in exchange for kickbacks, Defendants routinely referred patients for MRIs that were medically unnecessary.

- Unlike legitimate medical practices, the doctors and chiropractors who purportedly treated the patients did not know the CPT codes under which they were billing, review the bills or narratives before they were sent to insurance company or care whether the services provided or referrals for additional testing were medically necessary.

- Unlike legitimate medical practices, the doctors and chiropractors who purportedly provided services on behalf of the Defendant Clinics did not take a medical history or undertake any efforts to determine whether the claimed injures arose out of an automobile accident and therefore would be covered under the No-fault Law.

- Unlike legitimate medical practices, Defendants submitted Health Care Finance Administration ("HCFA") 1500 claim forms falsely certifying and misrepresenting that the services reflected therein were medically necessary and personally furnished by the licensed professional therein, when in fact the services were not medically necessary. On information and belief, in numerous instances the services were provided by physician extenders, including unlicensed persons and persons acting in

15

violation of their permitted scope of practice, as defined by their respective licensing board, who were not supervised by a medical doctor as required by Florida Law.

- Unlike legitimate medical practices and in violation of Florida Law, Defendants allowed medical services to be performed by unlicensed people, by licensed professionals practicing beyond the permitted scope of practice, and by physician extenders who lacked required supervision, endangering the health and well being of those patients who received such services.

- Unlike legitimate medical practices and in violation of Florida law, Defendants allowed x-rays to be performed by unlicensed persons, endangering the health and well-being of those patients who received such services.

- Unlike legitimate medical practices and in violation of the No-fault Law, the HCFA forms submitted by Defendants did not include the countersignature of Plaintiffs' insured authorizing the release of medical records or the assignment of benefits.

- Unlike legitimate medical practices, the Defendant doctors and chiropractors, as well as unnamed physical therapists and other licensed professionals, falsely certified that they reviewed the HCFA claims forms and narrative reports before they were submitted to Plaintiffs for payment.

47.    In these and numerous other ways, Defendants sought to deceive insurers into paying fraudulent medical claims that typically reached or exceeded the maximum permitted under the No-fault law per patient.

48.    Although the components of this organization operated at several different locations, and under at least four different names, their activities -- particularly their corporate structures, recruitment of "patients," billing and collection activities -- were firmly controlled by the Ringleaders and others working under their direction and control.  Through the Ringleaders, Defendants prepared and mailed insurance claim forms in the name of all the Defendant Clinics.

The claim forms prepared by and through the Ringleaders, through Defendants Continental Consulting, Inc., and Statewide Collections, Inc., directed insurers to mail checks to post office boxes that they rented or controlled, and the proceeds of those claims were deposited into corporate checking or operating accounts under their control.

49.     The fact that the proceeds of the Medical Network Enterprise went to the Ringleaders establishes their ownership and control of the illegal Enterprise alleged herein.  That control was also demonstrated by their day-to-day operation of the Enterprise.  For example, on information and belief, the Ringleaders:

a) retained the accountant and other professionals who formed and created the corporate structures under which the Enterprise was permitted to operate;

b) routinely and as a matter of practice paid runners for staging accidents;

c) hired physicians, other professionals, physician extenders and office support staff for the Defendant Clinics, and instructed them in the procedures they were to follow;

d) participated in the preparation of standardized reports that fabricated and/or exaggerated injuries to support prescriptions for unnecessary tests, follow-up visits, and medical equipment;

e) established management companies to collect the proceeds for all of the Enterprise's illegal activities;

f) entered into contracts and agreements on behalf of the Defendant Corporations;

g) maintained and controlled the corporate books and records for the defendant corporations.

50.     On information and belief, Defendant Roig assisted, and conspired with, the Ringleaders in the management of the Enterprise.  Among other things, she:

a)  prepared fraudulent bills and sent them to the Plaintiffs;

b)  created or caused to be created fictional narrative reports of patients' conditions and added stamped signatures on those reports;

c)  prepared or caused to be created false chiropractic reports; and

d)  added the stamped signatures of physicians, chiropractors and physical therapists on HCFA claim forms that must be filed with insurance carriers under Florida Law.

51.     On information and belief, Defendants' activity promoted and facilitated other fraudulent acts that caused losses to Plaintiffs well beyond the insurance proceeds that Defendants collected.

52.     On information and belief, the fictitious record of medical treatments, and the fictitious diagnoses and narrative reports that Defendants prepared to justify their bills, were also furnished to some patients, and a discrete group of personal injury attorneys, with documentation for fraudulent personal injury claims, seeking damages for pain, suffering and lost wages.  The certainty that Defendants would grossly exaggerate any actual injury and course of treatment became a powerful inducement for certain attorneys to refer clients to the Defendants -- enabling the attorneys to profit from Defendants' fraud.   At times, Defendants entered into illicit agreements with these attorneys to share the cost of recruiting persons who were willing to participate in fraudulent claims, and who could be used to enrich the Defendants and their associates in the legal community by generating fictitious medical bills and manufacturing personal injury claims.

53.     At other times, one or more attorneys, including but not limited to Defendant Alexander S. Fishman and his law office, illegally solicited clients in violation of Fla. Stat. §§ 817.234(9)

and 877.02 and in connection therewith referred them to one or more of the Defendant Clinics because they knew the clients would receive fictitious diagnoses, narrative reports and treatment, which they used to press favorable settlements in the personal injury claims they brought on their clients' behalf.

54.    The duration, scope and nature of Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies.  Defendants did not engage in sporadic acts of fraud -- although that would be troubling enough -- they adopted a fraudulent blueprint as their business plan.  Every facet of Defendants' operation, from patient recruitment to record keeping to billing, was carried out for the purpose of committing fraud.

55.    Accordingly, Plaintiffs seek damages under the RICO statute; the Civil Remedies for Criminal Practices Act (Fla. Stat. §§ 772.104 and 772.11) and common law.

<u>**NATURE OF THE ACTION**</u>

56.    This action is brought pursuant to:

  a)  The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c)&(d) and 1964(c);

  b)  Civil Remedies for Criminal Practices Act, Fla. Stat. §§ 772.104 and 772.11;

  c)  Common Law Unjust Enrichment Founded on Violations of the Professional Service Corporations and Limited Liability Companies Act, Fla. Stat. § 621.01 et seq.) (Corporate Practice of Medicine); and

  d)  Florida State common law.

## NATURE OF RELIEF SOUGHT

57.     Plaintiffs seek treble damages that they sustained as a result of Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for medical services it allegedly rendered to individuals covered by Plaintiffs under Florida State's No-fault Law.

58.     Plaintiffs further seek a permanent injunction enjoining and restraining Defendants:

      i)     From submitting to Plaintiffs any bills seeking payment for any examination, testing, treatment and referrals arising from services purportedly rendered by or through the Defendants as described herein; and

      ii)    From initiating against Plaintiffs any legal proceedings, including but not limited to lawsuits, in any forum or jurisdiction seeking payment for, or equitable relief regarding, any examination, testing, treatment and referral arising from services purportedly rendered by or through the Defendants as described herein

59.     Plaintiffs further seek a judgment declaring:

      i)     That Plaintiffs are under no obligation to pay any of Defendants' No-fault claims due to the Defendant Clinics' illegal corporate structure;

      ii)    That the assignments of benefits received by the Defendant Clinics are void as a matter of law and that the Defendant Clinics never had, and do not now have, standing to prosecute any claim for first-party No-fault

benefits as an assignee of Covered Persons in any lawsuit or other legal proceeding commenced in state court;

iii)    That Plaintiffs are under no obligation to pay any of Defendants' No-fault claims arising from any examination, testing, treatment and referral provided to Covered Persons because of Defendants' fraudulent and deceptive scheme to induce such payments.

60.    As a result of Defendants' actions alleged below, Plaintiffs were defrauded of an amount in excess of $611,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for services never rendered or that were medically unnecessary.

## THE PARTIES

### Plaintiffs

61.    Plaintiff Allstate Insurance Company is a corporation duly existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

62.    Plaintiff Allstate Indemnity Company is a corporation duly existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

63.    Plaintiff Deerbrook Insurance Company is a corporation duly existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

64.    Plaintiff Northbrook Indemnity Company is a corporation duly existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

65.    Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of Florida and to provide automobile insurance coverage to their policyholders under and in accordance with Florida Law.

**The Defendant Clinics**

66.    Defendant S.H.P. Medical was incorporated on or about February 15, 2000 as a Florida general business corporation, with its principal place of business located at 150 N.W. 168 Street, Suite 350, Miami, Florida.  On information and belief, from the date of its incorporation until on or about January 24, 2001, Defendant Pinchas Shapiro and Defendant Irina Shteyman (on information and belief, a.k.a. Irina Perekorenko), the wife of Defendant Dmitry Shteyman, owned S.H.P. Medical.  On or about, January 24, 2001, Defendant Irina Shteyman was removed as an officer and director of S.H.P. Medical, leaving Defendant Pinchas Shapiro as its sole officer and director.

67.    Defendant Sun State was incorporated on or about May 12, 2000 as a Florida general business corporation, with its principal place of business located at 16401 N.W. 2nd Avenue, Suite 100, Miami, Florida 33169.  On information and belief, from the date of its incorporation until on or about May 14, 2001, Defendant Jake Palter was listed as the sole officer and director of Sun State.  On or about, May 14, 2001, Defendant Dmitry Shteyman was added as an officer and director of Sun State.  On or about July 19, 2002, Defendant Palter was removed as an officer and director of Sun State and Defendant Mikhail Palterovich was added as an officer and director of same.

68.    Defendant MSG was incorporated on or about September 28, 2000 as a Florida general business corporation, with its principal place of business located at 3990 W. Flagler Street, Suite

407, Miami, Florida.  On information and belief, from the date of its incorporation until on or about May 14, 2001, Defendant Irina Perekorenko (on information and belief, a.k.a. Irina Shteyman) was listed as the sole officer and director of MSG.  On or about, May 14, 2001, Defendant Irina Perekorenko was removed as the sole officer and director of MSG and was replaced by Defendants Dmitry Shteyman and Vladimir Trintcher.

69.     Defendant N.M.B. Medical was incorporated on or about December 13, 2001 as a Florida general business corporation, with its principal place of business located at 951 N.E. 167th Street, North Miami Beach, Florida.   On information and belief, from the date of its incorporation until on or about June 19, 2002, Defendant Mikhail Palterovich, a.k.a. Michael Palterovich, was listed as the sole officer and director of N.M.B. Medical.  On or about, June 19, 2002, Defendant Palterovich was removed as the sole officer and director of N.M.B. Medical and Defendant Dmitry Grinberg, on information and belief a.k.a. Dmitry Shteyman, was added as sole officer and director of N.M.B. Medical.

70.     On information and belief, at all times mentioned herein, the owners, officers and directors of the Defendant Clinics, include but are not limited to the Defendant Ringleaders Mikhail Palterovich, a.k.a. Michael, Jake Palter, Dmitry Shteyman, a.k.a. Dmitry Grinberg, Vladimir Trintcher, Pinchas Shapiro, Irina Shteyman, and Isabelle Roig, a.k.a. Isabelle Losardo.

**The Management Company Defendants**

71.     Defendant Continental Consulting, Inc. ("Continental") is a corporation organized under the laws of the State of Florida, with offices located at 16401 N.W. 2nd Avenue, Miami, Florida. On information and belief, Defendant Palterovich is identified in the Articles of Incorporation as an owner and the sole officer and director of Continental, and lists his address as 100 Bayview

23

Drive, #2119, Sunny Isles Beach, Florida.  On information and belief, Continental was used to funnel money from the Defendant Clinics to the Defendants, as well as through the creation of a series of unknown shell and dummy corporations to be identified during the course of discovery and added as defendants at the appropriate time in accordance with the Florida Rules of Civil Procedure.

72.     Defendant Statewide Collections, Inc. ("Statewide") was a corporation organized under the laws of the State of Florida, with offices located at located at 951 N.E. 167th Street, Suite 102, Miami, Florida.  On information and belief, Defendant Roig is identified in the Articles of Incorporation as the sole director of Statewide.  On information and belief, Statewide was used to funnel money from the Defendant Clinics to the Defendants, as well as through the creation of a series of unknown shell and dummy corporations to be identified during the course of discovery and added as defendants at the appropriate time in accordance with the Florida Rules of Civil Procedure.

73.     On information and belief, at all times mentioned herein, the owners, officers and directors of the Defendant Clinics, include but are not limited to the Defendant Ringleaders Mikhail Palterovich, Jake Palter, Dmitry Shteyman, Irina Shteyman, Vladimir Trintcher, Pinchas Shapiro, and Isabelle Roig, a.k.a. Isabelle Losardo.

**The Individual Ringleader Defendants**

74.     Defendant Dmitry Shteyman (on information and belief, a.k.a. Dmitry Grinberg) is a natural person residing, on information and belief, at 2290 N.E. 197th Street, Unit 14V, Miami, Florida and is one of the principals, owners, officers and directors of the Defendant Clinics and Management Companies.  At all times mentioned herein, Defendant Shteyman was one of the

masterminds of Defendants' elaborate scheme to defraud and, in concert with Defendants Palterovich, Palter, Trintcher, Irina, Shapiro, and Roig established the Defendant Clinics that fraudulently submitted bills to insurers, in general, and Plaintiffs, in particular; established the Defendant Billing Companies to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; retained counsel; and solicited healthcare providers who sold their names and licenses to the Defendants to facilitate fictitious billing.

75.     Defendant Irina Shteyman (on information and belief a.k.a. Irina Perekorenko), is a natural person residing, on information and belief, at 2290 N.E. 197th Street, Unit 14V, Miami, Florida, and is one of the principals, owners, officers and directors of the Defendant Clinics.

76.     Defendant Mikhail Palterovich, a.k.a. Michael Palterovich, is a natural person residing, on information and belief, at 100 Bayview Drive, #2119, Sunny Isles Beach, Florida and is one of the principals, officers and directors of the Defendant Clinics and Management Companies. On information and belief, Palterovich is related to Defendant Jake Palter, a.k.a. Jacob Palter and Jacob Palterovich and Yakov Palterovich.  On information and belief, Defendant Palterovich uses multiple aliases and possesses multiple identifying information, in order to conceal his identity and to deceptively create the appearance that different people own or are associated with particular entities when, in fact, he owns them.   On information and belief, Defendant Palterovich also maintains a residence in Staten Island, New York and is the illegal owner of Church Avenue Medical Care, P.C., which was established in contravention of Article 15 of the New York State Business Corporation Law, which proscribes the ownership of a professional corporation by unlicensed individuals.   On information and belief, similar to the Defendant Clinics, Church Avenue Medical Care, P.C. fraudulently billed insurance companies under New York State's No-fault system.  On information and belief, Defendant Palterovich was the owner

of Church Avenue Professional Management Corp., which was established, pursuant to a standard No-fault scheme to defraud that is prevalent in New York State, to funnel money from Church Avenue Medical Care, P.C. to the management company.

77.     Defendant Jake Palter, a.k.a. Jacob Palter and Jacob Palterovich and Yakov Palterovich, is a natural person residing in the State of Florida and, on information and belief, was until July 19, 2002 the president and director of Defendant Sun State, with offices located 16401 N.W. 2nd Avenue, Suite 100, Miami, Florida.  On information and belief, Defendant Palter is related to Defendant Palterovich.

78.     Defendant Vladimir Trintcher is a natural person residing, on information and belief, at 100 Bayview Drive, #2119, Sunny Isles Beach, Florida, and is one of the principals, officers and directors of the Defendant Clinics and Management Companies.

79.     Defendant Pinchas Shapiro is a natural person residing in the State of Florida and is one of the principals, officers, and directors of the Defendant Clinics.

80.     Defendant Isabelle Roig, a.k.a. Isabelle Losardo, is a natural person residing, on information and belief, at 15711 S.W. 137th Avenue, Apartment 101, Miami, Florida and is one of the principals, officers and directors of the Defendant Clinics and Management Companies.

**Licensed Professional Defendants**

81.     Defendant Pierre M. Tallerie is a natural person residing in the State of Florida at 3826 Pebblebrook Court, Coconut Creek, Florida and is licensed as a chiropractic physician to practice chiropractic care in the State of Florida under license number CH8149 issued by the Florida State Department of Health on or about January 12, 2001.

82.      Defendant Mario LaPlume a.k.a Mario LaPlume Garbarino is a natural person residing in the State of Florida at 411 S.W. 27th Avenue, Suite 200, Miami, Florida and is licensed as a physician to practice medicine in the State of Florida under license number ME48489 issued by the Florida State Department of Health on or about June 26, 1986.

83.      Defendant William J. Moran is a natural person residing in the State of Florida at 1523 Arezzo Circle, Boynton Beach, Florida and is licensed as a chiropractic physician to practice chiropractic care in the State of Florida under license number CH8239 issued by the Florida State Department of Health on or about June 28, 2001.

84.      Defendant Grigory Kliger is a natural person residing in the State of Florida at, on information and belief, Major Boulevard, Suite 604, Orlando, Florida 32819, and is licensed as a physician to practice medicine in the State of Florida under license number ME82106 issued by the Florida State Department of Health on or about March 29, 2001.  On information and belief, on or about February 28, 2003, Defendant Kliger was arrested in New York State for, *inter alia*, his involvement in an insurance fraud scheme in which he was charged by the Suffolk County District Attorney's Office with among other things, insurance fraud.

85.      Defendant Virginia Planas is a natural person residing in the State of Florida at, on information and belief, 1802 North University Drive, Plantation, Florida and is licensed as a chiropractic physician to practice chiropractic care in the State of Florida under license number CH7133 issued by the Florida State Department of Health on or about May 1, 1996.

86.      Defendant Robert Piasio is a natural person residing in the State of Florida at, on information and belief, 10061 Sunset Strip, Sunrise, Florida and is licensed as a chiropractic

physician to practice chiropractic care in the State of Florida under license number CH3907 issued by the Florida State Department of Health on or about December 3, 1981.

**The Runner Defendants**

87.    On information and belief, Defendant Jack Byron a.k.a. Jay Byron is a natural person residing in the State of Florida and is a runner who was paid by the Ringleaders to stage accidents and refer the occupants of motor vehicles involved in staged accidents to one or more of the Defendant Clinics.

88.    On information and belief, Defendant David Guenon a.k.a David Guenoun is a natural person residing in the State of Florida and is a runner who was paid by the Ringleaders to stage accidents and refer the occupants of motor vehicles involved in staged accidents to one or more of the Defendant Clinics.

89.    On information and belief, Defendant Justo Devilla is a natural person residing in the State of Florida and is a runner who was paid by the Ringleaders to stage accidents and refer the occupants of motor vehicles involved in staged accidents to one or more of the Defendant Clinics.

90.    Defendants John Does 1 through 20 (collectively referred to as "John Does") are "runners," persons who the Defendants employed to recruit, solicit and induce individuals to stage accidents and refer individuals, who were not injured, or were only minimally injured as a result of being involved in a low impact accident, for medical treatment at the Defendant Clinics for which one or more of the Defendant Clinics submitted fraudulent claims to Plaintiffs, and for which the John Does received a fee.  These individuals conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein.  These individuals will be added

28

as defendants when their names and the extent of their participation become known through discovery.

91.     Each of the Runner Defendants conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein.

**The Attorney Defendants**

92.     Defendant Alexander S. Fishman is a natural person residing in the State of Florida at, on information and belief, 8031 Lagos de Campo Boulevard, Tamarac, Florida and is licensed to practice law in the State of Florida under license number 705179 issued by the Florida Supreme Court on or about October 6, 1987, and is admitted to practice law in the State of New York.

93.     Defendants Jane Does 1 through 20 (collectively referred to as "Jane Does") are attorneys who solicit claimants and/or pay runners to recruit, solicit and induce individuals to stage accidents and refer individuals, who are not injured or are only minimally injured, to their offices to pursue a personal injury action on their behalf.  These individuals conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

94.     Each of the Attorney Defendants conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein.

**The ABC Corporations**

95.     Defendant ABC Corporations 1 through 20 are shell and dummy corporations owned, operated and controlled by the Ringleaders and others for the purpose of concealing and

laundering money in violation of federal law.   These corporations are the alter egos of the Ringleaders and conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein.   These corporations will be added as defendants when their names and the extent of their participation become know through discovery.

## JURISDICTION AND VENUE

96.    The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*; 28 U.S.C. § 1331; and principles of pendent jurisdiction.

97.    The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

98.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

99.    Plaintiffs underwrite automobile insurance in the State of Florida, including but not limited to Dade and Broward Counties.

100.    Under the Florida Motor Vehicle No-fault Law ("No-fault Law"), Fla. Stat. §§ 627.730 through 627.7405, Plaintiffs are required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants and pedestrians ("Covered Persons") of their insured motor vehicles that arise out of the ownership, maintenance, or use of such motor vehicles.

101.    On information and belief, the Defendant Clinics are ostensibly health care providers that bill for treatments to, among others, individuals covered under the No-fault Law.  In exchange for their services, the Defendant Clinics accept assignments of benefits from their patients covered under the No-fault Law ("No-fault claimants") and submit claims for payment to No-Fault insurance carriers, in general, and to Plaintiffs, in particular.

102.    In purported compliance with the No-fault Law, the Defendant Clinics submitted statements of charges for medical services rendered, using the HCFA 1500 claim form approved by the Florida State Department of Insurance.

103.    Pursuant to Fla. Stat. § 817.234(1)(b), the reverse side of the standard HCFA claim form submitted to Plaintiffs by the Defendant Clinics contained the following warning at the header of the page:

> "Any person who knowingly files a statement of claim containing any misrepresentation of any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

104.    To process and verify claims submitted by the Defendant Clinics, Plaintiffs required, and the Defendant Clinics submitted, a written report of the history, condition, treatment, dates and costs of such treatment of the injured Covered Person, together with the certification in the HCFA claim form that the treatment or services rendered were reasonable and necessary and were incurred as a result of an automobile accident to determine their entitlement to recover No-Fault benefits, as well as to the alleged medical care and treatment rendered to Covered Persons, for which the Defendant Clinics were seeking payment from Plaintiffs.

31

105.    To fulfill its obligation to promptly process claims under the No-fault Law, Plaintiffs justifiably relied upon the bills and documentation submitted by the Defendants in support of their claims and has paid the Defendants based on the representations and information that Defendants mailed to the Plaintiffs.

106.    On information and belief, the Ringleaders created the Defendant Clinics to fraudulently bill No-fault insurance carriers for services that were never rendered or that were medically unnecessary.

107.    Under the complex scheme, the Ringleaders created S.H.P. Medical on or about February 15, 2000.  Thereafter, on or about May 12, 2000, as S.H.P. Medical's practices began to be scrutinized by insurance companies and, on information and belief, law enforcement, the Ringleaders formed Sun State as a new corporation, which similarly billed insurance companies under the No-fault system.  Subsequently, the Ringleaders formed MSG and N.M.B. Medical on September 28, 2000 and December 13, 2001, respectively, to also bill for No-fault services, which they did concurrently, sometimes to the same patients, as well as successively.

108.    In actuality, the Defendant Clinics were used interchangeably by the Ringleaders and were operated with a complete disregard for the requirements that they maintain separate and distinct legal identities.

109.    For example, the Certificates of Incorporation for S.H.P. Medical, Sun State and MSG were each filed by a certified public accountant named Martin Alman, with offices located at 17290 NE 19th Avenue, North Miami Beach, Florida.  Similarly, each of the foregoing Defendant Clinics designated Martin Alman's office as the address to which the Secretary of State was instructed to mail process that is served upon them.  Each of the Defendant Clinics used one or

both of the Defendant Management Companies, Defendants Continental and Statewide, who prepared and generated the fictitious narrative reports and bills that were submitted to insurers, in general, and Plaintiffs, in particular.

110.    At least two or more of the Defendant Corporations, including the Defendant Clinics and Management Companies, maintained their offices in the same buildings, with, for example, Sun State and Continental both maintaining an office at 16401 NW 2nd Avenue, Miami, Florida and N.M.B. Medical and Statewide both maintaining an office at 951 N.E. 167th Street, North Miami Beach, Florida.  Each of the Defendant Clinics employed the same doctors and utilized at least one of the two Defendant Management Companies.  Each of the Defendant Clinics relied almost entirely on the use of runners to recruit their patient population. Indeed, even though the Defendant Clinics were assigned their own tax identification numbers ("TIN") by the Internal Revenue Service ("IRS"), Defendants submitted bills to Plaintiffs using one another's TIN's.

111.    The Defendant Clinics were brazenly used to fraudulently bill No-fault insurance carriers for services that were never rendered or that were medically unnecessary.   Through the Defendant Clinics, the Ringleaders solicited and paid for staged accidents to procure "patients." Once the patients were referred to one or more of the Defendant Clinics, the Ringleaders produced, generated and manufactured false and fraudulent medical bills and reports and made referrals to diagnostic imaging facilities in exchange for kickbacks.

112.    On information and belief, the Ringleaders created the Management Companies to serve as billing management companies for the various Defendant Clinics that were ostensibly rendering services to persons covered by the Florida State No-fault Law.   In reality, the Management Companies were conceived and functioned as conduits in which to funnel

payments made by insurance companies, in general, and Plaintiffs, in particular, to the Ringleaders.

## A CENTRALIZED SCHEME TO DEFRAUD

113.    The Ringleaders conducted their business, affairs and operations from various locations and through various individuals, known and unknown to Plaintiffs.

114.    On information and belief, virtually every corporate document and public filing associated with the Defendant Clinics can be traced to the Ringleaders and one centralized scheme to defraud.  Each of the Ringleaders exercised oversight and control over the criminal enterprise.

115.    By way of example, although Defendants Irina Shteyman and Pinchas Shapiro were the original owners listed on the certificate of incorporation for S.H.P. Medical.  On information and belief, Irina Shteyman's husband, Defendant Dmitry Shteyman, referred to himself as the "Office Manager" and was responsible for S.H.P. Medical's day-to-day operations, including the issuance of checks, the purchase of equipment and the recruitment of patients through the use of runners.

116.    On information and belief, when Defendant Irina Shteyman was removed as an officer and director of S.H.P. Medical on or about January 24, 2001, Defendant Dmitry Shteyman continued to control its operations.

117.    In addition to working for S.H.P. Medical as its "officer manager," Defendant Dmitry Shteyman is also an officer and director of Sun State and MSG.

34

118.   On information and belief, despite being lay individuals who were not licensed physicians, Defendant Shteyman and the other Defendant Ringleaders were responsible for the day-to-day operations of the Defendant Clinics, including the development and implementation of a standard medical protocol and procedures.

119.   On information and belief, the Defendant Ringleaders had well defined roles and jointly shared other responsibilities.

120.   For example, Defendant Shteyman, and others unknown to Plaintiffs, were responsible for the overall, day-to-day operations of the Defendant Clinics and his responsibilities included hiring the health care professionals and instructing them on the protocol they were required to follow.

121.   On information and belief, Defendant Shteyman, along with the Ringleaders and others unknown to Plaintiffs, supervised and directed the support staff in the creation of the fictitious medical records and bills that were submitted to insurance carriers.   In particular, Defendant Shteyman and others unknown to Plaintiffs, in concert with one or more of the Defendant Ringleaders, knowingly managed, supervised, participated in, conducted and oversaw the day-to-day billing operations of the Defendant Clinics.

122.   Sun State's billing was prepared by and submitted to Plaintiffs by Defendant Continental, ostensibly a billing management company, which is owned by Defendant Palterovich.

123.   On information and belief, Continental employed Defendant Roig as its office manager and Defendant Roig was responsible for, among other things, supervising Continental's support

staff, generating fictitious reports and bills to be submitted to the insurance companies and collecting the payments remitted by insurers.

124.    In addition to purportedly providing billing management services to Sun State, Continental also submitted bills on behalf of MSG.

125.    Defendant Palter, who on information and belief is related to Defendant Palterovich, is listed as an officer and director with Defendant Dmitry Shteyman at Sun State, which was incorporated on May 12, 2000, only three months after S.H.P. Medical's incorporation.

126.    Defendant Trintcher is listed as an officer and director with Defendant Dmitry Shteyman at MSG, which was incorporated on or about September 28, 2000, approximately four months after the incorporation of Defendant Sun State.

127.    On information and belief, on or about October 19, 2001, almost a year after Continental was incorporated, Defendants incorporated Statewide, with Defendant Roig listed as the sole officer and director.

128.    Thereafter, with the exception of N.M.B. Medical, Statewide began submitting fictitious billing and supporting documentation on behalf of the Defendant Clinics in the same manner as its predecessor, Continental, did before Statewide's incorporation.

129.    Although S.H.P. Medical and MSG are purportedly independent corporations, public records on file with local and/or State offices reveal that each designated 17290 NE 19th Avenue, North Miami Beach, Florida, as the address to which the Secretary of State should forward process.

130.    Similar to S.H.P. Medical and MSG, Continental designated 17290 NE 19th Avenue, North Miami Beach, Florida, as the address to which the Secretary of State should forward process.

131.    On information and belief, Martin Alman, a certified public accountant, with an office located at 17290 NE 19th Avenue, North Miami Beach, Florida, filed the Certificates of Incorporation for S.H.P. Medical, Sun State, MSG and Continental.

132.    On information and belief, although they are purportedly distinct entities, many of the same healthcare professionals purportedly render services on behalf of the Defendant Clinics.

133.    Additional examples of the Defendants' centralized scheme are evident from the following:

- The Defendant Clinics were used interchangeably.   By way of example, on information and belief, the form letters submitted by Continental on behalf of Sun State and MSG were prepared by the same person, using the exact same template for both clinics, in many instances, with the same handwritten entries provided.

- On information and belief, and as further evidence of the interchangeability of the Defendant Clinics and Defendant Management Companies, the same address is listed with the Department of State for Mikhail Palterovich as officer/director of Continental, and for Vladimir Trintcher as officer/director of MSG, to wit:   100 Bayview Drive, #2119, Sunny Isles Beach, Florida.

- On information and belief, and as further evidence of a centralized scheme, Continental submitted a demand letter ostensibly on behalf of Sun State in which the accompanying bill was for neurological services purportedly rendered by Defendant Garbarino for MSG, showing that the billing records and reports for the Defendant Clinics were maintained together and prepared by the same person.

- On information and belief, together with their bills and medical records, Sun State and MSG submitted applications for No-fault benefits notarized by Defendant Isabelle Losardo, who uses the name Isabelle Roig when signing correspondence through the Defendant Management Companies. On information and belief, the use of different individual names for the billing company and the notary was intended to create a misimpression that two distinct people were performing the functions when, in fact, it was the same person, to wit: Defendant Roig.

- On information and belief, Continental conducted its business from the same address and office suite as Sun State, 16401 NW 2nd Avenue, Miami, Florida.

- On information and belief, and as a further example of the interchangeable use of the Defendant Companies, both Continental and Statewide submitted bills on behalf of one or more of the Defendant Clinics in connection with the same claims.

- On information and belief, the Defendant Clinics submitted bills to insurance companies, in general, and Plaintiffs, in particular, pertaining to the same file and claimant, for the same services, which in some instances were rendered on the same date.

- As indicated in their Certificates of Incorporation, with the exception of N.M.B. Medical and Statewide, the same accounting firm, Martin Alman, incorporated each of the Defendant Clinics and Continental.

- On information and belief, the bills, boilerplate narratives, medical records and accompanying collection form letters submitted by Defendants for the Defendant Clinics contained similar format, type and point settings.

- The HCFA claim forms that Defendants submitted to Plaintiffs each designated P.O. Box 601487, or P.O. Box 600820 or other post office boxes maintained and/or established by the Ringleaders, as the addresses for payment.

- On information and belief, one or more of the Ringleaders controlled and maintained the P.O. Boxes in which insurance carriers, in general, and Plaintiffs, in particular,

38

were instructed on the HCFA claim forms and collection letters to remit their payments to the Defendant Clinics.

- On information and belief, one or more of the Ringleaders were signatories on the bank accounts for the Defendant Clinics and Management Companies.

- On information and belief, none of the bank accounts for the Defendant Clinics and Management Companies were opened, controlled or included as a signatory a licensed health care professional who worked for any of the Defendant Clinics.

- On information and belief, the Defendant Clinics and Management Companies maintained their bank accounts with Union Bank of Florida and at the same branch in Plantation, Florida.

- On information and belief, the Ringleaders used the Defendant Clinics' bank accounts to enrich themselves through their scheme to defraud and to pay those involved in their organization including, but not limited to Grigory Kliger, M.D., Mario LaPlume a.k.a Mario LaPlume Garbarino M.D., William J. Moran, D.C., Pierre M. Tallerie, D.C., Robert Piasio, D.C. and Virginia Planas, D.C., who sold their names and licenses to facilitate the fraudulent conduct alleged herein.

**Defendants Staging of Accidents to Recruit "Patients"**

134.    The system that Defendants created required a steady influx of persons to portray as patients.  Defendants recruited persons who could fulfill that need, regardless of whether those persons were involved in actual automobile accidents or had any actual injuries.  The Defendants procured many of their "patients" by paying runners to stage accidents, paying runners who staged accidents, paying runners for referring individuals who were involved in actual accidents but were not injured or were only minimally injured, and from "walk-in" patients who, based on common knowledge in the neighborhood, knew that the Defendant Clinics paid for their patients and arranged for lawyers to represent those receiving "treatment" at their clinic.

39

135.    On information and belief, the Defendants' dependence on staged accidents to recruit patients for the Defendant Clinics was open and brazen, with one or more of the Defendants training prospective "claimants" how to participate in staged accidents.

136.    In addition, in the pursuit of creating fictitious claims, on information and belief, Defendant Shteyman and others accompanied willing participants to insurance brokers to obtain insurance for vehicles that would thereafter be used in staged accidents.

137.    The paying for staged accidents was a significant source of the Defendant Clinics' business and was implemented on a widespread and pernicious scale of unprecedented magnitude. Using a stable of runners to orchestrate staged accidents, the Defendant Clinics were guaranteed a steady stream of claimants for whom the Defendant Clinics could fraudulently bill insurance companies for a host of services that were never rendered or were medically unnecessary, and who would provide the vehicle for fee-for-service referrals in which the Defendant Clinics would accept kickbacks for various diagnostic tests, such as MRIs and x-rays.

138.    The arrangements with the runners were predicated on the runners being able to document the "accidents" that were being "sold" to the Defendants. The documentation included physical evidence of an accident. Before accepting and agreeing to pay for a referral, whether it was from a staged accident or an actual accident in which the claimants were uninjured, Defendant Shteyman and/or other support personnel from the Defendant Clinics would inspect the damage to the vehicle. Similarly, paper documentation also played a critical role in the Defendants scheme to defraud, since as part of the No-fault discovery process, insurance companies would request copies of the police accident report. On information and belief, the Defendants would pay the runners between $500 and $1000 per individual who appeared on the

police accident report and reported to their offices at least once to complete the No-fault applications, assignment of benefits forms and related No-fault paperwork that were necessary for the Defendants to establish a No-fault claim on their behalf and to start fraudulently billing the insurance companies. Following a staged accident, the runner would obtain a copy of the police report from the police precinct and thereafter transport each individual to one of the Defendant's Clinics where he or she would meet with Defendants Shtyeman, Roig and/or other support personnel to complete the aforementioned No-fault claim paperwork. Once the paperwork was complete, the runner would meet with Defendant Shtyeman, who would pay the runner a fee per individual who was involved in the staged accident.

139.    On information and belief, the Ringleaders repeatedly solicited, sanctioned and conspired with runners and others to stage accidents within the State of Florida. Defendant Shtyeman, in concert with the other Ringleaders, paid or arranged for the runners to be paid for staged accidents in which the participants were referred to the Defendant Clinics.

140.    By way of example, on or about April 23, 2001, Covered Persons for whom S.H.P. Medical submitted No-fault claims, and who for purposes of confidentiality are identified only as W.D. and C.W., were involved in a staged accident. On information and belief, W.D. and C.W. entered a vehicle insured by Plaintiff Allstate with the knowledge and intent to participate in an intentionally caused accident. Specifically, W.D. and C.W. were driven by a third party to a prearranged location in the late evening where they entered the insured vehicle, which was disabled, and remained inside until the adverse vehicle, a pick-up truck containing four complete strangers, intentionally drove into the stationary and non-functional insured vehicle, striking it in the rear. In addition, the unidentified third party, John Doe, referred C.W. to Defendant Alexander S. Fishman to pursue a claim. Notably, both W.D. and C.W. treated at S.H.P. Medical,

a medical clinic that similarly referred its patients to Defendant Alexander S. Fishman for representation in connection with their PIP benefits and third party claims. Furthermore, the three claimants in the adverse vehicle treated at Allied Medical Center in Orlando, which is not named as a defendant in this action but is another medical clinic that bills for multidisciplinary treatment to Covered Persons involved in automobile accidents. No-fault claims were established and submitted to Plaintiff Allstate, which assigned claim number 1654837424 to the file. In addition to receiving physical therapy at S.H.P. Medical, each Covered Person was referred by Defendant Robert Piasio, D.C. to Defendant Mario LaPlume a.k.a Mario LaPlume Garbarino, M.D. for expensive neurological testing.

141.     On information and belief, Defendant Byron is a runner for S.H.P. Medical and Sun State and has staged numerous accidents on their behalf, for which S.H.P. Medical and Sun State have paid him. By way of example, on or about November 4, 2000, Covered Persons for whom S.H.P. Medical submitted No-fault claims, and who for purposes of confidentiality are identified only as L.W. and D.W., were involved in a staged accident. On information and belief, L.W. and D.W. entered an older model vehicle, to wit: a 1986 Buick Regal, insured by Plaintiff Allstate with the knowledge and intent to participate in an intentionally caused accident. Specifically, on information and belief, L.W. and D.W. conspired with Defendant Byron to have the insured vehicle struck in the rear by an adverse vehicle. Consistent with the modus operandi for staging accidents, the adverse vehicle was clearly at fault and fled the scene, thereby positioning any personal injury claim that followed for a quick settlement. One week following the accident, Defendant Byron obtained a copy of the police report and transported the participants to S.H.P. Medical, where each one met with support people to complete and sign the necessary No-fault applications and related forms to establish their No-fault claims, which were mailed by

Defendants to Plaintiff.  Based thereon, No-fault claims were established and submitted to Allstate, which assigned claim number 3975202840 to the file.

142.    On information and belief, on August 25, 2001, a Covered Person for whom S.H.P. Medical submitted No-fault claims, and who for purposes of confidentiality is identified only as L.R., loaded his vehicle, which Plaintiff Allstate insured, with two additional occupants and arranged for it to be struck in the rear by an adverse vehicle.  Notably, the adverse vehicle was a rental car from Enterprise, which contained four occupants, three of whom, on information and belief, were complete strangers to the driver.  On information and belief, all claimants in the insured vehicle were referred for treatment to S.H.P. Medical, while all claimants in the adverse vehicle were referred for treatment to Citimed, which is not named as a defendant in this action, but is another medical clinic that bills for multidisciplinary treatment to Covered Persons involved in automobile accidents.  No-fault claims were established and submitted to Plaintiff Allstate, which assigned claim number 1654837424 to the file.

143.    Further demonstrating his proclivities as a runner, Defendant Byron arranged for still another Allstate insured vehicle to be involved in a staged accident, within a short time after the inception of its insurance policy.  On information and belief, on July 26, 2001, Covered Persons for whom S.H.P. Medical submitted No-fault claims, and who for purposes of confidentiality are identified only as C.B., B.J. and R.C., entered an older model vehicle, to wit:  a 1992 Subaru, insured by Plaintiff Allstate, with the knowledge and intent to participate in an intentionally caused accident.  Specifically, on information and belief, C.B., B.J. and R.C. intentionally drove the insured vehicle into an adverse vehicle, to wit:  a 1987 Honda Accord.  Consistent with the staging of accidents, both vehicles involved were older models, each vehicle contained multiple passengers, one vehicle was clearly at fault thereby positioning any personal injury claim that

43

followed for a quick settlement, and the vehicles sustained minor damage. Notably, on information and belief, Defendant Byron referred all claimants in the insured vehicle to S.H.P. Medical for treatment, for which he received a fee from S.H.P. Medical. In addition, Defendant Byron referred one or more claimants in the adverse vehicle to Sun State, for which he was also paid a fee by Sun State. No-fault claims were established and submitted to Allstate, which assigned claim number 1655293684 to the file.

144.    On information and belief, Defendant David Guenon a.k.a David Guenoun is a runner for MSG and has staged numerous accidents on its behalf, for which MSG has paid him. By way of example, on information and belief, Defendant Guenon arranged for a vehicle insured by Allstate and occupied by Covered Persons, to be involved in a staged accident, which resulted in No-fault claims being filed with Allstate. Conveniently, Defendant Guenon was present at the scene of the accident, approached claimants immediately following the accident, and referred them to MSG for medical treatment, for which he was paid a fee. Additionally, Defendant Guenon lured the claimants with promises of developing a "case" and a referral to an attorney, Joseph Rocca, who would develop a case for them where they would receive $6,700.00. Coincidentally, on information and belief, Joseph Rocca, who is not named as a defendant herein, was arrested in or about 1997, for his participation in a staged accident and insurance fraud ring. No-fault claims were established and submitted to Plaintiff Allstate, which assigned claim number 1655427522 to the file.

145.    Further, on October 18, 2001, only one day after the policy of insurance was issued by Plaintiff Allstate, Covered Persons, who for purposes of confidentiality are identified only as S.J., M.J. and G.J., entered their insured vehicle, to wit:  a 1990 Toyota Corolla, with the knowledge and intent to participate in an intentionally caused accident. Thereafter, the Covered

Persons proceeded to a prearranged location, to wit:  NE Miami Court and 62nd Street in Dade County, where the insured, intentionally drove the vehicle through a stop sign, purposefully striking an adverse vehicle.  With respect to the staging of the accident, all claimants refused medical treatment at the scene of the accident; all claimants in the insured vehicle received their initial medical treatment at or about the same time and from the same provider, to wit:  Sun State Diagnostics; all claimants in the adverse vehicle received their initial medical treatment at or about the same time and from the same provider, All Care Medical Facility, which is not named as a defendant in this action but is another medical clinic that bills for multidisciplinary treatment to Covered Persons involved in automobile accidents; and importantly, the policy of insurance was terminated on or about December 9, 2001, less than one month after the accident date, for non-payment.  No-fault claims were established and submitted to Allstate, which assigned claim number 1655351532 to the file.

146.   A further example of the means that Defendants employed to obtain their patient population is evident in another accident, which on information and belief, was also intentionally caused involving an Allstate insured.  In the context of this accident, and remarkably similar to the accident noted above, on May 15, 2000, two Covered Persons, who for purposes of confidentiality are identified only as F.V. and T.J., entered a vehicle insured by Plaintiff Allstate with the knowledge and intent to participate in a staged accident.  Thereafter, on information and belief, F.V. and T.J. proceeded to a prearranged location, to wit:  NE Miami Court and 62nd Street in Dade County, where the insured intentionally drove through a stop sign and into the front end and side of an adverse vehicle which conveniently fled the scene.  The circumstances surrounding this accident are consistent with the tell-tale signs of an intentionally caused or staged accident, to wit:  the accident involved what appeared to be a low impact collision; the

45

adverse vehicle conveniently fled the scene thereby by precluding a complete investigation surrounding the circumstances of the instant accident; on information and belief, no injuries were ever claimed by occupants of the adverse vehicle; claimants refused medical treatment at the scene of the accident; both claimants indicated they were referred by John Doe to Sun State where they received their initial medical treatment at or about the same time and from the same providers.  No-fault claims were established and submitted to Plaintiff Allstate, which assigned claim number 1654828282 to the file.

147.    On information and belief, the examples of staged accidents set forth herein are typical of the pervasive pattern and practice implemented by the Defendants to procure patients for treatment at the Defendant Clinics.    Often the staged accidents involved innocent and unsuspecting victims, callously thrust into harms way, without regard to their safety or well-being, in pursuit of Defendants' own greed.

148.    In addition, on information and belief, following each accident, Defendants Byron, Guenon, or John Doe, obtained a copy of the police report in connection with the accident and transported the participants to S.H.P. Medical, Sun State, or MSG.    After meeting with Defendants Shteyman, Palter or Palterovich, and other support people, and completing the requisite No-fault applications and related No-fault forms, each claimant received scripted treatments, examinations, tests and referrals detailed herein.

149.    The Defendant Clinics, in short, were established for the purpose of exploiting insurance coverage, particularly under the No-fault Law, and not for the purpose of providing legitimate medical care.  Day after day, year after year, Defendants billed Plaintiffs for medical services that

were either not provided, or were provided without medical benefit or justification, solely to extract money from insurers.

150.    The acts of the Defendants Clinics were done under the direction of the Ringleaders and the other individuals named as Defendants in this action.

151.    On information and belief, the Ringleaders were the principal beneficiaries of this scheme, amassing millions of dollars in fraudulent proceeds that were used, among other things, to purchase multiple homes and real estate.

### SOLICITATION AND THE USE OF RUNNERS BY DEFENDANT ALEXANDER S. FISHMAN

152.    On information and belief, Defendant Fishman was intimately involved in the fraudulent scheme depicted herein.

153.    Indicative of his knowledge of and participation in the fraudulent activities alleged herein, Defendant Fishman incorporated N.M.B. Medical and Statewide, both of which have designated his office as the registered agent for service of process by the Secretary of State. Further indicative of his complicity is the fact that Defendant Fishman maintained an office at the same address as N.M.B. Medical and Statewide.

154.    On information and belief, indicative of his knowledge of and participation in the fraudulent activities alleged herein, Defendant Fishman maintained offices at both S.H.P. Medical and MSG wherein he would meet with patients being treated there for the purpose of being retained as counsel in connection with their personal injury claims.

155.   On information and belief, indicative of his knowledge of and participation in the fraudulent activities alleged herein, Defendant Fishman shared office space and equipment with S.H.P. Medical, including stationary, postage meters and other office supplies.

156.   Indicative of his knowledge and participation in the fraudulent activities alleged herein, on information and belief, Defendant Fishman represented S.H.P. Medical, Sun State and MSG in No-fault suits filed against insurance carriers, in general, and Plaintiffs, in particular.

157.   Indicative of his knowledge and participation in the fraudulent activities alleged herein, Defendant Fishman maintained a regular presence at the Defendant Clinics wherein he "signed-up" claimants who were involved in automobile accidents in connection with their personal injury claims.

158.   Indicative of his knowledge and participation in the fraudulent activities alleged herein, on occasions where Defendant Fishman was unable to visit the Defendant Clinics, the Defendant Clinics provided transportation for the claimants to his office where they met with either Defendant Fishman or a "paralegal" from his office, and he was retained as counsel in connection with their personal injury claims.

159.   Indicative of his knowledge and participation in the fraudulent activities alleged herein and in apparent conflict with the prevailing canons of ethics governing attorney conduct, Defendant Fishman also represented claimants who were allegedly involved in automobile accidents in connection with their personal injury claims, even though, pursuant to the terms of the assignment given by his clients to the Defendant Clinics, the Defendant Clinics reserved the right to sue his clients in the event the Defendant Clinics were unable to recover payment directly from the insurance carriers.

160.    On information and belief, Defendant Fishman, in violation of the anti-solicitation laws of Florida, recruited clients who were purportedly injured in automobile accidents and referred them to the Defendant Clinics wherein his clients would receive treatment for services that were not medically necessary or fictitious medical reports would be created for services that were never rendered.

161.    On information and belief, Defendant Fishman employed "paralegals," including Defendants Jake Byron, a.k.a. Jacob Byron, Justo Devilla and David Guenon a.k.a David Geunoun, who were in fact runners and who, in violation of the anti-solicitation laws of Florida, solicited individuals who were purportedly injured in automobile accidents to Defendant Fishman's office for representation in connection with their personal injury claims.

162.    On information and belief, and by way of example, in connection with Defendant Fishman's solicitation of individuals who were involved in motor vehicle accidents, Defendant Fishman, through one or more of his paralegals, employees and/or agents, and for the purpose of filing a personal injury claim on their behalf, obtained police reports and visited the homes of individuals who were involved in motor vehicle accidents.

163.    On information and belief, on one such occasion, on or about December 17, 2000, following a motor vehicle accident that occurred on or about December 7, 2000, Defendant Devilla visited the home of a Covered Person, who for purposes of confidentiality is identified only as M.F., an Allstate insured, with a copy of the police accident report relating to the accident in hand.    On information and belief, Defendant Devilla's presence at M.F.'s home was unsolicited and he produced a business card indicating he was a legal representative and medical consultant.    During the visit, Defendant Devilla pressured and coerced M.F. into seeking

49

treatment at MSG, a clinic that he personally drove her to the next day, on December 18, 2002. While at MSG, claimant saw Defendant Fishman at the clinic. On the day of her initial visit, M.F. met with support staff for MSG to complete and sign the necessary No-fault application and related forms to establish M.F.'s No-fault claim, which were mailed by Defendants to Plaintiff Allstate.

164. On information and belief, M.F. was not predisposed to seek treatment or pursue a personal injury claim at the time Defendant Devilla visited her, ten days after the accident. Nevertheless, as a result of said visit, MSG filed a No-fault claim on M.F.'s behalf and Defendant Fishman was retained as M.F.'s counsel. Based thereon, a No-fault claim was established and submitted to Plaintiff Allstate, which assigned claim number 1655073300-01 to the file. On information and belief, M.F. received substantially similar scripted treatment as those of other individuals who received the treatment detailed herein at one or more of the Defendant Clinics.

165. By way of an additional example of Defendant Fishman's unlawful solicitation of individuals to pursue personal injury claims, following an automobile accident on or about October 18, 2001, in which three relatives were occupants in Allstate's insured vehicle, Defendant Jack Byron appeared at the occupants' home with a copy of the police report and directed them to S.H.P. Medical for treatment. Each of the occupants was taken to S.H.P. Medical by Fishman's representative. While at S.H.P. Medical, one or more of the claimants saw Defendant Fishman at the clinic. On the day of their initial visit, each of the occupants met with support staff at S.H.P. Medical to complete and sign the necessary No-fault application and related forms to establish their No-fault claims, which were mailed by Defendants to Plaintiffs.

166.   Based thereon, No-fault claims were established and submitted to Plaintiff Allstate, which assigned the primary claim number 1655346276 to the file.  On information and belief, each claimant received substantially similar scripted treatments detailed herein.

167.   On information and belief, Defendant Fishman knowingly and willfully assisted, conspired and urged claimants to submit fraudulent insurance claims in violation of Fla. Stat. § 817.234 (3).

168.   On information and belief, Defendant Fishman participated in the conduct of the criminal enterprise alleged herein.

169.   On information and belief, Defendant Fishman possessed discretion and control over the criminal solicitation of "patients" who were referred to the Defendant Clinics for treatment.  By serving as a runner, providing counsel and legal advice, and directing claimants that he and/or his office recruited to the Defendant Clinics, Defendant Fishman conducted and participated in the conduct of the criminal enterprise alleged herein and, to that extent, directed the enterprises affairs.

170.   On information and belief, Defendants Byron, Devilla and Guenon did violate Fla. Stat. § 817.234 (3) with the assistance, conspiracy and urging of Defendant Fishman.

171.   On information and belief, Defendants Byron, Devilla and Guenon, serving as runners, exercised discretion in the recruitment of claimants for the Defendant Clinics and Defendant Fishman and, to that extent, conducted and participated in the conduct of the criminal enterprise alleged herein, as well as directed its affairs in relating thereto.

**Defendant Medical Clinic Scheme**

172.    The incorporation of sham medical clinics that were controlled and operated by lay individuals who were motivated by greed and not the need of any legitimate patient base, and the paying for staged accidents and of runners for referring people who were involved in actual accidents, but were not injured, was only the starting point of Defendants' scheme to defraud. Once the sham medical clinics were created, the staged accidents and referrals by runners became their lifeblood, the very sustenance of their continued existence, ensuring a steady stream of people for whom they could generate fraudulent bills for services never rendered or that were medically unnecessary and could make unnecessary referrals to providers of expensive diagnostic services in exchange for kickbacks.  The staged accidents, and the use of runners for referrals of those who were involved in legitimate accidents but were uninjured, provided the platform in which the Ringleaders, aided by co-conspirators, were able to engage in a systematic, fraudulent billing scheme premised entirely on their ability to pass millions of dollars through the Defendant Clinics, which were established to exploit the No-fault system.

173.    On information and belief, the Ringleaders operated, controlled and managed the Defendant Clinics and Management Companies and employed personnel who were responsible for creating and generating fraudulent bills, medical records and No-fault forms to be submitted to insurance carriers.

174.    On information and belief, through the date of the filing of this complaint, the Ringleaders created the Defendant Clinics, ostensibly owned by different people, in order to falsely lead No-fault insurance carriers, in general, and Plaintiffs, in particular, to believe that each were separate, distinct and independent entities.

175.   On information and belief, each of the Ringleaders had defined roles.  Shtyeman, who was known as the "office manager," was responsible for the overall operations of the Defendant Clinics on a daily basis.  His responsibilities included hiring the health care professionals and coordinating and paying the runners.

176.   On information and belief, Roig, together with Shtyeman and others, including but not limited to Defendants Trinchter, Palter, Palterovich, Irina and Shapiro, supervised and directed the support staff in the creation of the fictitious medical records and bills that were submitted to insurance carriers.

177.   On information and belief, at all times mentioned herein, Roig, in concert with Shtyeman and others, including but not limited to Defendants Trinchter, Palter, Palterovich, Irina and Shapiro, knowingly managed, supervised, participated in, conducted and oversaw the day-to-day billing operations of the Defendant Clinics.  Roig's and Shtyeman's responsibilities and activities included, *inter alia:*

> a)  soliciting and maintaining relationships with runners;
>
> b)  encouraging people to participate in staged accidents;
>
> c)  conducting staged accident workshops for prospective participants;
>
> d)  making payoffs to runners who brought in individuals who were purportedly involved in automobile accidents to enable the Defendants to bill for services that were medically unnecessary or were never rendered;
>
> e)  falsifying the information contained in the HCFA forms submitted by the Defendant Clinics to No-fault insurance carriers, in general, and Plaintiffs, in particular, by preparing and submitting fraudulent support documentation;

f)  billing for services never rendered and altering test dates and results to justify extensive physical therapy, chiropractic treatment and diagnostic testing;

g)  generating fraudulent supporting documentation, such as narratives and test results in order to bill for electro-diagnostic tests, including EMG, NCV and SSEP tests, as well as other expensive diagnostic tests that were never conducted or that were medically unnecessary;

h)  manufacturing bogus test and raw data results to substantiate billing for NCV, EMG and other expensive diagnostic tests that were never conducted or that were medically unnecessary;

i)  Making self-referrals for NCVs, EMGs and other diagnostic tests in order to allow the Defendants to generate more revenue for diagnostic imaging and electro-diagnostic referrals;

j)  making referrals for MRIs in order to allow the Defendants to recover kickbacks for diagnostic imaging referrals;

k)  generating boilerplate, computer generated medical reports containing false information to justify extensive examinations, treatments and diagnostic testing; and failing to provide medical and chiropractic documentation that justified the patient's course of treatment; and

l)  billing for purported physical therapy, chiropractic services and other medical services that were medically unnecessary or never rendered.

178.    The Defendant Ringleaders devised and carried out a scheme to maximize the production of fraudulent bills by routinely billing insurers for the same massive battery of treatments, tests and other services, regardless of the existence or true nature or extent of the alleged injuries.

179.    On information and belief, the Ringleaders routinely engaged in a pattern and practice of up-coding bills submitted to insurance companies, in general, and Plaintiffs, in particular, for physical therapy and/or manipulation and traction.

180.    On information and belief, the licensed professionals who purportedly provided the treatment to the claimants did not read the medical reports that were submitted to insurance carriers bearing their names; did not know the CPT codes for which services were rendered; did not take a medical history; and, during the initial evaluation of a Covered Person, did not seek to determine whether the complained of injuries resulted from a motor vehicle accident to determine whether the claim was covered under the No-fault Law.

**The Mechanics of the Scheme to Defraud**

181.    As part of the fraudulent billing scheme, participants in staged accidents or individuals who were in actual accidents but were uninjured would be transported or referred to one of the Defendant Clinics by the runner who staged the accident or otherwise contacted an individual following an accident.  The participants or Covered Persons would be interviewed by Defendant Shteyman and/or other support staff for the purpose of establishing that they had or could obtain a copy of the police accident report to document their claim and to inspect the physical damage to the insured vehicle.  Upon satisfying the initial threshold inquiry for "treating" at one of the Defendant Clinics, the Covered Persons would be given various No-fault forms to complete upon entering a particular clinic for the first time.  The No-fault forms set forth all the information necessary for the Defendant Clinics to establish a file and prepare bills, including, but not limited to, claimant address, claimant information, claim number, policy number, name of insured, name of No-fault carrier and assignment of benefits forms.

182.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit, the Defendant Clinics would generate a boilerplate narrative report to justify the extensive and aggressive prescription of treatments and diagnostic testing that would immediately follow.

183.    As further part of the fraudulent billing scheme, a Covered Person's initial office consultation at any one of the Defendant Clinics would automatically trigger a series of internal billing practices and procedures in which Defendants would bill for services, including, but not limited to, physical therapy and chiropractic treatment rendered a minimum of five times per week during the first two weeks of treatment, followed by a reduction thereafter to four days per week, to three days per week, to two days per week. Routine billing procedure also resulted in expensive electro-diagnostic studies, regardless of whether such treatments and tests were actually performed or medically necessary. In addition, the Defendant Clinics referred patients for MRIs and x-rays, the latter of which the Defendant Clinics submitted bills for reimbursement to insurance carriers. The treatments and referrals for kickbacks were all part of Defendants' scheme to maximize profits through their illicit activities.

184.    In addition, demonstrating a common and centralized scheme, the licensed professionals who purportedly treated Covered Persons at the Defendant Clinics were primarily the same people, regardless of the clinic. For example, both Sun State and MSG regularly submitted bills and medical reports in the names of Defendants Garbarino, Kliger, Moran and Griner, an unlicensed individual under whose name the Defendants were billing for professional services.

56

185.    Initial office consultation at the Defendant Clinics similarly triggered automatic billing for follow-up examinations, testing, and treatment, which they would bill the Plaintiffs for regardless of whether or not the follow-up activity ever took place, or was at all necessary.

186.    In their pursuit of greed, Defendants devised a scheme best characterized as "symptom creep" whereby the initial examination showed findings suggestive of merely soft tissue injury without radiculopathy.  Subsequent evaluations by the same or other medical providers under Defendants employ and control documented symptoms and/or physical examination findings that were never before mentioned.  These new "findings' became incorporated into some but not all of the subsequent examinations to create a pattern of contradictory findings inconsistent with a true clinical condition.  The new findings were then cited in the letters of medical necessity as justification for additional expensive testing, such as the MRIs.

187.    As a matter of standard operating procedure, Covered Persons had x-rays taken at the Defendant Clinics on the day of their first office visit and were not referred for MRIs until approximately four weeks after they started treatment at the Defendant Clinics.

188.    Defendants' scheme to defraud was predictable in its progression of symptoms and findings.  Although their billing scheme allowed for slight variations in medical histories and initial examination reports, each claimant received virtually identical examinations, diagnostic tests, self-referrals for electro-diagnostic testing and referrals for MRIs and x-rays.

189.    That Defendants were creating and generating boilerplate reports is evident from the frequent misuse of proper pronouns in referring to the Covered Persons, misspelling of names and consistent spelling and grammatical mistakes, which would appear in each of the Defendant

Clinics' reports, further supporting that the medical records were being prepared by the same person or group of people as part of a centralized scheme to defraud.

190.    Irrespective of whether a claimant was purportedly treated at S.H.P. Medical, Sun State, MSG or N.M.B. Medical, the examinations, treatments and tests varied slightly, if at all, from clinic to clinic or from patient to patient.  Alleged treatments at the Defendant Clinics followed a predictable, scripted pattern, reflecting the fact that the bills were prepared at one centralized location to meet the needs of one centrally controlled scheme.

191.    By way of example, on information and belief, S.H.P. Medical, Sun State and MSG submitted bills, bearing Defendant Garbarino's name, in excess of the amount customarily charged for such neurological tests and that were either never rendered, were medically unnecessary, or were inadequately performed.

192.    In addition, Defendant Garbarino submitted neurological reports for S.H.P. Medical, Sun State, and MSG that used the same template, including the same header and similar recommendations, including in one instance, the submission of identical reports for two claimants associated with claim number 1655293361.

193.    Defendants Tallerie, Piasio and Planas submitted reports for S.H.P. Medical and Sun State that used the same template, including the same header, recommendations for multiple modalities of physical therapy and aggressive regiments of physical therapy five times per week for the first two weeks of treatment.

194.    By way of example of the boilerplate nature of the Defendant Clinics' reports, under Allstate Claim numbers 3975202840 (Piasio in association with S.H.P. Medical), 1655361507

(Tallerie in association with Sun State), 3975355416 (Planas in association with S.H.P. Medical), 1655266359 (Tallerie in association with Sun State), 165507887 (Piasio in association with S.H.P. Medical), 1655340386 (Tallerie in association with Sun State), 1655340303 (Tallerie in association with Sun State), and 1655185666 (Planas in association with S.H.P. Medical), each of the initial medical reports follow the same boilerplate template.

195.    Additional examples of Defendants' apparent manufacture and use of boilerplate reports and recommendations are found in files relating to Allstate claim numbers 1655215372 (Kidd in association with MSG), 1655342457 (Mart in association with MSG), and 1655232054 (Planas in association with S.H.P. Medical), all of which contain bills, supporting documentation and findings relating to various Covered Persons.

196.    In addition to fabricating patient symptoms and examination findings, Defendants' use of their fraudulent billing system to generate bills for standardized batteries of procedures -- based upon profitability rather than need -- is evident from the substantially similar pattern of treatment administered to claimants by and through any of the Defendant Clinics.  In the vast majority of cases, each claimant at the Defendant Clinics began with an initial office visit and x-ray, received follow-up examinations, physical therapy and chiropractic treatment five times per week, and purportedly received, at a minimum, a self-referral for electro-diagnostic testing, including but not limited to NCVs, EMGs and SSEPs.  Following a scripted formula, Defendants made or caused to be made "referrals" for a series of MRIs, at other entities that participated in Defendants' scheme and paid kickbacks for the opportunity to similarly fraudulently bill insurance companies for unnecessary services.

197.    Irrespective of whether a claimant was purportedly treated at any one of the Defendant Clinics, a review of the medical records submitted by them demonstrates that the examinations, treatments and tests varied slightly, if at all, from one Defendant Clinic to the next and from patient to patient.  Alleged treatments at any of the Defendant Clinics followed a predictable, scripted pattern, reflecting the fact that the bills were prepared at one centralized location to meet the needs of one centrally controlled scheme.   Moreover, the claimants treatment at the Defendant Clinics generally ended abruptly without any indication in the medical records that they had received optimal care or benefit from the prescribed course of treatment.  Rather, the cessation of treatment appeared to coincide with the exhaustion of the claimants' PIP benefits under the No-fault Law.

198.    Once the PIP benefits were exhausted, Defendants failed to follow-up on the diagnoses and apparent medical conditions they had fabricated to justify the aggressive physical therapy and expensive electro-diagnostic tests for which they billed and for which they submitted fraudulent documentation, including false interpretations of unnecessary medical testing.

199.    On information and belief, Defendants routinely billed for, among other things, NCV and evoke potential studies purportedly performed by the Defendant Doctors, including but not limited to Defendant Garbarino, to rule out radiculopathy.  On information and belief, to confirm or rule out a diagnosis of radiculopathy, an NCV or SSEP is insufficient, and an EMG must be performed to establish the diagnosis.  Notwithstanding the foregoing, Defendants routinely billed for NCV testing for the alleged purpose of evaluating radiculopathy, without conducting EMG testing.  To perform NCVs or SSEPs to diagnose radiculopathy lacks medical efficacy, and therefore represents fraudulent billing for services that were medically unnecessary.  By way of example, such instances where the NCVs and/or SSEPs was purportedly performed to diagnose

or rule out radiculopathy, but no correlative EMG was performed, are found in bills mailed and submitted by Defendants in connection with the following Allstate claim numbers: 3975149512, 1655098819 and 165507330.

200.    On information and belief, as a matter of practice, pattern and protocol, Defendants submitted bills, medical reports, documentation of medical necessity and test results to Plaintiffs relating to neurological examination and NCV and EMG testing performed on Covered Persons, which, if true, indicated that the patients were suffering from polyneuropathy or polyradiculopathy that required immediate diagnoses and treatment.   Notwithstanding the foregoing, Defendants routinely interpreted these blatantly abnormal results as normal, or else diagnosed polyneuropathy as part of their list of diagnoses, but failed to pursue these critical diagnoses.

201.    On information and belief, polyneuropathy means that there is an underlying illness or metabolic process affecting multiple nerves in the body.  It is critical that if such condition exists, it must be fully evaluated and diagnosed so as to address the underlying causative medical problem.  If left undiagnosed and untreated, the patient will most likely experience progression of the underlying illness or disease process, resulting in permanent impairment of the nervous system and quite possibly death due to the underlying process.  Faced with such findings, it is incumbent on the electro-diagnostic physician to properly interpret the electro-diagnostic findings, and then personally undertake the requisite diagnostic evaluation or refer the patient to a specialist for that diagnostic evaluation.

202.    On information and belief, polyradiculopathy means inflammation or dysfunction of more than one nerve root.    Polyradiculopathy is similar to polyneuropathy in that

polyradiculopathy is usually caused by a diffuse or disseminated process within the spinal canal that can include cancer, infection and other inflammatory processes. Upon finding evidence of a polyradiculopathy, it is incumbent upon the supervising physician to recognize this possibility and pursue the required diagnostic evaluation to discover the underlying clause of the polyradiculopathy or else refer the patient to a specialist for this evaluation.

203.   On information and belief, the NCVs and EMGs submitted by Defendants indicated, as a matter of practice, pattern and protocol that the patients suffered from polyneuropathy or polyradiculopathy, which results were routinely ignored and for which the patients never received treatment or further diagnostic evaluation. On information and belief, the tests were ignored because they were known to be fictitious and therefore not indicative of any underlying condition warranting additional evaluation or diagnostic testing of the Covered Person.

204.   On information and belief, there are only two possible explanations for the failure to correctly interpret these blatantly abnormal results despite the fact that Defendants submitted bills and supporting documentation to Plaintiffs indicating that Defendant Garbarino and others had performed the required analysis and interpretation: either Defendant Garbarino and others never reviewed these results, or, in pursuit of their fraudulent scheme, they were callously indifferent to the health and welfare of their patients.

205.   On information and belief, while the NCV testing may be done by a technician, the supervising physician must review the results prior to "unhooking the patient" from the EMG/NCV machine in case any further testing must be done or any portion of the testing needs to be repeated and verified. The supervising physician is then required to evaluate every element

of the electro-diagnostic data to identify abnormalities according to the standard procedures of electro-diagnostic medicine.

206.    On information and belief, failure to perform the required analysis of the data constitutes misrepresentation of the work performed by the physician to merit reimbursement for services rendered and thereby constitutes fraudulent billing.  More importantly, assuming that the data is valid, failure to fully and diligently perform these analyses recklessly endangers the patient, since in the present case, the likely cause of the pattern of polyneuropathy with conduction block includes progressively fatal diseases including AIDS related neuropathy, (Guillaume-Barre), polyneuropathy of systemic cancer and exposure to toxins.  If the patients truly have these electro-diagnostic findings, and if the cause of these electro-diagnostic findings is one of these progressive and often fatal diseases, failure to review the data appropriately and recognize these obvious findings delays diagnosis and treatment of these diseases that may be treatable if recognized early enough.  Furthermore, by performing an EMG/NCV test and then, as a pattern and practice, misinterpreting blatantly abnormal results as normal, other physicians in the future might rely upon this erroneous normal test, and thereby further delay diagnosis and treatment of these grave diseases.

207.    On information and belief, since the testing was a total fabrication, none of the medically accepted electro-diagnostic protocols were followed.

208.    On information and belief, notwithstanding such exigent circumstances, Defendants ignored these potentially grave findings, because they were fallacious.

209.    On information and belief, despite these obvious abnormalities, Defendant Garbarino documented that these studies were normal, using the exact language present in his other reports,

and treatment by Defendants remained the same.  Additional examples of Defendants' apparent manufacture of symptomologies and test results are found in files relating to Allstate claim numbers:  1655323721, 1655316477 and 1655132593, all of which contain bills, supporting documentation and findings relating to various Covered Persons, which required emergent care and if left untreated would likely result in progression of the underlying illness or disease, resulting in permanent impairment of the nervous system, and possibly in death.

210.   As a matter of practice, procedure and protocol, Defendants fraudulently billed for diagnostic tests that were never rendered, including needle EMGs for which they tested an inadequate number of limb muscles, thereby rendering the EMG medically invalid and misrepresenting that they had performed a "complete" EMG as required by the CPT code.  By presenting these CPT codes to Plaintiffs, they misrepresented the services purportedly rendered and billed for services, which were not rendered.  By choosing to perform medically invalid testing, Defendants willfully and materially misrepresented their findings and conclusions as valid medical findings when in fact they were not.

211.   With respect to billing for needle EMGs, on information and belief, such testing was never rendered or performed.  On information and belief, notwithstanding that the test results and supporting documentation submitted in support of a claim for such testing, EMG needles were, in fact, never inserted into the skin and muscle of the Covered Person.  By definition, a needle EMG requires multiple needle insertions into the patient's muscles.

212.   On information and belief, Defendants mailed and submitted numerous claims for payments, nearly all of which reflect services that were never rendered and/or are predicated on fabricated test results and supporting documentation.

64

213.    On information and belief, Defendants purportedly used a diagnostic machine known as the Cadwell 5200 or the Cadwell Sierra LT and other similar EMG machines to perform NCVs, SSEPs and EMGs.  On information and belief, the data values reflected in some of the test results and documentation submitted by the Defendant Clinics are incompatible with the actual diagnostic machine and are wholly or partly fictitious.

214.    On information and belief, some of the data values reflected in the test results and other documentation submitted by the Defendant Clinics to insurers contain misrepresentations of test results that could not have been produced by a Cadwell 5200 electro-diagnostic machine or a similar machine, meaning within a reasonable high degree of scientific certainty that the reports were altered or are wholly fictitious.

215.    On information and belief, the Defendants created, utilized, designed and/or procured word processing software that worked in conjunction with the diagnostic machines that were purportedly used by the Defendant Clinics to create phony reports and data values that resemble real reports that are generated by the diagnostic machines.  Such reports, however, were not legitimate or created through the administration of tests performed on Covered Persons or patients.  Rather, the reports were wholly fabricated for the purpose of substantiating claims for expensive neurological diagnostic tests that were never performed.

216.    In addition to creating fictitious EMG test results and upcoding, Defendants also mailed and submitted bills to Plaintiffs for such services, even though their own documentation indicated that they did not test a sufficient number of peripheral limb muscles to satisfy the definition of a complete EMG.  By way of example, such instances where the EMG reports failed to demonstrate that a complete EMG was performed are found in reports and bills mailed and

submitted by Defendants in connection with the following Allstate claim numbers 1654837424, 1655160933, 3975123616, 1655050167 and 3975527576.

217.    With respect to NCV testing, Defendants engaged in an unlawful pattern of billing for services never rendered.  Specifically, Defendants routinely billed for eight units of sensory NCV testing under CPT code 95903 indicating that eight nerves were tested, when, in fact, the supporting documentation mailed and submitted by Defendants to Plaintiffs shows testing limited to four nerves.  By way of example, such instances of billing for services not rendered are found in bills mailed and submitted by Defendants in connection with the following Allstate claim numbers:  1655346276, 3975527576 and 3975123616.

218.    Under CPT code 95903, Defendants billed for F waves routinely performed in a manner that renders the test medically invalid and is thereby a violation of the requirements for use of CPT code 95903.  Billing for F wave under CPT 95903 requires at least 10 stimulations of the nerve, in order to obtain valid data.  Defendants routinely stimulated the nerve only 4 to 8 times, thereby rendering the results invalid and misrepresenting the nature of the services and the medical validity of their conclusions.  By way of example, such instances of medically invalid F waves are found in bills and medical reports mailed and submitted by Defendants in connection with the following Allstate claim numbers: 1655346276, 3975527576 and 3975123616.

219.    On information and belief, none of the Covered Persons suffered the grave symptoms reported by Defendants.  Rather the severe findings reported by Defendants were used to justify additional expensive diagnostic tests and follow-up treatments.   On information and belief, Defendants routinely upcoded office visits to a level not supported by the clinical circumstances or the clinical documentation as required for use of the office visit CPT codes.

220.    On information and belief, the fact that Defendants used their billing machinery to fabricate fraudulent claims is also evident from the fact that with respect to the four claims, Sun State, MSG and S.H.P. Medical mailed bills and supporting medical records to Plaintiffs indicating that they rendered the same services on the same date to the same claimant.

221.    By way of example, Sun State, MSG and S.H.P. Medical mailed bills and computer generated medical records for neurological examinations that each clinic purportedly administered on the same dates to each Covered Person under Allstate claim numbers 1654802758-02, 1654837424-02, 1654837424-03, and 1654859386-01, respectively. Further, Sun State and MSG each billed for NCV testing of the same Covered Person that was purportedly conducted at each of their clinics on the same dates in connection with claim number 1655386595-01.

222.    By way of additional example, the billing for NCVs and other treatments that were purportedly rendered to the same patients on the same dates at two of the Defendant Clinics further demonstrates an intentional, concerted effort by the Ringleaders to generate money by billing for fictional services. On information and belief, the services for which they sought payment could not be justified as having to be duplicated on the same day at the same location by two purportedly different clinics; it is doubtful that any were rendered at all.

223.    On information and belief, there is at least one instance where the Defendant Clinics submitted bills to Plaintiffs for identical services -- in excess of nineteen physical therapy sessions -- they purportedly rendered on the same date, serving to underscore the fact that the Defendants' billings were driven by Defendants' greed and brazenness, as well as a common and

integrated billing system that automatically triggered billings for services, regardless of whether they were rendered.

224.    By way of example of the Defendants' billing for services never rendered, with respect to Allstate claim number 1655340303, Sun State billed Allstate a total of $1,980 for an initial evaluation and physical therapy that was purportedly performed on or about November 7, 2001, over four months after the accident occurred on or about July 31, 2001.  The foregoing occurred even though, on information and belief, the Covered Person was uninjured and never treated at this facility.  On information and belief, at the time of the accident, the Covered Person was with a friend, who was uninjured but did treat at Sun State.  Once equipped with the information relating to the accident, Defendants established a No-fault claim in the name of the Covered Person who did not treat there.  On information and belief, because the billed for treatment occurred four months after the accident, Defendants backdated the initial report from Defendant Garbarino to indicate the initial treatment commenced shortly after the accident.

225.    By way of additional example of the Defendants' billing for services never rendered, Defendant S.H.P. Medical mailed bills and supporting documentation to Plaintiffs for chiropractic manipulation, massage therapy, manual therapy and neuromuscular reeducation purportedly rendered to a Covered Person under claim number 3975202840.  During a recorded statement conducted on or about January 15, 2001 said Covered Person denied ever receiving any of the foregoing modalities.  Likewise, S.H.P. Medical submitted bills and supporting documentation to Plaintiffs for mechanical traction, manual therapy and neuromuscular re-evaluation purportedly rendered to a Covered Person under claim number 1654909132.  During a recorded statement conducted at the law office of Defendant-Attorney Fishman, said Covered Person denied receiving any of the foregoing modalities.

226.    Additional examples of Defendants' pattern, practice and protocol of billing for services never rendered is evident under claim numbers 165507887 and 3975248413.  In each of the foregoing, Defendants billed for one or more modalities that were never rendered.  For instance, under claim number 16507887, Defendant S.H.P. Medical submitted bills and supporting documentation for chiropractic adjustments and manual therapy, but during an examination under oath ("EUO") taken on October 10, 2001, said Covered Person unequivocally denied receiving any treatment consistent with the modalities billed.  Similarly, under claim number 3975248413, S.H.P. Medical mailed bills for, among other things, ultrasounds, massage therapy, chiropractic adjustments and electro-diagnostic testing it ostensibly provided to a Covered Person.  However, in a recorded statement, the Covered Person denied having any of the foregoing treatments, tests, or modalities.

227.    By way of further example of the boilerplate operation established by Defendants, Defendants generated an extensive series of identical bills for successive sets of claimants – two and three at a time -- who were supposedly injured in automobiles insured by Plaintiffs.  On information and belief, each set of two or three claimants purportedly sought medical attention at the Defendant Clinics, following their alleged accidents.  Defendants then generated a series of bills for each alleged victim.  When looked at in unison, it becomes clear that the bills for each one of the patients represent charges for virtually identical treatments, rendered by virtually the same physicians, neurologists, specialists, chiropractors and physical therapists on or about the same dates.  Defendants' billing documents represented that every alleged patient in this sample received virtually identical diagnostic tests, including NCVs, x-rays and MRIs.

228.    On information and belief, the bills and documentation submitted by the Defendant Clinics in support of their claims, included fraudulent narrative reports and records that

69

intentionally misrepresented, exaggerated and falsified the condition and test results of Covered Persons. Defendants' billing documents, in these and every other submission, also contained the implicit misrepresentation that the services were administered and the bills were generated by licensed professionals.

229.  On information and belief, in some instances and in contravention of Florida Law, Defendant Shtyeman's father, Valentino Shtyeman, performed x-rays at S.H.P. Medical, even though he is not licensed to do so, thereby exposing people, who were not injured to begin with, to unnecessary radiation and jeopardizing their health.

230.  The performance of x-rays by unlicensed professionals is widespread and Defendants are grossly indifferent to the potential health hazards that arise from unnecessarily exposing individuals to radiation. In addition to allowing Defendant Shtyeman's father to perform x-rays, on information and belief, with respect to Allstate claim number 1655420378, MSG, in clear contravention of Florida Law, allowed its receptionist, Hector, to perform x-rays.

231.  On information and belief, Defendants routinely and as a matter of practice held out lay persons as licensed health care professionals, when in fact they were not. By way of example, Defendants falsely held out Yefim Griner ("Griner") as a licensed health care professional, when in fact he is not licensed to practice any healthcare profession in the State of Florida.

232.  On information and belief, Defendants submitted bills to Plaintiffs for professional services under Griner's name and social security number, when he did not perform the professional services and, under the law, he could not have performed any professional service as he was not licensed to do so under Florida State Law. By way of example, Defendants submitted bills to Plaintiffs for professional health services, to wit:  range of motion and muscle tests

ostensibly administered by Griner in the following Allstate claims: 1655451167, 1655471793, 1655448726, 1655490116, 1655444634 and 1655477345.

233.    On information and belief, Griner was employed as a data entry clerk, responsible for inputting information into a computer program that generated reports for range of motion tests. Although Griner's functions were limited to imputing data, Defendants generated reports with Griner's name appearing thereon and falsely represented that (a) he was a licensed health care professional and (b) he had performed the range of motion and muscle tests, for which Defendants submitted bills to Plaintiffs for reimbursement.  Although bills for ROM testing were submitted under Griner's name and social security number as the purported "service provider," the insurers were directed to remit payment to a post office box established, maintained, and controlled by the Defendants.

234.    On information and belief, as part of the fraudulent billing scheme, many of the medical records were composed and generated before or well after the purported examinations, treatments or tests allegedly took place and were submitted by the Defendants to Plaintiffs to fraudulently "document" their claims for payment.

235.    Further evidence of the fact that the Defendant Clinics were operated as part of a centralized scheme to defraud are the numerous instances in which Sun State and MSG billed under the same TIN. Each TIN assigned by the IRS is unique and belongs solely to applicant entity.   By way of example, Sun State's and MSG's TIN numbers are: 651011264 and 651043610, respectively.  Notwithstanding the uniqueness of their respective numbers, Sun State billed Plaintiffs using MSG's TIN in connection with at least twenty-five separate claim files, further demonstrating that they were part of a common scheme, that they were controlled and

operated by and through the Defendants and that the Defendant Clinics were in fact alter egos—interchangeable billing components of one massive enterprise created to defraud insurance companies.

**Other Violations of State Licensing Requirements**

236.   In contravention of Florida Law, as a matter of practice, procedure and protocol, Defendants routinely billed for services performed by massaged therapists, physician assistants and medical assistants who were not supervised by a physician.  As such, Defendants were not entitled to reimbursement under the No-fault law for services purportedly rendered by the foregoing individuals.

237.   Medical assistants and physician assistants are creations of the Florida medical licensing statutes and related provisions.  Physicians are the only ones who can supervise these physician extenders.  In contravention of Florida Law, any supervision that was provided to physician assistants and medical assistants was done under the direction of chiropractors acting outside of the scope of their license.

238.   In contravention of Florida Law, as a matter of practice, procedure and protocol, Defendants routinely billed for services performed by unlicensed individuals.

239.   In contravention of Florida Law, on information and belief, the Defendant Clinics are not licensed as "massage establishments" as that term is defined under Fla. Stat. § 480.046, *et seq.* and, therefore, were not entitled to reimbursement under the No-fault Law for services purportedly rendered by a massage therapist.

**The Providers**

240.    On information and belief, the Ringleaders purchased the right to use the names and professional license numbers of various health care providers (including but not limited to the Defendant Doctors) for the purpose of submitting fraudulent claims to No-fault carriers, in general, and Plaintiffs, in particular.  Defendants then billed for services that were never rendered or were medically unnecessary under those providers' names.  The names of the providers that the Ringleaders purchased include, but are not limited to, the following:

        a)   Grigory Kliger, M.D.

        b)   Mario LaPlume Garbarino, M.D.

        c)   Pierre M. Tallerie, D.C.

        d)   Robert Piasio, D.C.

        e)   Virginia Planas, D.C.

        f)   William J. Moran, D.C.

241.    On information and belief, the Ringleaders paid these "professionals" to use their names and licenses through compensation agreements wherein the providers were paid a salary for performing services for the Defendant Clinics that were either medically unnecessary or were never rendered.  Similarly, as part of their compensation agreement with the Ringleaders, the Defendant Doctors were also paid not to treat patients, but to sign their names and/or allow their names to be signed on their behalf on HCFA forms and narrative reports, which falsely represented that the Defendant Doctors actually rendered the health services for which the Defendant Clinics submitted bills, when in fact these "professionals" never examined, treated or otherwise came into contact with many of the patients at the Defendant Clinics.

242.    On information and belief, each of the Defendant Doctors exercised discretion and conducted and participated in the conduct of the affairs of the criminal enterprise alleged herein.

243.    By selling their names and licenses, these "professionals" provided the essential means in which the Ringleaders were able to fraudulently bill insurance carriers in contravention of Florida State Law.

244.    On information and belief, the Ringleaders paid other providers to allow Defendants to use their names and license numbers on bills for services that were never rendered, or that were performed by unsupervised medical or physician assistants or unlicensed personnel who were not authorized to render such services under the laws of the State of Florida, or that were medically unnecessary.

245.    On information and belief, the Ringleaders also used the names of other doctors, physical therapists and chiropractors, with and without their permission, misrepresenting that they had rendered services that were never actually rendered, or that were performed by unsupervised medical or physician assistants or unlicensed personnel, or that were medically unnecessary.

## STATEMENT OF COUNTS

### COUNT I – RICO 18 U.S.C. § 1962(C)
### AGAINST ALL DEFENDANTS

246.    The allegations of paragraphs 1 through 245 are hereby repeated and re-alleged as though fully set forth herein.

## The RICO Enterprise

247.    The Medical Network Enterprise (consisting of S.H.P. Medical, Sun State, MSG, N.M.B. Medical, Continental and Statewide) is an enterprise within the meaning of 18 U.S.C § 1961(4).

The Medical Network Enterprise engaged in activities, including defrauding insurers that are based outside of Florida, that affect interstate commerce.

248. Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, and Roig, at all relevant times, were the principals of, exerted control over, and directed the operations of the Medical Network Enterprise and each of its component parts. Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, and Roig utilized that control to conduct the affairs of the Medical Network Enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately three years.

249. Defendants Kliger, Garbarino, Tallerie, Piasio, Planas, Moran, Fishman, Byron, Devilla and Guenon were employed by or associated with the Medical Network Enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

250. Each of the doctors and general business corporations (Defendant Clinics, Management Companies and ABC Corporations) that are named as Defendants were associated with the Medical Network Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

251. On information and belief, Defendants Continental, Statewide, the ABC Corporations, and Shteyman and Roig, for example, paid runners to stage accidents and refer the patients to the Defendant Clinics. The Ringleaders prepared or caused to be prepared fraudulent bills in the name of the other corporate entities, and collected the proceeds of those claims. Each of the doctors furnished their names to the Medical Network Enterprise and provided the essential means for the Medical Network Enterprise to fraudulently bill insurance companies. Each of the

Defendant Clinics furnished the Medical Network Enterprise with the identities of patients who were recruited for the purpose of generating fraudulent claims and with facilities that were essential prerequisites to an insurance fraud scheme. The remaining corporate entities furnished documents that Plaintiffs required to obtain payment for fraudulent claims. Defendant Attorney Fishman and the Defendant paralegals, Byron, Devilla and Guenon provided a patient population by serving as runners for the clinics and by representing claimants who were involved in staged accidents or were involved in legitimate accidents but were uninjured and profited from the fraudulent activities and the submission of bogus claims described herein.

252.    As a whole, Defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiffs into paying bills for medical services that were not necessary and, in many cases, not supplied.

### The Pattern of Racketeering Activity

253.    Defendants engaged in a nearly three-year period of criminal activity that continues as of the day of the filing of this complaint.

254.    During the period in which the individual Defendants operated the Medical Network Enterprise, they submitted thousands of fraudulent claim forms seeking payment for services that were purportedly (but not actually) provided to many hundreds of patients.

255.    Although Plaintiffs have not yet identified all of the bills that Defendants submitted, the records identified to date include thousands of bills for hundreds of separate patients. Those bills resulted in payments totaling more than $611,000.00. The bills and supporting documents that were sent by the Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States mail. By virtue of those activities, Defendants engaged

in a continuous series of predicate acts of mail fraud, extending from the formation of the enterprise through the date of the filing of this Complaint.

256.    A representative list of predicate acts is set forth in the Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of their scheme.  In addition to the specific misrepresentations identified for each of the mailings on that list, each and every document identified on the list contains the implicit material misrepresentation that the bill was reviewed and provided by a licensed health care professional authorized by law to provide and therefore bill for the services contained in each statement of charges submitted by the Defendants.

257.    As a part of the pattern of racketeering activity, for the purpose of executing the scheme to defraud Plaintiffs that is described above, Defendants, overall, submitted thousands of insurance claims to Plaintiffs during the three-year period relevant to this Complaint. Defendants participated in the preparation and mailing of those claims, knowing that they contained materially false and misleading information.

258.    Each of the thousands of submissions constitutes mail fraud pursuant to 18 U.S.C. § 1341.

259.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C.§ 1961(1)(b).  By causing the mailing of over one thousand false claims, the Defendants have conducted the affairs of the Medical Network Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C.§ 1962(c).

## Damages Sustained by the Plaintiffs

260.    Plaintiffs were injured in their business or property, by reason of Defendants' violation of 18 U.S.C. § 1962(c).  Plaintiffs were defrauded into paying for alleged medical services that were not necessary, that often were not provided, and that generally were not prescribed by any physician or other licensed professional.  Plaintiffs paid hundreds of thousands of dollars to the Defendants based upon forged signatures, fictitious narratives describing patients' conditions, and misrepresentations of the treatment provided to patients, many of who were involved in staged accidents and were not injured.  Defendants were not legally entitled to those payments, and Plaintiffs would not have made those payments if it had not been deceived by Defendants' fraudulent conduct.

261.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## COUNT II – RICO 18 U.S.C. § 1962(C)

### AGAINST DEFENDANTS SHTEYMAN, IRINA SHTEYMAN, PALTEROVICH, PALTER, TRINTCHER, SHAPIRO, ROIG, GARBARINO, PIASIO, PLANAS, FISHMAN, BYRON, DEVILLA AND GUENON

262.    The allegations of paragraphs 1 through 262 are hereby repeated and realleged as though fully set forth herein.

## The RICO Enterprise

263.    At all times relevant herein, S.H.P. Medical was an "enterprise" engaged in, and the activities of which affect, interstate commerce, as that term is defined by 18.U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

264.   From in or about February 2000 through the date of the filing of this Complaint, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Garbarino, Piasio, Planas, Fishman, Byron, Devilla and Guenon, conducted and participated in the affairs of S.H.P. Medical (the enterprise) through a pattern of racketeering activity, including the thousands of acts of mail fraud described in Plaintiffs' "FIRST CLAIM FOR RELIEF," and in the exhibits annexed to this complaint, all of which are incorporated by reference.   Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

### The Pattern of Racketeering Activity
### (Racketeering Acts)

265.   The racketeering acts set forth herein were carried out over nearly a three-year period, were related and similar, were committed as part of Defendants' ongoing scheme to use their control of the Defendant Clinics to defraud insurers and, if not stopped, will continue in the future.

266.   As part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud Plaintiffs as described above, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Garbarino, Piasio, Planas, Fishman, Byron, Devilla and Guenon caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.   The mailings were made in furtherance of a scheme or artifice to defraud the Plaintiffs, and to induce issuance of checks to the S.H.P. Medical enterprise based upon materially false and misleading information.

267.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

268.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**The Damages**

269.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $611,000.00, the exact amount to be determined at trial.

270.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Garbarino, Piasio, Planas, Fishman, Byron, Devilla and Guenon, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

**COUNT III – RICO 18 U.S.C. § 1962(C)**

**AGAINST DEFENDANTS SHTEYMAN, IRINA SHTEYMAN, PALTEROVICH, PALTER, TRINTCHER, SHAPIRO, ROIG, KLIGER, GARBARINO, TALLERIE, MORAN, , FISHMAN, BYRON, DEVILLA, GUENON, CONTINENTAL AND STATEWIDE.**

271.   The allegations of paragraphs 1 through 271 are hereby repeated and realleged as though fully set forth herein.

**The RICO Enterprise**

272.   At all times relevant herein, Sun State was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18.U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

273.   From in or about May 2000 through the date of the filing of this Complaint, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Moran,

Fishman, Byron, Devilla, Guenon, Continental and Statewide conducted and participated in the affairs of Sun State (the enterprise) through a pattern of racketeering activity, including the thousands of acts of mail fraud described in Plaintiffs' "FIRST CLAIM FOR RELIEF," and in the exhibits annexed to this complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

### The Pattern of Racketeering Activity
### (Racketeering Acts)

274.    The racketeering acts set forth herein were carried out over a 29-month period, were related and similar, were committed as part of Defendants' ongoing scheme to use their control of the Defendant Clinics to defraud insurers and if not stopped would have continued into the future.

275.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Moran, Fishman, Byron, Devilla, Guenon, Continental and Statewide caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud the Plaintiffs, and to induce it to issue checks to the Sun State enterprise based upon materially false and misleading information.

276.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C.§ 1961(1)(b).

277.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C.§ 1961(5).

**The Damages**

278.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $611,000.00, the exact amount to be determined at trial.

279.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Moran, Fishman, Byron, Devilla, Guenon, Continental and Statewide, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## COUNT IV – RICO 18 U.S.C. § 1962(C)

### AGAINST DEFENDANTS SHTEYMAN, IRINA SHTEYMAN, PALTEROVICH, PALTER, TRINTCHER, SHAPIRO, ROIG, KLIGER, GARBARINO, MORAN, FISHMAN, BYRON, DEVILLA, GUENON, CONTINENTAL AND STATEWIDE

280.   The allegations of paragraphs 1 through 280 are hereby repeated and realleged as though fully set forth herein.

## The RICO Enterprise

281.   At all times relevant herein, MSG was an "enterprise" engaged in, or the activities of which affect interstate commerce, as that term is defined by 18.U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

282.   From in or about September 2000 through the date of the filing of this Complaint, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Moran, Fishman, Byron, Devilla, Guenon, Continental and Statewide conducted and participated in the affairs of MSG (the enterprise) through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Plaintiffs' "FIRST CLAIM FOR RELIEF,"

and in the exhibits annexed to this complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## The Pattern of Racketeering Activity
### (Racketeering Acts)

283.   The racketeering acts set forth herein were carried out over more than a 25-month period, were related and similar, were committed as part of Defendants' ongoing scheme to use their control of the Defendant Clinics to defraud insurers and if not stopped will continue into the future.

284.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Moran, Fishman, Byron, Devilla, Guenon, Continental and Statewide caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud the Plaintiffs, and to induce it to issue checks to the MSG enterprise based upon materially false and misleading information.

285.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C.§ 1961(1)(b).

286.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C.§ 1961(5).

**The Damages**

287.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured

in their business and property and Plaintiffs have been damaged in the aggregate amount

presently in excess of $611,000.00, the exact amount to be determined at trial.

288.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants

Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Moran,

Fishman, Byron, Devilla, Guenon, Continental and Statewide, jointly and severally, three-fold

damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## COUNT V – RICO 18 U.S.C. § 1962(C)

### AGAINST DEFENDANTS SHTEYMAN, IRINA SHTEYMAN, PALTEROVICH, PALTER, TRINTCHER, SHAPIRO, ROIG, TALLERIE, FISHMAN, BYRON, DEVILLA, GUENON, CONTINENTAL AND STATEWIDE.

289.    The allegations of paragraphs 1 through 288 are hereby repeated and realleged as though

fully set forth herein.

## The RICO Enterprise

290.    At all times relevant herein, N.M.B. Medical was an "enterprise" engaged in, or the

activities of which affect interstate commerce, as that term is defined by 18.U.S.C. § 1961(4),

and within the meaning of 18 U.S.C. § 1962(c).

291.    From in or about December 2001 through the date of the filing of this Complaint,

Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Tallerie, Fishman,

Byron, Devilla, Guenon, Continental and Statewide conducted and participated in the affairs of

N.M.B. Medical (the enterprise) through a pattern of racketeering activity, including the

thousands of acts of mail fraud described in Plaintiffs' "FIRST CLAIM FOR RELIEF," and in

the exhibits annexed to this complaint, all of which are incorporated by reference.  Defendants'
conduct constitutes a violation of 18 U.S.C. § 1962(c).

## The Pattern of Racketeering Activity
### (Racketeering Acts)

292.    The racketeering acts set forth herein were carried out over more than a 11-month period,
were related and similar, were committed as part of Defendants' ongoing scheme to use their
control of the Defendant's Clinics to defraud insurers and, if not stopped, will continue into the
future.

293.    As a part of the pattern of racketeering activity, and for the purpose of executing the
scheme and artifice to defraud as described above, Defendants Shteyman, Irina, Palterovich,
Palter, Trintcher, Shapiro, Roig, Tallerie, Fishman, Byron, Devilla, Guenon, Continental and
Statewide caused mailings to be made through the United States Postal Service, in violation of
18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud the
Plaintiffs, and to induce it to issue checks to the N.M.B. Medical enterprise based upon
materially false and misleading information.

294.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. §
1961(1)(b).

295.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within
the meaning of 18 U.S.C.§ 1961(5).

### The Damages

296.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured

in their business and property and Plaintiffs have been damaged in the aggregate amount

presently in excess of $611,000.00, the exact amount to be determined at trial.

297.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants

Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Tallerie, Fishman, Byron, Devilla,

Guenon, Continental and Statewide, jointly and severally, three-fold damages sustained by them,

together with the costs of this lawsuit and reasonable attorneys' fees.

## COUNT VI – CONSPIRACY TO VIOLATE RICO - 18 U.S.C. § 1962(D)
## AGAINST ALL DEFENDANTS

298.    The allegations of paragraphs 1 through 297 are hereby repeated and realleged as though

fully set forth herein.

### The Racketeering Conspiracy

299.    From approximately February 2000 through the date of the filing of this Complaint, both

dates being approximate and inclusive, within Dade County and elsewhere, Defendant

Shteyman, being a person associated in fact with the enterprise of Defendants Shteyman, Irina,

Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Piasio, Planas, Moran,

Fishman, Byron, Devilla, Guenon, Continental and Statewide and John Does 1 through 20, Jane

Does 1 through 20 and ABC Corporations 1 through 20 described above, which was engaged in,

and the activities of which affected interstate commerce, did unlawfully, willfully and knowingly

combine, confederate, conspire and agree together and with Shteyman, Irina, Palterovich, Palter,

Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Piasio, Planas, Moran, Fishman, Byron,

Devilla, Guenon, Continental and Statewide and John Does 1 through 20, Jane Does 1 through 20, and ABC Corporations 1 through 20 and others to violate 18 U.S.C. §§ 1961(1) and (5), through the commission, as principals or as aiders and abettors, of multiple racketeering acts (mail fraud), as set forth at length herein, all in violation of 18 U.S.C. § 1962(d).

300.   It was an object of the conspiracy that the Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Piasio, Planas, Moran, Fishman, Byron, Devilla, Guenon, Continental and Statewide and John Does 1 through 20, Jane Does 1 through 20 and ABC Corporations 1 through 20 would enrich themselves by submitting and causing to be submitted to Plaintiffs and other No-fault insurance carriers, claims for health services purportedly rendered or given to Covered Persons knowing the medical bills and records submitted in support of their claims were false and fraudulent in that the services were never rendered or were medically unnecessary and performed for the purpose of generating fraudulent bills.  By submitting fraudulent medical bills and records, Defendants falsely induced and caused millions of dollars in claims to be paid by Plaintiffs.

301.   It was further an object of the conspiracy that the Defendants would, and did, devise a scheme and artifice to defraud Plaintiffs and other No-fault insurance carriers by means of false, misleading and fraudulent pretenses and representations, and to cause Plaintiffs to pay claims arising from the intentional filing of false claims and supporting documentation through Defendant Shteyman for the benefit of the co-conspirators who include, among others, Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, Roig, Kliger, Garbarino, Tallerie, Piasio, Planas, Moran, Fishman, Byron, Devilla, Guenon, Continental and Statewide and John Does 1 through 20, Jane Does 1 through 20 and ABC Corporations 1 through 20.  For the purpose of executing such scheme and artifice, and attempting to do so, the Defendants would and did place,

and caused to be placed, in post offices and authorized depositories certain mail matter and things to be sent and delivered by the Postal Service, and would and did take and receive such matter and things there from, in violation of 18 U.S.C. § 1341.

302.   In furtherance of the racketeering conspiracy and to effect the objects thereof, the Defendants committed, and caused to be committed as overt acts, among others, the racketeering predicate acts alleged above.

### The Damages

303.   The allegations of paragraphs 1 through 304 above, describing the injury and damages sustained by the Plaintiffs are repeated and realleged as though fully set forth herein.

### COUNT VII – UNJUST ENRICHMENT FOUNDED ON THE CORPORATE PRACTICE OF MEDICINE

### PROFESSIONAL SERVICE CORPORATIONS AND LIMITED LIABILITY COMPANIES ACT,  FLA. STAT. §§ 621, *ET SEQ.*

### AGAINST THE DEFENDANT CLINICS

304.   The allegations of paragraphs 1 through 303 are hereby repeated and realleged as though fully set forth herein.

305.   Pursuant to the Professional Service Corporations and Limited Liability Companies Act, Fla. Stat §§ 621.01, *et seq.*, the Florida No-fault Law, Fla. Stat. §§ 627.730 through 627.7405 and the laws governing the practice of licensed professions, a corporation may only render professional services through individuals authorized by law to render such professional services.

306.   Fla. Stat. § 621.03 (1) defines professional service as "any type of service to the public which requires as a condition precedent to the rendering of such service the obtaining of a license or other legal authorization." Health care professionals, including but not limited to physicians,

88

osteopathic physicians, surgeons, doctors of medicine and chiropractic physicians are such professions that require a license to practice within the State of Florida.

307. Fla. Stat. § 621.03 (2) defines a professional corporation as a corporation which is "organized for the sole and specific purpose of rendering professional service and which has as its shareholders only other professional corporations, professional limited liability companies, or individuals who themselves are duly licensed or otherwise legally authorized to render the same professional service as the corporation."

308. Fla. Stat. § 621.05 limits the right to be a shareholder in a professional corporation to those who are authorized by law to practice in the same profession that the corporation is authorized to practice.

309. Fla. Stat. § 621.06 prohibits the rendering of professional services through anyone who is not duly licensed or otherwise legally authorized to render such professional services within the State.

310. Fla. Stat. § 621.09 restricts the issuance of stock by a professional service corporation to only those who are duly licensed or otherwise legally authorized to render the same specific professional services as those for which the corporation was incorporated.

311. Fla. Stat. § 621.11 prohibits a shareholder of a professional corporation from selling or transferring his or her shares in such corporation to anyone who is not licensed or otherwise authorized by law to practice the profession that the professional corporation is authorized to practice.

312.    The Professional Service Corporations and Limited Liability Companies Act embodies the doctrine of the Corporate Practice of Medicine, which seeks to ensure that licensed professionals can enjoy the benefits of being a corporation while having its shareholders subject to the jurisdiction of the licensing authority governing the profession that the professional corporation is authorized to practice medicine.

313.    If a licensed professional wishes to practice his or her profession as a corporation, he or she must do so in accordance with the Professional Service Corporations and Limited Liability Companies Act.

314.    Pursuant to Fla. Stat. § 627.736 (5)(a) of the No-fault Law, for a health care provider to be entitled to recover No-fault benefits, the provider must have lawfully rendered treatment to an injured person for a bodily injury covered by personal injury protection.

315.    Pursuant to Fla. Stat. § 627.736 (5)(e) of the No-fault Law, no statement of medical services may include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services.

316.    The No-fault Law sets forth the exclusive eligibility requirements for reimbursement to providers under the No-fault law.  For an entity to be eligible to recover No-fault benefits under the No-fault Law it must be lawfully licensed, to wit: a professional corporation formed and operated in accordance with the Professional Service Corporations and Limited Liability Companies Act.

317.   An entity not formed in accordance with the Professional Service Corporations and Limited Liability Companies Act is not lawfully rendering treatment for purposes of reimbursement under the No-fault Law.

318.   An entity registered under the newly created clinic registration law, Fla. Stat. § 456.0375 and its recently enacted successor statute, Health Care Clinic Act, Fla. Stat. §400.990, is not a lawfully licensed corporation entitled to bill for professional health care services under the No-fault law.

319.   The Defendant Clinics are general business corporations owned by lay people who are not licensed or otherwise legally authorized to perform the professional services that they are rendering and for which they have submitted bills to Plaintiffs for payment under the No-fault Law.

320.   As general corporations owned by lay people, the Defendant Clinics are entities that are unlawfully rendering professional health care services and are engaged in the illegal corporate practice of medicine.

321.   As general business corporations, not professional corporations whose owners are licensed professionals, the Defendant Clinics do not have standing nor are they entitled to recover No-fault benefits under the No-fault Law.

322.   The corporate structure of the Defendant Clinics as general business corporations owned by laypersons violates the Professional Service Corporations and Limited Liability Companies Act as well as specific provisions of the No-fault Law.

323.    The rendering of professional services by an entity that is not owned and controlled exclusively by professionals licensed in the specific profession for which the corporation was formed is a violation of Fla. Stat. § 458.327 and constitutes the unauthorized practice of medicine.

324.    The Defendant Clinics and Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro and Roig received substantial monies from Plaintiffs based on its justifiable and good faith reliance that the Defendant Clinics complied with applicable statutes and administrative regulations governing the provision of health services in Florida and therefore were compensable under the No-fault Law.

325.    The services that were allegedly rendered by the Defendant Clinics, and paid for by Plaintiffs, were rendered pursuant to a corporate practice of medicine structure not permitted under Florida Law.  The Defendant Clinics and Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro and Roig have received payments from Plaintiffs to which they are not entitled and have been unjustly enriched, as a result thereof.

326.    Plaintiffs are entitled to recover restitution for that amount by which the Defendant Clinics and Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro, and Roig were unjustly enriched as a result of payments made by Plaintiffs to said Defendants.

327.    Plaintiffs have conferred a benefit upon Defendants through the unlawful receipt of No-fault benefits.

328.    Defendants have accepted and retained said benefits.

329.   Under the circumstances alleged in the complaint, it would be inequitable for the defendants to retain the benefit.

330.   By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $611,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the court deems just.

**COUNT VIII – COMMON LAW FRAUD**

**AGAINST ALL DEFENDANTS**

331.   The allegations of paragraphs 1 through 330 are hereby repeated and realleged as though fully set forth herein.

332.   On information and belief, each and every bill, report and test result submitted by Defendants to Plaintiffs set forth fictional symptoms, diagnoses and representations of services provided.  The false representations contained therein not only were intended to defraud the Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent health provider.

333.   On information and belief, Defendants intentionally, knowingly, fraudulently, and with an intent to deceive the Plaintiffs submitted patient medical reports, HCFA claim forms, and bills for medical treatment which contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations:

a) false and misleading statements concerning the circumstances surrounding the Covered Person's treatment;

93

b) false and misleading statements and information as to the type, existence and extent of the Covered Person's symptoms and injury;

c) false and misleading statements and information designed to conceal the fact that the treatment and diagnostic testing for said injury were not rendered or were medically unnecessary;

d) false and misleading statements and information as to the results of treatment and diagnostic testing, as well as the diagnosis, for said injury;

e) false and misleading statements and information designed to conceal the fact that the referral of Covered Persons for further treatment and diagnostic testing was medically unnecessary;

f) false and misleading statements and information as to the underlying causes of said injury;

g) false and misleading statements contained in each and every bill and HCFA form wherein they certified that the Defendant Clinic was lawfully licensed and authorized to render the billed for services when, in fact, they were not; and

h) false and misleading statements and information in connection with the submission of bills and reports which contained stamped signatures, without countersignatures from the Defendant Clinics' patients as required by law.

334.    The foregoing was intended to deceive and mislead the Plaintiffs into believing that the Defendant Clinics were lawfully licensed and eligible to recover No-fault benefits when, in fact, they were not.   Under the State of Florida's No-fault Law, an insurance company is under no obligation to pay No-fault benefits to an entity, such as the Defendant Clinics, that is not incorporated in accordance with the Professional Service Corporations and Limited Liability

Companies Act and, therefore, does not possess the valid licenses required to perform the billed for professional services.

335.    Defendants knew the foregoing material misrepresentations to be false when made and made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

336.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed, as a result of Defendants' acts of fraud and deception.

337.    Had Plaintiffs known that Defendant Clinics were sham corporations, created in violation of Florida law, they would not have paid their claims for reimbursement of No-fault benefits.

338.    Had Plaintiffs known of the fraudulent content of the medical reports and HCFA forms and bills for medical treatment, they would not have paid the Defendants' claims for reimbursement of No-fault benefits submitted in connection therewith.

339.    Had Plaintiffs known that many of the Covered Persons treated at Defendant Clinics were participants in staged accidents, Plaintiffs would not have paid their claims for reimbursement of No-fault benefits.

340.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and has been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $611,000.00 the exact amount to be determined at trial, plus interest, costs and other relief the court deems just.

## COUNT IX – CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT

## FLA. STAT. § 772.11

## AGAINST ALL DEFENDANTS

341.    The allegations of paragraphs 1 through 340 are hereby repeated and realleged as though fully set forth herein.

342.    In violation of Fla. Stat. Ch. 812, including but not limited to Section 812.014, Defendants knowingly obtained or endeavored to obtain and/or use the property and/or monies of Plaintiffs with the intent to temporarily or permanently deprive Plaintiffs of their right and/or benefit of their property and/or monies.

343.    The activities, in violation of Fla. Stat. §§ 772.11 and 812.012, *et seq.*, undertaken by the Defendants, show that they unlawfully, willfully and knowingly combined, confederated, conspired and agreed to participate, as principals or as aiders and abettors, in the commission of said violations.

344.    Plaintiffs have made a written demand upon Defendants for recovery of these monies pursuant to Fla. Stat. § 772.11 and Defendants have not complied with such demand within thirty (30) days of receipt thereof.

345.    Pursuant to Fla. Stat. § 772.11, Plaintiffs are entitled to recover attorney's fees and cost, incurred in this action, through trial and the appellate courts.

346.    By reason of the foregoing, Plaintiffs request that this Court enter a judgment for damages and treble damages against Defendants, jointly and severally, for payment of claims submitted by Defendants, and further an order granting Plaintiffs' minimum fines, interest, attorney's fees, costs, incidental expenses and any additional damages this Court deems just.

## COUNT X -- CIVIL REMEDIES FOR CRIMINAL PRACTICES

## FLA. STAT. § 772.104

## AGAINST ALL DEFENDANTS

347.    The allegations of paragraphs 1 through 346 are hereby repeated and realleged as though fully set forth herein.

348.    In violation of Fla. Stat. Ch. 772.103 – 772.104, Defendants, with criminal intent, obtained or endeavored to obtain and/or received proceeds directly or indirectly from a pattern of criminal activity, or through the collection of an unlawful debt to use or invest, directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest or equity in real property or in the establishment or operation of any enterprise.

349.    In violation of Fla. Stat. Ch. 772.103 – 772.104, Defendants, through the pattern of criminal activity set forth herein, or through the collection of an unlawful debt, acquired or maintained, directly or indirectly, interest in or control of an enterprise(s), or real property, including but not limited to the Defendant Clinic and Diagnostic Providers.

350.    In violation of Fla. Stat. Ch. 772.103 – 772.104, Defendants were associated with and/or employed by an enterprise, including but not limited to the Defendant Clinic and the Diagnostic Providers, to conduct or participate, directly or indirectly, in such enterprise, through the pattern of criminal activity, or through the collection of an unlawful debt, as set forth herein.

351.    In violation of Fla. Stat. Ch. 772.103, the Defendant Clinic and Diagnostic Providers, at the direction or with the knowledge of its officers, directors and managing agents, intended to

injure, defraud and/or deceive Plaintiffs by submitting bills and supporting documentation it knew contained false, incomplete, misrepresentative and/or misleading information.

352.    The activities, in violation of Fla. Stat. §§ 772.103 and 772.104, undertaken by the Defendants, show that they unlawfully, willfully and knowingly combined, confederated, conspired and agreed to participate, as principals or as aides and abettors, in the commission of said violations.

353.    Pursuant to Fla. Stat. § 772.104, Plaintiffs are entitled to recover attorney's fees and cost, incurred in this action, through trial and the appellate courts.

354.    By reason of the foregoing, Plaintiffs request that this Court enter a judgment for damages and treble damages against Defendants, jointly and severally, for payment of claims submitted by Defendants, and further enter an order granting Plaintiffs' minimum fines, interest, attorney's fees, costs, incidental expenses and any additional damages this Court deems just.

## COUNT XI – INJUNCTIVE RELIEF
## AGAINST ALL DEFENDANTS

355.    The allegations of paragraph 1 through 354 are hereby repeated and realleged as though fully set forth herein.

356.    For at least the last three years, Defendants have engaged and continue to engage in a pattern of fraudulent conduct to induce Plaintiffs to make payments to the Defendant Clinics by submitting bills and supporting medical records containing materially false and misleading information or misrepresentations designed to conceal the fact that the treatments, diagnostic testing, and referrals billed for by the Defendant Clinics for services rendered to Covered

Persons were never rendered or were medically unnecessary and were performed, if at all, for the sole purpose of obtaining payment on fraudulent claims.

357.    Defendants, acting singly and in concert with each other, defrauded the Plaintiffs, who are required to process claims for No-fault insurance benefits pursuant to Florida Motor Vehicle No-fault Laws, Fla. Stat. §§ 627.730 through 627.7405.  Defendants implemented, participated in and/or employed fraudulent means to procure their patient population, as well as a fraudulent billing scheme in which all Covered Persons at the Defendant Clinics received substantially similar treatments, testing and referrals to providers regardless of the nature of the alleged complained of injuries.  As part of the fraudulent billing scheme, a Covered Person's initial office consultation at the Defendant Clinics would automatically trigger a series of internal billing practices and procedures in which the Defendant Clinics would bill for services, including, but not limited to, nerve conduction velocity tests, regardless of whether such tests were actually performed or medically required.  The initial office consultation also triggered automatic billing for follow-up examinations, testing, treatment and a referral regimen that the Defendant Clinics would bill for regardless of whether the Covered Persons appeared for same or they were medically necessary.

358.    At the time the foregoing material misrepresentations were made by Defendants, they were known by the Defendants to be false.  Defendants nevertheless submitted the claims for insurance benefits with the intent to deceive and to defraud Plaintiffs and to induce Plaintiffs to pay the fraudulent claims, which Plaintiffs did in fact pay in reliance thereon, and which Plaintiffs would not have otherwise paid at all had Plaintiffs known the true facts.

359.    Defendants' conduct warrants the grant of a permanent injunction against them requiring that Defendants cease further submission to Plaintiffs of any bills seeking payment for any examinations, testing, treatment and referrals rendered to Covered Persons.

360.    Defendants' conduct warrants the grant of a permanent injunction against them precluding their initiation against Plaintiffs of any legal proceedings, including but not limited to arbitration proceedings or lawsuits, in any forum or jurisdiction seeking payment for, or equitable relief regarding any examinations, testings, treatments and referrals rendered to Covered Persons.

361.    As a direct result of Defendants' fraudulent conduct, Plaintiffs and the public are suffering and will continue to suffer, irreparable harm for which there exists no adequate remedy at law via a money judgment for damages.   In addition to the economic injury caused to Plaintiffs' business and property, Defendants' practices have and will continue to result in the requirement that the driving public pay increased insurance premiums to allay the cost of the fraudulent scheme perpetrated by the Defendants.

362.    Most importantly, so long as Defendants are permitted to continue their pattern of fraud and deceit, the physical health and well-being of those members of the general public who seek care at the Defendant Clinics will be jeopardized, as the first victim of Defendants' nefarious scheme is the ethical and medically appropriate diagnosis and treatment of a Covered Person's injuries.

363.    As the foregoing recitation of Defendants' endeavors demonstrates, a balancing of the equities favors granting the requested injunctive relief.   That is, denial of the relief sought will cause far greater harm to Plaintiffs than the granting of the relief will cause Defendants.

364.    Granting the injunctive relief sought will foster Plaintiffs' responsibility to combat fraud and will protect Plaintiffs' respective rights to legal and equitable remedies.  Moreover, granting the injunctive relief will foster and protect the public interest in obtaining proper and affordable health care, as well as in stemming the increase in the costs of insurance.

365.    Furthermore, granting the injunctive relief sought will serve the imperative of denying Defendants further opportunity to unjustly enrich themselves through the ill-gotten proceeds of illegal activity; to continue to capitalize on their fraud through accumulation of funds, assets, and property by use of tainted proceeds; and to disserve Plaintiffs and the public's rights and interests.

366.    Based upon the foregoing, there is an immediate need for the injunctive relief requested by Plaintiffs.

## COUNT XII -- DECLARATORY JUDGMENT

### CORPORATE PRACTICE OF MEDICINE PROFESSIONAL SERVICE CORPORATIONS AND LIMITED LIABILITY COMPANIES ACT

### FLA. STAT. §§621.01, *ET SEQ.*

### AGAINST ALL DEFENDANTS

367.    The allegations of paragraphs 1 through 366 are hereby repeated and realleged as though fully set forth herein.

368.    For at least the last three years, Defendants Shteyman, Irina, Palterovich, Palter, Trintcher, Shapiro and Roig have established the Defendant Clinics to fraudulently bill insurance carriers.

369.   Under Florida law, an insurance company is not required to pay No-fault benefits to providers who lack standing to seek reimbursement under the No-fault Law.  As a matter of standing, the Defendant Clinics, which are owned by unlicensed professionals, do not have the right to recover No-fault benefits, since the services were not rendered by a properly licensed entity as required under the No-fault Law and the Professional Service Corporations and Limited Liability Companies Act.

370.   As the Defendant Clinics are owned by lay people who are not allowed under Florida law to provide professional services, it is respectfully requested that this Court issue an order declaring that Plaintiffs are under no obligation to pay any of Defendants' No-fault claims because of the Defendant Clinics illegal corporate structure.

## COUNT XIII -- DECLARATORY JUDGMENT

## UNLAWFUL ASSIGNMENT OF FIRST PARTY BENEFITS TO A NON-PROVIDER

## AGAINST ALL DEFENDANTS

371.   The allegations of paragraphs 1 through 370 are hereby repeated and realleged as though fully set forth herein.

372.   The Florida No-fault Law provides for the recovery of, *inter alia*, professional health services pursuant to Fla. Stat. § 627.736 (5)(e) of the No-fault Law, except that no statement of medical services may include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services.

373.   Because the Defendant Clinics are general business corporations, not professional corporations owned by licensed professionals, and are owned by laypersons, the Defendant Clinics do not possess valid licenses and they are not entitled to be compensated for any services

allegedly rendered by them to Covered Persons.   In addition, any purported assignment of benefits given to the Defendant Clinics by Covered Persons under the No-fault Law are in violation of the above sections and are therefore null and void *ab initio*, since the assignment was not given to a provider who was lawfully rendering treatment.

374.     Because Defendant Clinics are general business corporations which cannot lawfully bill for professional services under the No-fault Law, Plaintiffs are entitled to judgment declaring that the Defendant Clinics are not entitled to be compensated for any services allegedly rendered by them to Covered Persons, that the assignments of benefits received by the Defendant Clinics are void as a matter of law, and that the Defendant Clinics never had, and do not now have, standing to prosecute any claim for No-fault benefits as an assignee of Covered Persons in any arbitration proceeding or lawsuit commenced in any court.

## COUNT XIV - DECLARATORY JUDGMENT
## AGAINST ALL DEFENDANTS

375.     The allegations of paragraphs 1 through 374 are hereby repeated and realleged as though fully set forth herein.

376.     Defendants' fraudulent and deceptive scheme to induce Plaintiffs to make payments to the Defendants for examinations, treatments, diagnostic testing, self-referrals and referrals that were medically unnecessary or were for services which were never rendered warrants the grant of declaratory judgment, declaring that Plaintiffs are under no obligation to pay any of Defendants' No-fault claims arising from any examinations, testing, treatment and referrals provided to Covered Persons.

**WHEREFORE,** Plaintiffs demand judgment as follows:

1.  Compensatory damages in an amount in excess of $611,000.00, the exact amount to be determined at trial;

2.  Treble damages, costs and reasonable attorneys' fees on the First through Sixth Claims for Relief;

3.  Recovery on the Seventh Claim for Relief of monies received by Defendants in violation of the Professional Service Corporations and Limited Liability Companies Act, Fla. Stat. §§ 621.01, et seq.;

4.  Compensatory damages on the Eighth Claim for Relief;

5.  Treble damages, costs and reasonable attorney's fees on the Ninth and Tenth Claim for Relief;

6.  Injunctive relief on the Eleventh Claim for Relief, enjoining and restraining Defendants, their officers, agents, servants, employees, affiliates and attorneys, and any business entities and/or persons controlled by them or acting on their behalf, or those in active concert or participation with them, and any persons or other entities having joint ownership of assets with them:

    i)   From submitting to Plaintiffs any bills seeking payment for any examinations, testing, treatments and referrals arising from services purportedly rendered by or through the Defendants to Covered Persons; and

ii)     From initiating against Plaintiffs any legal proceedings, including but not limited to lawsuits or other legal proceedings, in any forum or jurisdiction seeking payment for, or equitable relief regarding, any examinations, testing, treatments and referrals arising from services purportedly rendered by or through the Defendants to Covered Persons;

7.     Declaratory relief on the Twelfth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of Defendants' No-fault claims because of the Defendant Clinics' illegal corporate structure;

8.     Declaratory relief on the Thirteenth Claim for Relief declaring that the assignments of benefits received by the Defendant Clinics are void as a matter of law and that the Defendant Clinics never had, and do not now have, standing to prosecute any claim for first-party No-fault benefits as an assignee of Covered Persons in any arbitration proceeding or lawsuit commenced in state court;

9.     Declaratory relief on the Fourteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of Defendants' No-fault claims arising from any examinations, testing, treatments and referrals provided to Covered Persons because of Defendants' fraudulent and deceptive scheme to induce such payments.

Trial By Jury Demanded

Dated: Boca Raton, Florida
       June 14, 2004

                              Stern & Montana, LLP

                              By:_____
                                    Laura C. Douglas
                                    Fla. Bar No. 111392
                                    Attorneys for Plaintiffs
                                    4800 North Federal Highway, Suite 307B
                                    Boca Raton, Florida 33431
                                    Telephone:  561-347-1771
                                    Facsimile:  561-347-1555

# <u>APPENDIX</u>

**ALLSTATE PREDICATE ACTS**

**S.H.P. MEDICAL REHABILITATION CENTER, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| G. M.<br><br>1655050167 | HCFA bill for physical therapy services provided from 01/08/01 to 02/01/01, with sign-in sheet and Assignment of Benefits | S.H.P. | Allstate | 2/20/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services.<br>4. Fraudulently billed for NCV/EMG when no such service were provided. |
| C. L.<br><br>1655026597 | HCFA bill for health services provided from 10/23/00 to 10/30/00, with Assignment of Benefits and reports | S.H.P. | Allstate | 11/30/00 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| L. J.<br><br>1655137121 | HCFA bill for health services provided from 3/5/01 to 3/8/01 with Application for No-fault Benefits, Assignment of Benefits and reports | S.H.P. | Allstate | 4/2/03 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| V. J.<br><br>1655137121 | HCFA bill for health services provided from 3/5/01 to 3/22/01, with Application for No-fault Benefits, Assignment of Benefits and reports | S.H.P. | Allstate | 4/2/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

**ALLSTATE PREDICATE ACTS**

**S.H.P. MEDICAL REHABILITATION CENTER, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| R.J.<br><br>1655137121 | HCFA bill for health services provided from 3/5/01 to 3/16/01, with Application for No-fault Benefits, Assignment of Benefits and reports | S.H.P. | Allstate | 4/2/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| M.J.<br><br>1655137121 | HCFA bill for health services provided from 3/5/01 to 3/22/01, with Application for No-fault Benefits, with Assignment of Benefits and reports | S.H.P. | Allstate | 4/2/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| B.J.<br><br>1655293684 | HCFA bill for health services provided from 8/3/01 to 8/17/01, Assignment of Benefits and reports | S.H.P. | Allstate | 9/4/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| C.B.<br><br>1655293684 | HCFA bill for health services provided from 8/6/01 to 8/15/01, Assignment of Benefits and reports | S.H.P. | Allstate | 9/4/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

**ALLSTATE PREDICATE ACTS**

**SUN STATE DIAGNOSTICS, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| R. L.<br><br>1655346276 | HCFA bill for health services provided from 10/22/01 to 10/26/01, with Assignment of Benefits and progress notes | Sun State | Allstate | 11/9/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services.<br>4. Fraudulently billed for NCV/EMG when no such service were provided. |
| L. L.<br><br>1655346276 | HCFA bill for health services provided from 10/22/01 to 10/26/01, with Assignment of Benefits and progress notes | Sun State | Allstate | 11/9/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| D. R.<br><br>1655132593 | HCFA bill for health services provided on 4/11/01 to 5/4/01, with Assignment of Benefits and reports | Sun State | Allstate | 5/11/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| G. J.<br><br>1655351532 | HCFA bill for health services provided on 10/29/01 to 11/1/01, with Assignment of Benefits and progress notes | Sun State | Allstate | 11/28/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

**ALLSTATE PREDICATE ACTS**

**SUN STATE DIAGNOSTICS, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| M. J.<br><br>1655351532 | HCFA bill for health services provided on 10/19/01 to 10/26/01, with Assignment of Benefits and progress notes | Sun State | Allstate | 11/5/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of fraudulent protocol and unnecessary/improper services. |
| L. B.<br><br>3975123616 | HCFA bill for health services provided on 10/12/01, with Assignment of Benefits and reports | Sun State | Allstate | 10/16/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of fraudulent protocol and unnecessary/improper services.<br>4. Fraudulently billed for NCV/EMG when no such service were provided. |
| R. C.<br><br>1655438354 | HCFA bill for health services provided on 4/8/02, with Assignment of Benefits and reports | Sun State | Allstate | 4/29/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of fraudulent protocol and unnecessary/improper services.<br>4. Fraudulently billed for NCV/EMG when no such service were provided. |
| J. B.<br><br>1655379111 | HCFA bill for health services provided from 1/28/02 to 2/6/02, with Assignment of Benefits and progress notes | Sun State | Allstate | 2/20/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of fraudulent protocol and unnecessary/improper services. |

**ALLSTATE PREDICATE ACTS**

**SUN STATE DIAGNOSTICS, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| M.G.<br><br>1655513321 | HCFA bill for ROM and muscle testing provided on 6/04/02, with evaluation report and graphs | Sun State | Allstate | 7/08/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services.<br>4. Represented service provided by licensed healthcare professional. |
| M.G.<br><br>1655513321 | HCFA bill for physical therapy services provided from 5/24/02 to 6/14/02, with initial evaluation report and progress notes | Sun State | Allstate | 6/21/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| A.M.<br><br>165545974 | HCFA bill for physical therapy services provided from 3/20/02 to 4/05/02, with initial evaluation report and progress notes | Sun State | Allstate | 4/12/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| M.L.<br><br>1655451365 | HCFA bill for ROM and muscle testing provided on 4/05/02, with assignment of benefits, report and graphs | Sun State | Allstate | 4/17/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services.<br>4. Represented service provided by licensed healthcare professional. |

**ALLSTATE PREDICATE ACTS**

**MED SERVICES GROUP, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| S. C.<br><br>1655427522 | HCFA bill for health services provided from 6/5/01 to 8/24/01, with Assignment of Benefits and reports | Med Services | Allstate | 2/7/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| L. A.<br><br>1655160933 | HCFA bill for health services provided on 5/01/01 and 6/05/01, with sign-in sheets, Assignment of Benefits and reports | Med Services | Allstate | 6/14/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| N. L.<br><br>1655170528 | HCFA bill for health services provided on 4/19/01, with Assignment of Benefits and reports | Med Services | Allstate | 4/30/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services.<br>4. Fraudulently billed for NCV/EMG when no such service were provided. |
| M. G.<br><br>1655269619 | HCFA bill for medical evaluations provided by Drs. Kidd and Mart on 6/15/01 with sign-in sheets, Assignment of Benefits and reports | Med Services | Allstate | 6/18/01 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

**ALLSTATE PREDICATE ACTS**

**MED SERVICES GROUP, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| C. R.<br><br>1655496674 | HCFA bill for health services provided from 4/15/02 to 5/9/02, with sign-in sheets, Assignment of Benefits and reports | Med Services | Allstate | 5/30/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| C. P.<br><br>1655496674 | HCFA bill for health services provided from 5/13/02 to 5/17/02, with sign-in sheets, Assignment of Benefits and reports | Med Services | Allstate | 6/3/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| D. H.<br><br>1655444634 | HCFA bill for health services provided on 2/15/02, with reports | Med Services | Allstate | 2/20/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

**ALLSTATE PREDICATE ACTS**

**NMB MEDICAL GROUP, INC.**

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| S. L.<br><br>1655566436 | HCFA bill for health services provided from 7/15/02 to 7/19/02, with sign-in sheet and Assignment of Benefits | NMB | Allstate | 9/4/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| J. G.<br><br>1655566436 | HCFA bill for health services provided from 6/24/02 to 7/2/02, with sign-in sheet and Assignment of Benefits | NMB | Allstate | 8/12/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| G. D.<br><br>165533410 | HCFA bill for health services provided on 6/25/02, with evaluations and reports | NMB | Allstate | 8/14/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| O. M.<br><br>1655529194 | HCFA bill for health services provided from 8/13/02 to 8/15/02, with progress notes | NMB | Allstate | 9/6/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

# ALLSTATE PREDICATE ACTS

## NMB MEDICAL GROUP, INC.

| COVERED PERSON | DOCUMENTS MAILED | MAILED BY | MAILED TO | APPROX. DATE OF MAILING | MISREPRESENTATIONS INCLUDE |
|---|---|---|---|---|---|
| J. P.<br>1655500690 | HCFA bill for health services provided from 5/6/02 to 5/10/02, with progress notes | NMB | Allstate | 7/5/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |
| D. L.<br>1655493631 | HCFA bill for health services provided from 3/25/02 to 4/5/02, with progress notes and report | NMB | Allstate | 5/23/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of fraudulent protocol and unnecessary/improper services. |
| J. R.<br>1655490116 | HCFA bill for health services provided from 6/3/02 to 6/13/02, with progress notes | NMB | Allstate | 7/8/02 | 1. Represented service related to injury sustained in accident.<br>2. Contained fictitious medical reports, findings and recommendations.<br>3. Service provided as part of pattern of fraudulent protocol and unnecessary/improper services. |

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET   04-21402

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CIV HUCK**

## I. (a) PLAINTIFFS

Allstate Insurance Company
(see attachment for other Plaintiffs)

## DEFENDANTS

Palterovich, Mikhail
(see attachment for other Defendants)

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Cook Co., IL
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Miami-Dade Co., FL
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**MAGISTRATE**

04CV 21402   P2H

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Laura C. Douglas, Esq.  (see attachment
for firm name, address, telephone)

ATTORNEYS (IF KNOWN)

**NIGHT BOX FILED**

(d) CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| B☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs. | ☐ 830 Patent | X☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **A LABOR** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | A☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

18 U.S.C. Sections 1961, 1962(c) and (d), and 1964(c); violation of Racketeer Influenced and Corrupt Organizations Act
LENGTH OF TRIAL
via 9 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION   ☐ UNDER F.R.C.P. 23

DEMAND $611,000.00   CHECK YES only if demanded in complaint:
JURY DEMAND:   X☐ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
June 14, 2004

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

$150.00   502875

# ATTACHMENT TO CIVIL COVER SHEET (JS 44)

**Box 1.(a)**

<u>Additional Plaintiffs</u>:  Allstate Indemnity Company, Deerbrook Insurance Company, and Northbrook Indemnity Company

<u>Additional Defendants</u>:  Palter, Jake, a.k.a. Palterovich, Jacob; Shteyman, Dmitry, a.k.a. Grinberg, Dmitry; Trintcher, Vladimir; Shteyman, Irina, a.k.a. Perekorenko, Irina; Roig, Isabelle, a.k.a Losardo, Isabelle; Shapiro, Pinchas; Kliger, Grigory, M.D.; LaPlume, Mario, a.k.a Garbarino, Mario LaPlume, M.D.; Tallerie, Pierre M., D.C.; Piasio, Robert, D.C.; Planas, Virginia, D.C.; Moran, William J., D.C.; Fishman, Alexander S., Esq.; S.H.P. Medical Rehabilitation Center, Inc.; Sun State Diagnostic, Inc.; Med Services Group, Inc.; NMB Medical Group, Inc.; Continental Consulting, Inc.; Statewide Collections, Inc.; Byron, Jack; Guenon, David; Devilla, Justo; John Does 1 through 20; Jane Does 1 through 20 and ABC Corporations 1 through 20

**Box 1.(c)**

<u>Plaintiffs' Attorney's full name, address and telephone number</u>:
Laura C. Douglas, Esq.
Stern & Montana LLP
4800 North Federal Highway
Suite 307B
Boca Raton, Florida  33431
Telephone:  (561) 347-1771
Facsimile:  (561) 347-1555