UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-21402-CIV-HUCK/SIMONTON

ALLSTATE INSURANCE CO., et al.,

      Plaintiff,

v.

MIKHAIL PALTEROVICH, et al.,

      Defendants.

                              /

## ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL DEFAULT JUDGMENT

Presently pending before the Court is Plaintiffs' Motion for Default Judgment (DE # 571). The deadline to file a timely response expired on October 20, 2008 and none has been filed to date. This matter is referred to the undersigned Magistrate Judge for final disposition based upon the parties' consent (DE # 278).[1] Based upon a careful review of the record as a whole and for the reasons stated herein, Plaintiffs' motion is GRANTED. It is hereby ORDERED that a Final Judgment shall issue in favor of Plaintiffs and against Defendants Mikhail Palterovich ("Palterovich"), Dmitry Shteyman ("Shteyman"), Sun State Diagnostic, Inc. ("Sun State"), Continental Consulting, Inc. ("Continental") and Mario LaPlume ("LaPlume"), jointly and severally, for the sum of $1,522,231.11, plus attorneys' fees and costs, additional prejudgment interest as set forth in detail below, as well as postjudgment interest at the statutory rate; and, the Court shall retain jurisdiction to enter an Order regarding the amount of attorneys' fees and costs.

---

[1] This matter was also referred to the undersigned Magistrate Judge as to other defendants against whom a default had been entered for failure to respond to the Complaint, and who therefore did not consent. As to the defaulted defendants, this matter was referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law on the issue of damages, and those matters are the subject of a companion Report and Recommendation.

I.     **BACKGROUND**

In a complaint filed on June 10, 2004, Plaintiffs alleged that 22 defendants participated in a four-year long conspiracy to defraud them, and other insurance companies like them, by staging automobile accidents and operating sham medical clinics that submitted insurance claims for testing and treatment that were never rendered or were medically unnecessary.  Thus, Plaintiffs sued the defendants under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962 and 1964 (Counts I-VI); common law unjust enrichment based on the Florida Professional Service Corporations and Limited Liability Companies Act, Fla. Stat. §§ 621, *et. seq.* (Count VII); common law fraud (Count VIII); as well as the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. §§ 772.104 and 772.11 (Counts IX-X); and, Plaintiffs sought injunctive relief (Count XI) and declaratory judgments (Counts XII-XIV) in addition to monetary damages (DE # 1).

This Court entered default judgments as to liability against Palterovich, Shteyman, Sun State, Continental and LaPlume as a sanction for their willful disregard for the Court's Orders and their failure to participate in discovery as required (DE ## 269, 512, 566).[2]

---

[2]  This report and recommendation does not address Plaintiffs' claims against Defendants that have entered into settlement agreements resulting in a final judgment or dismissal as to those Defendants, including Robert Piasio, D.C., Alexander Fishman, Esq., Jake Palter, Irina Shteyman, Grigory Kliger, M.D., Pierre Tallerie, D.C., William Moran, D.C., Jack Byron, David Guenon and Justo Davilla (DE ## 275, 456, 470, 536, 542, 551, 552, 556, 564).  Moreover, Plaintiffs' claims against Defendants Vladimir Trintcher, Isabelle Roig, Pinchas Shapiro, Virginia Planas, S.H.P. Medical Rehabilitation Center, Inc., Med Services Group, N.M.B. Medical Group, Inc. and Statewide Collections, Inc. have not been referred to the undersigned Magistrate Judge for final disposition; and, therefore, Plaintiffs' claims against those Defendants will be addressed in a separate Report and Recommendation.

In the presently pending motion, Plaintiffs request that this Court enter a final default judgment against the defaulted defendants as to Counts I-VI and VIII-X of the Complaint; assess damages against them in the amount of $2,618,617.41,[3] plus additional prejudgment and postjudgment interest, as well as attorneys' fees and costs; and, find them jointly and severally liable for the entire sum (DE # 571).

II.   ANALYSIS

Based upon the allegations of the Complaint which are deemed admitted pursuant to the entry of a default as to liability, as well as the analysis set forth herein, the undersigned concludes that it is appropriate to enter a final default judgment in favor of Plaintiffs and against Defendants Palterovich, Shteyman, Sun State, Continental and LaPlume, jointly and severally, for the sum of $1,522,231.11, plus additional prejudgment interest as set forth in detail below, as well as postjudgment interest at the statutory rate, based upon their violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961, 1962 and 1964 (Counts I-VI); common-law fraud (Count VIII); and the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. §§ 772.104 and 772.11 (Counts IX-X) (DE # 1).

A.   The RICO Act (Counts I-V)

By virtue of Defendants' default – which renders all well-pled allegations in the Complaint to be admitted as true – the undersigned finds that Plaintiffs have stated a cause of action under the RICO statute.  18 U.S.C. §§1962(c) and 1964.

---

[3]  For the reasons set forth *infra.*, the undersigned finds that the requested damages must be reduced to $1,522,231.11, based upon a reduced award of prejudgment interest, and the decision that only the actual damages, and not the prejudgment interest award, should be trebled; as well as certain mathematical errors in Plaintiffs' submission.

3

It is well established that the elements for a civil RICO claim consist of: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property." *Ace Pro Sound and Recording, LLC v. Albertson*, 512 F. Supp. 2d 1259, 1266 (S.D. Fla. 2007) (citing *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311 (11th Cir. 2000)); *accord Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co.*, 202 F. Supp. 2d 1339 (S.D. Fla. 2002). In addition, the provision of the RICO Act that forms the basis for Plaintiffs' claims expressly requires proof that the Defendants are associated with an enterprise that is "engaged in, or the activities of which affect, interstate or foreign commerce . . . ." 18 U.S.C. § 1962(c).

1.    <u>Enterprise</u>

To satisfy the first element of the RICO statute, Plaintiffs must demonstrate the existence of a "RICO enterprise," which is defined as "any union or group of individuals" that is "associated together for a common purpose of engaging in a course of conduct." 18 U.S.C. § 1961; *United States v. Turkette*, 452 U.S. 576, 583 (1981). Plaintiffs bear the burden of showing "evidence of an ongoing organization, formal or informal," as well as evidence "that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583. In the Complaint, Plaintiffs satisfactorily allege that Defendants Palterovich, Shteyman, Sun State, Continental and LaPlume, among others, participated in a RICO enterprise.

a.    <u>Existence of an Enterprise</u>

The overarching RICO enterprise is described in the Complaint as an association-in-fact enterprise known as the "Medical Network Enterprise." The Medical Network Enterprise consists of the Defendant Clinics (including Sun State) and the Defendant Management Companies (including Continental), each of which was controlled by the

4

Defendant Ringleaders (including Palterovich and Shteyman) to effectuate the fraudulent scheme through the assistance of the Defendant Providers (including LaPlume).

The Defendants, individually and collectively, each fulfilled a role in the Medical Network Enterprise.  For example, the Defendant Ringleaders operated the Defendant Clinics; the Defendant Management Companies generated and processed the fraudulent medical bills and passed the insurance payments onto the individual Defendants; and, the Defendant Providers were licensed medical professionals who allowed their names to be used in order to support the fraudulent insurance claims that were based on bills for testing and treatments that were either unnecessary or never performed (DE # 1 at 74-76) (Count I).

In addition to the overarching "Medical Network Enterprise," Counts II-V of the Complaint allege that each of the Defendant Clinics – including Sun State (Count III) – constituted individual RICO enterprises as well, and that the Defendants participated in the operation of these individual enterprises in a similar fashion (DE # 1 at 80).

The Medical Network Enterprise and each of the Defendant Clinics is a RICO enterprise because each consisted of a group of individuals that associated together for the purpose of engaging in a course of conduct that included "defrauding Plaintiffs into paying bills for medical services that were not necessary and, in many cases, not supplied" (DE # 1 at 76, ¶ 252).  Thus, the individuals and entities named as Defendants in this lawsuit, who worked together to operate sham medical clinics and billing agencies over a four-year period, comprised an "enterprise," as that term is used in the RICO Act, which is to be "liberally construed to effectuate its remedial purposes," and defines "enterprise" expansively.  *See Boyle v. United States*, 129 S.Ct. 2237, 2243 (2009) (internal citation omitted).

b.    **Distinctness**

The RICO Act provides that it is "unlawful for any *person* . . . associated with any *enterprise*" to participate in racketeering activity.  18 U.S.C. § 1962 (emphasis added).[4] The statute thus "imposes a 'distinctness' requirement whereby the 'person' and the 'enterprise' identified must be separate and distinct entities."  *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare*, 502 F. Supp. 2d 1237, 1253 (S.D. Fla. 2007).  This limitation applies, however, "only when the singular person or entity is defined as both the person and the only entity comprising the enterprise."  *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).  Thus, the fact that the Complaint names Defendant Sun State to be a RICO enterprise in its own right does not preclude a finding that it is simultaneously a RICO person and a component of a distinct RICO enterprise.  The RICO enterprises at issue in this case, whether identified as the underlying "Medical Network Enterprise" – as in Count I – or as the individual Defendant Clinics – as in Counts II through V – are made up of other individuals and groups, such as the Defendant Ringleaders and the Defendant Providers, each of which were "free to act independently of each other and to advance their own separate interests," meaning that Sun State is not only a RICO enterprise, but a RICO person as well, thus satisfying the "distinctness" requirement.[5]  *See Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare*, 502 F. Supp. 2d

---

[4]  RICO defines a "person" simply as "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).

[5]  The undersigned recognizes that certain allegations in the Complaint somewhat draw into question whether Sun State can constitute both a RICO person and a RICO enterprise in Count III, in which it is alleged that Sun State is, itself, the RICO enterprise. Keeping in mind that the "key to distinctness" relies heavily on "whether the corporations are free to act independently of each other and to advance their own separate interests," *see Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare*, 502 F. Supp. 2d 1237, 1253 (S.D. Fla. 2007), it is questionable whether Sun State qualifies as a distinct

1237, 1253 (S.D. Fla. 2007).

c.  **Interstate Commerce**

Plaintiffs specifically allege that the Medical Network Enterprise, as well as each of the Defendant Clinics, is "engaged in activities, including defrauding insurers[,] that are based outside of Florida, that affect interstate commerce" (DE # 1 at 75, ¶ 247; DE # 1 at 80, ¶ 272; DE # 1 at 82, ¶ 281; DE # 1 at 84, ¶ 290), and thus satisfy the pleading requirements mandated by 18 U.S.C. § 1962(c) for each of the Defendants, who are all alleged to be "associated" with or employed by those RICO enterprises whose actions affect interstate commerce.  *See United States v. Flores*, No. 08-10775, 2009 WL 1842652, at *10 (11th Cir. June 29, 2009) ("This Court has concluded that in the context of a RICO conspiracy, 'only a slight effect on interstate commerce is required.'").

2.  **Pattern of Racketeering Activity**

Plaintiffs have also fulfilled the three-pronged test necessary to establish a "pattern of racketeering activity" by alleging: (1) that Defendants committed more than two predicate acts within a ten-year span, *see* 18 U.S.C. § 1961(5); (2) that the predicate acts are related to each other; and (3) that the illegal conduct is of a continuous nature. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 n.14 (1985) (quoting S. Rep. No. 91-

---

RICO "person" for the purposes of Count III, considering the fact that it is the only RICO enterprise alleged in that Count and the fact that the Complaint alleges that "the Defendant Clinics were used interchangeably . . . and were operated with a complete disregard for the requirements that they maintain separate and distinct legal identities" (DE # 1 at 32, ¶ 108).  Even if the distinctness doctrine were to prevent the Court from assessing liability in Count III, however, there is no barrier to finding it liable under the remaining RICO counts alleged in the Complaint, as discussed above.  In Count I, for example, the "enterprise" is defined as the "Medical Network Enterprise," which consists of various unrelated persons and entities, meaning that SHP is not the "*only* entity comprising the enterprise," *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (emphasis added), and, therefore, the distinctness doctrine does not bar a finding of liability under the RICO Act.

617 at 158) ("It is this factor of *continuity plus relationship* which combines to produce a pattern.").

        a.    <u>Two or More Predicate Acts</u>

      According to the statutory definition, a "pattern of racketeering activity" consists of "at least two acts of racketeering activity" that occur within ten years of each other. Mail fraud constitutes an "act of racketeering activity" and Plaintiffs have alleged that Defendants committed mail fraud thousands of times over the course of their four-year scheme (*see, e.g.,* DE # 1 at 77).

      The allegations in the Complaint show that Defendants committed mail fraud because they purposefully endeavored to fraudulently bill insurance companies, like Plaintiffs, based on medical tests and treatments that were either unnecessary or never performed; and, that Defendants were aware that it was necessary to use the mails in order to process the insurance claims and payments required to effectuate their scheme. The Complaint alleges that the mail fraud consisted generally of Defendants' submission of "thousands of fraudulent claim forms seeking payment for services that were purportedly (but not actually) provided to many hundreds of patients;" and, that "[t]he bills and supporting documents that were sent by the Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States mail" (DE # 1 at 76, ¶¶ 254-55). *See United States v. Parkman*, 488 F.2d 1392, 1392 (5th Cir. 1974) (affirming mail fraud conviction of a physician involved in the staging of fraudulent automobile accidents for the purpose of creating false personal injury claims, based on his use of the mails "to transmit fraudulent medical bills to the insurance

companies.").[6]

It is immaterial whether any particular Defendant physically placed a fraudulent document in the mail, so long as that Defendant knew "that the use of the mails . . . w[ould] follow in the ordinary course of business, or where such use c[ould] reasonably be foreseen, even though not actually intended." *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)).  That the Defendants reasonably foresaw that their scheme would require use of the mails is adequately alleged in the Complaint (*see, e.g.,* DE # 1 at 77, ¶ 257) ("Defendants, overall, . . . participated in the preparation and mailing of those [insurance] claims, knowing that they contained materially false and misleading information.").

An illustrative, but not exhaustive, list of examples of the predicate acts of mail fraud is set forth with particularity in the Appendix attached both to the Complaint and the RICO Case Statement, which includes, for each fraudulent claim form that was mailed: (1) the initials of the "covered person;" (2) a description of the documents that were placed in the mail; (3) the sender and (4) the recipient; as well as (5) the approximate date of mailing; and (6) an explanation of the misrepresentations contained in the documents that were mailed (DE # 1 at 108-117; DE # 82 at 73-85).[7]

---

[6] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

[7] It is not necessary to rely on the RICO Case Statement to establish any element of the violations alleged in this case because its contents are cumulative of the allegations contained in the Complaint, although the undersigned notes that it would not likely be inappropriate to rely on the RICO case statement for present purposes.  *See Old Time Enters., Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1218-19 (5th Cir. 1989) (considering RICO case statement in analysis of motion to dismiss for failure to state a claim); *Glessner v. Kenny*, 952 F.2d 702, 712 n.9 (3d Cir. 1991), *ovverruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 260 (3d Cir. 1995) ("Courts

b.      **Relatedness**

The fact that these predicate acts of mail fraud are related to one another as well as to the enterprise charged is self-evident from the Complaint as a whole, which describes how each individual predicate act was part of a larger scheme to induce Plaintiffs into paying no-fault insurance claims to which Defendants were not entitled, often by staging fake car accidents in an identical manner; and, by utilizing an interchangeable stable of patients, doctors, clinics, billing agencies and support staff. *See United States v. Browne*, 505 F.3d 1229, 1257-58 (11th Cir. 2007) ("[T]he predicate acts must relate to the enterprise charged [and] to each other . . ., meaning that the predicate acts must 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise be interrelated by distinguishing characteristics") (emphasis and internal alterations omitted).  As Plaintiffs summarize in their RICO Case Statement:

> The predicate acts . . . are related, not only in their method of commission, but involve the same parties and each mailing contains the same misrepresentations, including: health care services rendered as being related to injury; fictitious medical reports, findings and recommendations; unnecessary or improper services provided as part of a pattern of fraudulent protocol; and billing for diagnostic testing never rendered.  In addition to the specific representations, each mailing contains the same implicit misrepresentation, to wit: that the health care services were being rendered by a properly licensed professional

(DE # 82 at 35); (DE # 1 at 46, ¶¶ 148-49); (*see also* DE # 1 at 42-43 and 45-46, ¶¶ 141, 143, 146-47) (describing the modus operandi for staging car accidents as involving older-model vehicles; each containing multiple passengers; a low-impact collision; and, a

_____

may consider the RICO case statements in assessing whether plaintiffs' RICO claims should be dismissed."); *Tierney and Partners, Inc. v. Rockman*, 274 F. Supp. 2d 693, 699 (E.D. Pa. 2003).

clearly blame-worthy adverse vehicle that would "conveniently fle[e] the scene of the crime[,] thereby precluding a complete investigation surrounding the circumstances" of the accident and ensuring that "any personal injury claim that followed" would result in a "quick settlement"); (*see also* DE # 1 at 57-68) (detailing Defendants' "standard operating procedure" for fabricating symptoms, findings, tests and treatments that was common to all patients for the purpose of filing false insurance claims).

      c.    <u>Continuity</u>

The final prong of the analysis to determine the existence of "a pattern of racketeering activity" requires Plaintiffs to show either that the predicate acts exhibited a "closed-ended continuity" or an "open-ended continuity." Here, there is both "closed-ended continuity" and "open-ended continuity."

"Closed-ended continuity" occurs when "a series of related predicates extend[s] over a substantial period of time." *H.J., Inc. v. N.W. Bell Telephone Co.*, 492 U.S. 229, 242 (1989). Because the predicate acts in this case occurred over a four-year period, which is a "substantial period of time," Plaintiffs have fulfilled their burden of demonstrating a closed-ended pattern of continuing racketeering activity. *Compare Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc.*, 814 F. Supp. 1084, 1094 (S.D. Fla. 1992) (finding a two-year period was a "substantial amount of time" to commit "numerous acts of mail and wire fraud" for the purpose of establishing closed-ended continuity) *with Ferrell v. Durbin*, 311 Fed. Appx. 253, 256 (11th Cir. Feb. 9, 2009) ("In this Circuit, 'closed ended continuity cannot be met with allegations of schemes lasting less than a year.'").[8]

---

[8]  Although temporal scope is the primary factor in establishing the existence of closed-ended continuity, it may also be appropriate to consider other relevant factors, "with the goal of achieving a common sense result," including the "number of victims, number of racketeering acts, variety of racketeering acts, whether the injuries were

"Open-ended continuity" occurs when "the misrepresentations were part of the 'regular way of doing business' or threaten repetition in the future." *Ferrell v. Durbin*, 311 Fed. Appx. 253, 257 (11th Cir. Feb. 9, 2009) (quoting *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1265 (11th Cir. 2004)).  "[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J., Inc.*, 492 U.S. at 242-43.  In this case, the purpose for establishing the RICO enterprises and manner in which Defendants operated them fulfills the "open-ended continuity" inquiry.  Plaintiffs allege that the RICO enterprises and their component parts, including the Defendant Clinics and Defendant Management Companies, were established for the express purpose of committing insurance fraud as part of their "regular way of doing business;"[9] and, that they were operated in such a way as to ensure that their fraudulent scheme, "if not stopped, [would] continue in the future" (DE # 1 at 79, ¶ 265); (*see also* DE # 82 at 40-41).  Finally, the Complaint fairly alleges that Defendants committed the predicate

---

distinct, complexity and size of the scheme, and nature or character of the enterprise or unlawful activity." *Ward v. Nierlich*, No. 99-14227-CIV, 2008 WL 852789, at *10-11 (S.D. Fla. Mar. 28, 2008) (internal quotation marks omitted) (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993)).  While it does not affect the ultimate result in light of the fact that Plaintiffs have shown the existence of a pattern of racketeering activity that is continuous in a closed-ended sense due to the fact that the racketeering acts clearly occurred over a "substantial period of time," the undersigned notes that the high volume of the racketeering acts committed by Defendants; the complex nature of the scheme; the size of the scheme; and, the complexity and the nature of the predicate acts alleged all support the "common sense result" that Defendants' pattern of racketeering activity was "continuous" under the language of the RICO Act.

[9]  (*See* DE # 1 at 32, ¶ 106; DE # 1 at 52, ¶ 172) ("[T]he [Defendant] Ringleaders created the Defendant Clinics to fraudulently bill No-fault insurance carriers for services that were never rendered or that were medically unnecessary."); (*see also* DE # 1 at 55, ¶ 179) ("[T]he [Defendant] Ringleaders routinely engaged in a pattern and practice of up-coding bills submitted to . . . Plaintiffs").

offenses in their respective roles participants in "a long-term association that exist[ed] for criminal purposes." *H.J., Inc.*, 492 U.S. at 242-43.

### 3.    Causation

When a civil RICO claim is premised on acts of mail or wire fraud, the plaintiff shoulders the burden of proving (1) that defendant sent material misrepresentations via the mails or wires, (2) that such misrepresentation would have been relied upon by a reasonable person, and (3) that the plaintiff suffered a specifiable amount of damages as a result of such reliance. *See Bocciolone v. Solowsky*, No. 08-20200-CIV, 2009 WL 936667, at *5 (S.D. Fla. Apr. 6, 2009).

The Complaint adequately alleges that Defendants' fraudulent misrepresentations were the legal and proximate cause of direct and specific harm to Plaintiffs' business (DE # 1 at 77-78); (DE # 1 at 32, ¶ 105) ("To fulfill [their] obligation to promptly process claims under the No-fault law, Plaintiffs justifiably relied upon the bills and documentation submitted by Defendants in support of their claims and ha[ve] paid the Defendants based on the representations and information that Defendants mailed to Plaintiffs."); (DE # 82 at 33, 64-66) (stating that, as a result of Defendants' RICO violations, "Plaintiffs paid substantial sums of money based on the submission of fraudulent claims and were caused to incur additional expenses associated with the processing and handling of those fraudulent claims as well as related investigative expenses.").

### B.    RICO Conspiracy (Count VI)

"A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Panama*

*v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997).  As the Eleventh Circuit explained in *United States v. Gonzalez*, 921 F.3d 1530, 1539 (11th Cir. 1991), "[a] RICO conspiracy requires proof of an agreement to violate a substantive RICO provision," which in this case was to "conduct or participate . . . in the conduct of [the] affairs" of the Medical Network Enterprise "through a pattern of racketeering activity," in violation of 18 U.S.C. § 1962(c).  In other words, as Plaintiffs put it in their Motion for Default Judgment, each Defendant was aware that the purpose of the Medical Network Enterprise was to facilitate the commission of mail fraud and "agreed to associate with it, knowing that at least two predicate acts would be committed on its behalf" (DE # 571 at 13) (citing DE # 1 at 87-88, ¶¶ 300-302); (*see also* DE # 82 at 64-66).

The undersigned agrees with Plaintiffs.  According to the Complaint, the Defendant Ringleaders (including Palterovich and Shteyman) "operated, controlled and owned the Defendant Clinics" (DE # 1 at 3, ¶ 6), which were used to "perpetrate[ ] a fraud upon . . . Plaintiffs[,] who relied on their fictitious medical reports" (DE # 1 at 8, ¶ 26) and therefore reimbursed the Defendants "for services that were never rendered or that were medically unnecessary" (DE # 1 at 32, ¶ 106).  The Defendants together "stole . . . from the Plaintiffs by submitting fraudulent medical claims" (DE # 1 at 10, ¶ 33) by "routinely submitt[ing] fabricated reports, findings and data to . . . Plaintiffs . . . to substantiate their fraudulent claims and induce payment" (DE # 1 at 6, ¶ 16) according to a centralized scheme involving a pattern of racketeering activity that is described in detail in the Complaint (*see, e.g.,* DE # 1 at 14-16, 37-39).  Based upon the Complaint as a whole, including the specific allegations set forth below, the undersigned concludes that each

of the Defendants agreed to the overall objective of the conspiracy.[10]

### 1.  The Defendant Ringleaders (Palterovich and Shteyman)

In addition to their shared role as Defendant Ringleaders who were responsible for masterminding and executing the fraud, the Complaint contains specific allegations relating to the following Defendants:

Among other things, Defendant Mikhail Palterovich, who used multiple aliases to hide his ownership of business entities, was previously involved in a similar scheme in New York.  In the context of this case, he served as an officer and director of Sun State, one of the Defendant Clinics involved in this scheme that sent at least 12 fraudulent insurance claim forms to Plaintiffs; he was the sole officer and director of N.M.B. Medical Group, Inc. ("NMB"), another Defendant Clinic that sent at least 7 fraudulent insurance claim forms to Plaintiffs; and, he was the sole officer and director of Continental, a Defendant Management Company that was used to funnel money from the Defendant Clinics to the individual Defendants (DE # 1 at 22-26, ¶¶ 67, 69, 71, 76) (DE # 1, Appx. A at 110-12, 115-16); (*see also* DE # 82 at 20-21).

Defendant Dmitry Shteyman was, among other things, a director and officer of three of the Defendant Clinics – Sun State, Medical Services Group, Inc. ("MSG") and NMB –, which sent fraudulent claim forms to Plaintiffs; and, he ran the day-to-day operations at the Defendant Clinics, including soliciting, hiring and paying the Defendant Providers and the runners who organized the staged car accidents, as well as creating false paperwork to support the fraudulent insurance claims (DE # 1 at 23-25, 34, 53-54, ¶¶

---

[10]  In light of this conclusion, it is unnecessary to decide whether the Defendants also "agreed to commit two predicate acts," *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997), although this is certainly true for at least some of the Defendants, such as the Defendant Clinics, for instance.

67-69, 74, 175-77) (DE # 1, Appx. A at 110-16); (*see also* DE # 82 at 18-19).

### 2.    The Defendant Providers (LaPlume)

In addition to his role as one of the Defendant Providers, licensed healthcare professionals who were instrumental in the scheme, Defendant LaPlume, among other things, shared in the proceeds of the criminal scheme (DE # 1 at 39, ¶ 133); and, he allowed his signature to be used on medical and insurance claim reports that "falsely represented that [he] actually rendered the health services for which the Defendant Clinics submitted bills, when in fact [he] never examined, treated or otherwise came into contact with many of the patients (DE # 1 at 73-74); (*see also* DE # 82 at 25-26).[11]

### 3.    The Defendant Clinics (Sun State)

In addition to its role as one of the Defendant Clinics, which were necessary to carry out the fraud, Defendant Sun State was run by the Defendant Ringleaders and sent at least 12 fraudulent insurance claim forms to Plaintiffs (DE # 1 at 22, ¶ 67); (DE # 1, Appx. A at 110-12);  (*see also* DE # 82 at 10-12).

### 4.    The Defendant Management Companies (Continental)

In addition to its role as one of the two Defendant Management Companies that were established by the Ringleader Defendants to carry out the fraud, Defendant Continental was established "to ensure that the profits from their criminal enterprise were funneled" to Defendants (DE # 1 at 23-24, ¶ 71); it was used by the Defendant Clinics to "prepare[ ] and generate[ ] the fictitious narrative reports and bills that were

---

[11]   While it is not included in the sample of fraudulent insurance claims that Plaintiffs attached to their Complaint, the undersigned notes that, in the detailed accounting attached to Plaintiffs' Motion for Default Judgment to support their claim for actual damages, Defendant LaPlume personally appears as a payee on two separate claims using Defendant SHP's unique Tax Identification Number ("TIN") (DE # 571, Ex. A at 10, 11).

submitted to . . . Plaintiffs" (DE # 1 at 32-33, ¶ 109); and, it submitted fictitious reports

and bills on behalf of the Defendant Clinics Sun State and MSG (DE # 1 at 35-36, ¶¶ 122,

124); (*see also* DE # 82 at 15-17).

      C.      <u>Common Law Fraud (Count VIII)</u>

      In this case, the Complaint successfully states a claim for common law fraud

under Florida law by alleging the following elements:

> (1) a false statement or misrepresentation of material fact; (2) the
> representor's knowledge at the time the misrepresentation is made that the
> statement is false; (3) an intention that the misrepresentation induce
> another to act; (4) action in justifiable reliance on the representation; and
> (5) resulting damage or injury.  *See Bailey v. Trenam, Simmons, Kemker,*
> *Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F.Supp. 825, 829 (S.D. Fla.1996);
> *Johnson v. Davis*, 480 So.2d 625, 627 ([Fla. ]1985).

*MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1363 (S.D. Fla. 2000);

*accord Gentry v. Harborage Cottages-Stuart, LLP*, 602 F. Supp. 2d 1239, 1259 (S.D. Fla.

2009).

      The undersigned begins by noting that the common law fraud claims are

generally duplicative to the RICO claims that are premised upon multiple acts of mail

fraud as alleged in Count I.  The most significant difference between the two claims is

that to state a claim for common law fraud, the plaintiff must show that it *actually* relied

on defendants' misrepresentation, whereas to state a claim under the RICO Act, such

"first-person reliance" is not necessary, so long as it was reasonable for some person to

rely on the misrepresentation and the plaintiff was directly or indirectly harmed as a

result.  *See Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131, 2141 (2008).  This,

however, is not an issue in this case, where Plaintiffs have alleged that their injuries

flowed directly from their reliance on Defendants' misrepresentations *and* that such

reliance was reasonable (DE # 1 at 78, ¶ 260); (DE # 1 at 32, ¶ 105) ("To fulfill [their]

obligation to promptly process claims under the No-fault law, Plaintiffs justifiably relied upon the bills and documentation submitted by Defendants in support of their claims and ha[ve] paid the Defendants based on the representations and information that Defendants mailed to Plaintiffs.").

Plaintiffs have satisfied the first two prongs of the common law fraud analysis by documenting numerous instances in which the (1) Defendants made misstatements concerning material facts (2) despite knowing that the statements were false and misleading.  For instance, according to the Complaint, the Defendant Ringleaders (including Palterovich and Shteyman) established an enterprise with the specific purpose to make false and misleading statements concerning third parties' medical conditions to justify expensive testing and treatments (*see, e.g.,* DE # 1 at 93-94, ¶ 333). Those false and misleading statements were generated by agents and employees working on behalf of the Defendant Clinics (including Sun State) (*see, e.g.,* DE # 1 at 56, ¶ 182); supported by the signatures of the Defendant providers (including LaPlume) (*see, e.g.,* DE # 1 at 73, ¶ 241); and, submitted to Plaintiffs through the Defendant Management Companies (including Continental) (*see, e.g.,* DE # 1 at 33, ¶ 109).

Moreover, Plaintiffs have satisfied the final three prongs of the common law fraud analysis by virtue of their allegations that (3) Defendants intended to induce Plaintiffs to rely on their false and misleading statements; and, that (4) Plaintiffs acted in justifiable reliance of those statements (5) to their detriment.  For instance, the Complaint states that Defendants "made . . . false representations with the intention and purpose of inducing Plaintiffs to rely thereon" (DE # 1 at 95, ¶ 335);[12] that Plaintiffs "did reasonably

---

[12]  (*Accord* DE # 1 at 14, ¶ 45; DE # 1 at 16, ¶ 47) ("Defendants created a billing apparatus that was designed to exploit the No-fault laws" and to "deceive insurers into

and justifiably rely on the foregoing material misrepresentations" (DE # 1 at 95, ¶ 336);[13] and, that Plaintiffs consequently "sustained compensatory damages" because they were tricked into paying false medical claims that they would not have reimbursed had they known that the claims were based on Defendants' false and misleading statements (DE # 1 at 95, ¶¶ 338-40).

 **D.** **Florida Civil Remedies for Criminal Practices Act (Counts IX-X)**

 Plaintiffs have successfully pled two causes of action under Florida's Civil Remedies for Criminal Practices Act: namely, Fla. Stat. § 772.11 (Count IX) and Fla. Stat. § 772.104 (Count X).

  **1.** **Fla. Stat. § 772.11 (Count IX)**

 Plaintiffs asserted a cause of action in Count IX by showing that they were injured based on Defendants' knowing deprivation of their property by targeting Plaintiffs in their insurance fraud scheme, in violation of Fla. Stat. §§ 772.11, 812.014.

 Section 772.11 entitles the plaintiff to treble damages upon a showing that it was injured by virtue of the defendant's violation of any one of a number of criminal acts, including theft, which occurs when a person "knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently[, d]eprive the other person of a right to the property."  Fla. Stat § 812.014. Under the statute, the term "property" is defined broadly to mean "anything of value." Fla. Stat. § 812.014(4).

_____

paying fraudulent medical claims").

 [13] (*Accord* DE # 1 at 32, ¶ 105) (Plaintiffs "justifiably relied upon the bills and documentation submitted by the Defendants in support of their [medical insurance] claims" in order to "fulfill [their] obligation to promptly process claims under the No-fault Law").

Under similar circumstances, in which an insurance company alleged that it was wrongfully induced to pay money based on defendants' false statements, this Court concluded that the insurance company successfully pled a claim of civil theft under section 812.014.  *See Colonial Penn Ins. Co. v. Value Rent-A-Car Inc.*, 814 F. Supp. 1084, 1098 (S.D. Fla. 1992).

Moreover, in interpreting the predecessor to the theft statute, Florida courts have found defendants liable in situations where they gained "possession of the property of another by means of fraud or trickery and ha[d] a preconceived purpose to appropriate such property to [their] own use or to deprive the owner of its use," which is precisely the kind of activity Plaintiffs allege occurred in the case at bar.  *See Collins v. State*, 319 So. 2d 135, 137 (Fla. 2d Dist. Ct. App. 1975).  In fact, to establish a claim for theft based on fraud under the predecessor statute, Florida courts have applied the same five-part test for common law fraud that is discussed in the preceding section of this Order.  *See Green v. State*, 190 So. 2d 614, 616 (Fla. 3d Dist. Ct. App. 1966); *Rosengarten v. State*, 171 So. 2d 591 (Fla. 2d Dist. Ct. App. 1965).

Finally, by alleging that Defendants did not respond to Plaintiffs' demand for return of the insurance proceeds fraudulently obtained, Plaintiffs have satisfied the pre-suit demand requirements imposed by Fla. Stat. § 772.11 (DE # 1 at 95, ¶ 344).

### 2.    Fla. Stat. § 772.104 (Count X)

Plaintiffs have also asserted a cause of action in Count X by showing that they were injured as a result of Defendants' pattern of criminal activity.  Fla. Stat. §§ 772.103, 772.104.

Section 772.104 entitles Plaintiffs to treble damages upon a showing that they were injured by virtue of Defendants' violation of section 772.103, which prohibits any

20

person from using proceeds directly or indirectly derived from a pattern of criminal activity to establish an enterprise; from acquiring an interest in an enterprise through a pattern of criminal activity; from being employed by or associated with an enterprise for the purpose of participating in a pattern of criminal activity; or from conspiring to do any of the preceding acts.  Fla. Stat. § 772.103.

The undersigned notes at the outset that section 772.103 is dubbed the "Florida RICO Act" because it is patterned after the federal RICO Act; and, the Eleventh Circuit has therefore stated that "the analysis we apply to the plaintiffs' federal RICO claims is equally applicable to their state RICO claims."  *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1264 (11th Cir. 2004).  Thus, for the reasons set forth in the preceding sections of this Order addressing Plaintiffs' federal RICO claims – including conspiracy to violate the RICO Act – the undersigned finds that: (1) Defendants were employed by or associated with an enterprise for the purpose of participating in a pattern of criminal activity; (2) Defendants conspired to associate with an enterprise for the purpose of participating in a pattern of criminal activity; and (3) Plaintiffs were directly injured thereby.[14]

---

[14]  The undersigned notes that the Florida RICO Act also imposes liability for using proceeds derived from a pattern of criminal activity to establish or acquire an interest in an enterprise or real property.  Fla. Stat. §§ 772.103(1) and (2).  Although these elements of the Florida RICO Act are not directly addressed in the context of analyzing Plaintiffs' federal RICO Act claims, the undersigned notes that Plaintiffs allege that Defendants' use of the proceeds derived from a pattern of criminal activity constitute a redundant basis for liability under the Florida RICO Act (*see* DE # 1 at 97, ¶ 349) (alleging that "Defendants, through the pattern of criminal activity set forth herein, . . . acquired or maintained, directly or indirectly, interest in or control of an enterprise(s) or real property, including but not limited to the Defendant Clinic[s] and [Defendant] Providers").

E.   **Damages**

The undersigned concludes that the Final Default Judgment should reflect that Defendants are liable to Plaintiffs for a total of $1,522,231.11.  This sum consists of $1,112,635.20, which is the treble value ($1,862,635.20) of Plaintiffs' actual damages ($620,878.40), minus the value of settlements that Plaintiffs have obtained as to other Defendants ($750,000.00); and, an additional $409,595.91 in prejudgment interest that accrued through December 31, 2008.  The undersigned also concludes that the damage award should accrue prejudgment interest at a rate of $136.10 per day for each day between January 1, 2009 and the date that the judgment is entered, as well as postjudgment interest at the statutory rate for each day thereafter.

1.   **Compensatory Damages**

Unlike a default as to liability, the allegations contained in the complaint regarding the measure of damages are not considered admissions by virtue of the default.  *See Stockwire Research Group, Inc. v. Lebed*, 577 F. Supp. 2d 1262, 1263 n.2 (S.D. Fla. 2006).  Rather, the plaintiff bears the burden of proving the amount of damages, which may be established either by submitting "sufficient evidence . . . to support the request for damages," or, if the documentary evidence is not sufficient, via a hearing on damages.  *Wallace v. The Kiwi Group*, 247 F.R.D. 679, 681 (M.D. Fla. 2008).  Because the record in this case, which includes detailed affidavits provided by Plaintiffs, provides a clear basis for ascertaining the appropriate measure of damages, it is not necessary to have an evidentiary hearing to calculate the damage award.  *See Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985); *Wallace*, 247 F.R.D. at 682.

The starting point for the analysis to determine the full extent of Defendants'

liability is to compute the amount of actual damages that Plaintiffs incurred as a proximate result of Defendants' fraudulent acts.

According to the plain language of the RICO Act, a successful plaintiff is entitled to recover "threefold the damages he sustains," 18 U.S.C. § 1964(c).  In this case, where the basis for liability is a series of predicate acts of mail fraud designed to induce an insurance company to pay fraudulent medical claims, the "damages sustained" consists of the value of the fraudulent insurance claims that Plaintiffs paid as a result of Defendants' scheme as alleged in Counts I-VI.  *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1569 (1st Cir. 1994) (holding that insurer that prevailed under the RICO Act "is entitled to damages equal to the entire amount of its payments on fraudulent claims"); *City of Chicago Heights, Ill. v. Lobue*, 914 F. Supp. 279, 282 (N.D. Ill. 1996) ("The measure of civil RICO damages (before trebling) is the harm flowing from the predicate acts," meaning "any direct financial injury" suffered by the plaintiffs as a result of those acts).

The same holds true for the measure of damages under Florida's Civil Remedies for Criminal Practices Act (the so-called "Florida RICO Act"), which Plaintiffs allege in Counts IX and X.  *See* Fla. Stat. §§ 772.104(1); 772.11(1); *see also Palmas Y Bambu, S.A. v. E.I dupont De Nemours & Co.*, 881 So. 2d 565, 570 (Fla. 3d Dist. Ct. App. 2004) (holding, in an action under 772.104, that the plaintiff must show that "his injury was caused by, that is, his damage was 'by reason of,' the predicate mail or wire fraud acts."); *Anthony Distrib., Inc. v. Miller Brewing Co.*, 941. F. Supp. 1567, 1576-77 (M.D. Fla. 1996) (holding, in an action under section 772.11, that "damages in the context of civil theft normally correspond to the value of the property stolen by the defendant.").

Finally, Plaintiffs allege that Defendants committed common-law fraud in Count

VIII of the Complaint, which permits a recovery of the actual damages occasioned as a result of the fraud, although those damages are not trebled, as they are in the remaining counts.  *See Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003) (under Florida law, the "first measure of damages" for a successful fraud claim is known as the 'out-of-pocket rule,'" which "allows for recovery of amounts that the plaintiff actually lost.").

The undersigned finds that the Affidavit and Exhibits attached to his Affidavit of of Brett Kelley, Allstate's Special Investigations Analyst, establishes that Plaintiffs suffered $620,878.40 in actual losses as a direct result of Defendants' illegal activities that formed the basis for liability in Counts I-VI and VIII-X of the Complaint.[15]

Specifically, the Exhibits demonstrate that Plaintiffs paid $232,763.14 based on fraudulent insurance claims submitted by Sun State between 2000 and 2002; and, they paid an additional $388,115.26 based on false insurance claims submitted by the other Defendant Clinics between 2000 and 2003 (DE # 571, Ex. A at 8-24).[16]  It is appropriate to consider the losses incurred as a result of the false insurance claims submitted by all of

---

[15]  The undersigned notes that the Exhibits attached to Mr. Kelley's Affidavit document that Plaintiffs suffered $620,878.40 in damages, although Mr. Kelley incorrectly states that the total measure of actual damages is $643,574.47, a difference of $22,696.07.  Specifically, the Exhibits show that the amount of payments Plaintiffs made to Defendant SHP was $328,235.40, although Mr. Kelley incorrectly states that the total is $342,052.30, a difference of $13,816.90.  In addition, the Exhibits show that the amount of payments Plaintiffs made to Defendant MSG was $37,099.12, while Mr. Kelley incorrectly states that the total is $46,794.57, a difference of $9,695.45.  The undersigned further notes that there are a number of entries reflecting a credit to Defendants' accounts, but those amounts have been disregarded by the Court in calculating the proper measure of damages (DE # 571, Ex. A at 12) (reflecting $12.00 credit to SHP); (DE # 571, Ex. B at 21, 22) (reflecting credits of $664.00 and $152.28 to Sun State).

[16]  This $388,115.26 consists of $328,235.40 in insurance payouts resulting from false claims submitted by SHP; $37,099.12 based on claims from MSG; and $22,780.74 based on claims from NMB (DE # 571, Ex. A at 8-24); (DE # 580).

the Defendant Clinics – even though the claims relating to SHP, MSG and NMB are addressed in the companion Report and Recommendation – because the Defendant Clinics were "used interchangeably" and functioned as a single unit, resulting in the imposition of joint and several liability for the reasons discussed below and in the Report and Recommendation  (*see* DE # 1 at 37, ¶ 133).   Thus, Plaintiffs' actual out-of-pocket losses as a result of Defendants' actions in violation of the RICO Act (Counts I-VI), common-law fraud (Count VIII) and the Florida Civil Remedies for Criminal Practices Act (Counts IX and X) totaled $620,878.40.

2.   Prejudgment Interest

For the reasons that follow, the undersigned concludes that Plaintiffs are entitled to prejudgment interest on both their federal and state claims, for a total of $409,595.91 (from the date that the losses occurred until December 31, 2008), plus an additional sum of prejudgment interest at a rate of $136.10 per diem, for each day between January 1, 2009 and the date that the judgment is entered.

a.   Entitlement to Prejudgment Interest

With respect to Plaintiffs' federal claims, the law of this Circuit counsels that "awards of prejudgment interest are equitable remedies to be awarded or not awarded in the district court's sound discretion."  *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998) (citing *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987)).  The Court must remain mindful of the fact that the purpose of awarding prejudgment interest is compensatory.  *See Armco Chile Prodein, S.A. v. M/V Norlandia*, 880 F. Supp. 781, 797 (M.D. Fla. 1995) (citing *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1550 (11th Cir. 1987)).  "In deciding if and how much prejudgment interest should be granted, a district court . . .

25

will consider a number of factors, including whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, . . . whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 (1989); *cf. Panix Prods., Ltd. v. Lewis*, No. 01-CIV-2709-HB, 2003 WL 21659370, at *3 (S.D.N.Y. July 15, 2003) ("Prejudgment interest on RICO damages may be awarded under circumstances in which the treble damages do not adequately compensate the plaintiff or the defendant acted unreasonably and unfairly to delay or obstruct the course of litigation.").

With respect to Plaintiffs' claims that arise under state law, the United States District Court for the Middle District of Florida summarized Florida law regarding prejudgment interest as follows:

> ["W]hen a verdict liquidates damages or a plaintiff's out-of-pocket pecuniary losses, that plaintiff is entitled as a matter of law to prejudgment interest at the statutory rate from the date of that loss." *Air Prods. and Chems., Inc. v. Louisiana Land and Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir.1989) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla.1985)). "[N]either the merit of the defense nor the certainty of the loss affects the award of prejudgment interest." *Id.* (citing *Argonaut*, 474 So.2d at 215). The key to the calculation of prejudgment interest is the date of the loss. *Id.* at 1381. The only cases exempt from this rule are damages for intangible losses.

*Offices Togolais Des Phosphates v. Mulberry Phosphates, Inc.*, 62 F. Supp. 2d 1316, 1328 (M.D. Fla. 1999).  Although prejudgment interest is awarded as a matter of course, "the law is not absolute and may depend on equitable considerations," *see Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1297 (11th Cir. 2002) (quoting *Broward County v. Finlayson*, 555 So. 2d 1211, 1213 (Fla. 1990)), including (1) whether "the delay between injury and judgment is the fault of the prevailing party;" and, (2) whether the prevailing plaintiff "could have, but failed to, mitigate its damages."  *Id.*

26

The undersigned finds that, in the absence of binding legal authority requiring or precluding an award of prejudgment interest with respect to the federal RICO claims alleged in Counts I-VI, it is appropriate to incorporate an award of prejudgment interest as an element Plaintiffs' recovery in light of the circumstances of this case as a whole. *See Tremaine v. Downs*, No. 2:04-CV-151-FTM-29SPC, 2007 WL 865557 (M.D. Fla. Mar. 21, 2007) (awarding prejudgment interest on actual damages based upon defendant's default in a RICO action); *Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1084 (2d Cir. 1993) ("Since the RICO statute does not contain any provisions concerning the award of prejudgment interest, the district court had discretion as to whether to award such interest."); *accord Maiz v. Virani*, 253 F.3d 641, 663 n.15 (11th Cir. 2001) ("Although we need not and do not decide the issue today, we observe that Defendants cite no federal Court of Appeals decision holding prejudgment interest unavailable as a matter of law under § 1964.").  In weighing the equities presented in this case, the undersigned notes that Plaintiffs' compensation should take into account that they were deprived of the ability to use money that was rightfully theirs.  *See Indus. Risk Insurers*, 141 F.3d at 1446-47.  Moreover, the RICO Act, which serves as the basis of Plaintiffs' recovery, is intended to be applied in a manner that effectuates its remedial purpose.  *See, e.g., Boyle v. United States*, 129 S. Ct. 2237, 2239 (2009).  The record reflects no countervailing consideration that would make an award of prejudgment interest inequitable or unjust.

Plaintiffs are similarly entitled to an award of prejudgment interest with respect to the state law claims alleged in Counts VIII-X, because Plaintiffs have submitted evidence that details their out-of-pocket pecuniary damages (DE # 571, Ex. A); and, in such cases, the general rule under Florida law is that "a plaintiff is entitled to prejudgment interest as

27

a matter of law." *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320 (11th Cir. 2007)

(quoting *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985)); *accord*

*Offices Togolais*, 62 F. Supp. 2d at 1328 (applying Florida law).  The undersigned

expressly notes that such an award is equitable in this case, for the reasons expressed

above, even if it is not mandatory.

> ### b.    Amount of Prejudgment Interest

Where, as here, the controlling federal statute is silent as to the manner of

computing prejudgment interest,

> the choice of a rate at which to set the amount of prejudgment interest is ...
> within the discretion of a federal court. *Industrial Risk Insurers*, 141 F.3d at
> 1447. That decision is "usually guided by principles of reasonableness and
> fairness, by relevant state law, and by the relevant fifty-two week United
> States Treasury bond rate, which is the rate that federal courts must use in
> awarding post-judgment interest." *Id.* (citing 28 U.S.C. § 1961).

*In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 710 (11th Cir. 2005).  The undersigned finds

that the method for calculating prejudgment interest under Florida law, which is

explained in detail below, is both a reasonable and fair method of calculating the amount

of prejudgment interest that should be applied to Plaintiffs' claims that arise under

federal law.[17]

Under Florida law, "when a verdict liquidates damages on a plaintiff's out-of-

pocket pecuniary losses, the plaintiff is entitled to prejudgment interest at the statutory

rate from the date of such loss;" and when the loss arises from "a series of civil thefts,

---

[17]  The undersigned finds that Plaintiffs' proposed methodology for calculating
prejudgment interest does not result in a facially unreasonable or unfair amount under
federal law, given the circumstances of the case as a whole.  However, because it is
necessary to calculate prejudgment interest under Florida state law, the undersigned
finds that calculating prejudgment interest in the same manner for the claims arising
under federal law is, overall, the most precise, reasonable and fair way to calculate this
element of Plaintiffs' recovery.

prejudgment interest is an element of compensatory damages [that] should be calculated from the date of each taking," based on "any portion of the damages that are ascertainable as of a date certain from the record." *Greenberg v. Grossman*, 683 So. 2d 156, 157 (Fla. 3d Dist. Ct. App. 1996) (citing Fla. Stat. § 772.11).  Under Florida law, where there is no contract rate establishing the appropriate interest rate, the interest rate is set annually by the Chief Financial Officer.  *See* Fla. Stat. §§ 687.01 and 55.03.  The applicable interest rate for the relevant years is set forth below:

| YEAR | ANNUAL RATE | DAILY RATE |
|------|-------------|------------|
| 2009 | 8% | .0002192 |
| 2008 | 11% | .0003014 |
| 2007 | 11% | .0003014 |
| 2006 | 9% | .0002466 |
| 2005 | 7% | .0001918 |
| 2004 | 7% | .0001918 |
| 2003 | 6% | .0001644 |
| 2002 | 9% | .0002466 |
| 2001 | 11% | .0003014 |
| 2000 | 10% | .0002740 |

*See* Florida Department of Financial Services, Statutory Interest Rates, *available at* http://www.fldfs.com/aadir/interest.htm (last accessed August 24, 2009).

In their motion for default judgment, Plaintiffs suggest that the Court should calculate the prejudgment interest applicable to both their federal claims and their state law claims in the same manner, by taking the following steps in order to simplify the computation of prejudgment interest: First, Plaintiffs propose calculating the

prejudgment interest based on the sum of all of its actual losses.[18]  Second, Plaintiffs

propose applying a 9% annual prejudgment interest rate, which is the average of the

variable annual prejudgment interest rates in effect under Florida law between 2000 (the

date of Plaintiffs' first payment to the Defendant Clinics) and 2008 (the date that

Plaintiffs' filed their motion for Final Default Judgment).  Finally, rather than calculating

the prejudgment interest rate separately for each day that Plaintiffs reimbursed

Defendants for a fraudulent insurance claim, Plaintiffs propose considering all of its

losses to have occurred on May 22, 2000, the date of Plaintiffs' first payment to the

Defendants.

       The undersigned notes at the outset that Plaintiffs' proposal for calculating the

amount of prejudgment interest is inconsistent with Florida law; and, unlike the

relatively lenient federal standards governing awards of prejudgment interest, Florida

law "forecloses discretion in the award of prejudgment interest" as well as "discretion in

the rate of that interest."  *Ins. Co. of North America v. Lexow*, 937 F.2d 569, 572 (11th Cir.

1991).  With respect to their claims arising under Florida law, Plaintiffs are due

prejudgment interest for each payment they made to Defendants beginning on the date

of each loss, or in other words, *on the date that each payment occurred*.

       The flaw in Plaintiffs' proposal is illustrated by assuming that Defendants'

fraudulent scheme was only successful in inducing Plaintiffs to pay the first two

fraudulent insurance claims that are detailed in Plaintiffs' briefs, with the first set of

payments occurring on May 22, 2000 and the second set of payments occurring on June

---

[18]  As stated above, the correct measure of actual damages, based upon the
records provided by Plaintiffs in support of their Motion for Final Default Judgment, is
$620,878.40 even though Plaintiffs incorrectly state that the payments add up to
$643,574.47.

12, 2000.  Under these simplified facts, it is clear that Plaintiffs would be entitled to prejudgment interest on their first payment beginning on May 22, 2000, while they would not be entitled to prejudgment interest on the second payment until June 12, 2000.  If Plaintiffs' prejudgment interest on the second payment ran from May 22, 2000 – before the loss occurred – then they would enjoy an impermissible windfall.  *See Metro. Dade County v. Bouterse, Perez & Fabregas Architects Planners, Inc.*, 463 So. 2d 526, 527 (Fla. 3d Dist. Ct. App. 1985).  Yet, this would be the consequence for all subsequent payments if the Court were to adopt Plaintiffs' proposal to "fix the date of interest" on all of its payments "to begin on May 22, 2000, the date of Plaintiffs' first payment to Defendant Clinics" (DE # 571 at 27).

While Plaintiffs' proposal would greatly simplify the computation of damages – considering the fact that Plaintiffs made approximately 600 payments to Defendants on approximately 200 different days over a four-year period, and each day that Plaintiffs made a payment to Defendants requires a re-calculation of the amount of prejudgment interest – the law in Florida is clear that, "[w]here there has been a series of civil thefts, prejudgment interest . . . should be calculated from the date of each taking."  *Greenberg v. Grossman*, 683 So. 2d 156, 157 (Fla. 3d Dist. Ct. App. 1996).  Thus, the method that must be used to calculate the prejudgment interest on the series of civil thefts at issue in this case is as follows:

First, it is necessary to arrange the payments in chronological order.  As discussed above, this is necessary because the amount of prejudgment interest depends on the date on which the damage was incurred.

For example, Plaintiffs' first payment to Defendants occurred on May 22, 2000; and, based on the tables promulgated by the Florida Department of Treasury,

31

prejudgment interest in the year 2000 accrued at a rate of .0002740 per day.  Thus, to calculate the amount of prejudgment interest that accrued during the year in which the loss occurred, it is necessary to multiply the amount of the loss that Plaintiffs incurred on that day ($3,345.60)[19] by the per diem interest rate (.0002740) and the number of days remaining in the year (223 days).

This must be done for each separate day in which the loss occurred, meaning, for instance, that the total value of the payments made on June 12, 2000 ($2,170.40)[20] must be multiplied by the per diem interest rate (.0002740) and the number of days remaining in the year (202 days).

This process must also be completed separately for each year in which losses occurred (2000-2003), because the applicable interest rate changes annually.  In 2001, for instance, the daily interest rate increased from the previous year, to a rate of .0003014 per day.  So, for example, to calculate the prejudgment interest that accrued in 2001 based on the first day's worth of losses in that year – which occurred on January 4, 2001 – it is necessary to multiply the total amount of the payments Plaintiffs made on that day ($7,669.73) by the applicable per diem interest rate (.0003014) and the number of days remaining in the year (362 days).[21]

After computing the amount of prejudgment interest for the year in which each loss occurred, it is necessary to find the amount of prejudgment interest for the

---

[19]  Plaintiffs paid Defendants two checks on that day, one for $1,568.80, and another for $1,776.80 (DE # 571, Ex. A).

[20]  Plaintiffs paid Defendants two checks on that day, one for $1,135.20, and another for $1,035.20 (DE # 571, Ex. A).

[21]  Plaintiffs paid Defendants four checks that day, for $2,654.11, $1,270.57, $498.58 and $919.00 (DE # 571, Ex. A)

remaining years, through December 31, 2008.  This is done by multiplying the total losses for that year by the applicable annual prejudgment interest rate for all remaining years, on a year-by-year basis.

For example, the total amount of losses that Plaintiffs incurred in 2000 was $217,723.45.  Thus, to find the total amount of prejudgment interest that accrued in the year 2001, it is necessary to multiply that sum by the annual prejudgment interest rate in effect in 2001 (11%).  This process must be repeated separately for each subsequent year to account for the fact that the prejudgment interest rate in Florida changes annually.  The results are summarized in the chart below, which indicates that the prejudgment interest that accrued from January 1, 2001 to December 31, 2008 on the $217,723.45 worth of losses that occurred in 2000 equals $154,583.65.

| 2001 Pre-judgment Interest (11%) | 2002 Pre-judgment Interest (9%) | 2003 Pre-judgment Interest (6%) | 2004 Pre-judgment Interest (7%) | 2005 Pre-judgment Interest (7%) | 2006 Pre-judgment Interest (9%) | 2007 Pre-judgment Interest (11%) | 2008 Pre-judgment Interest (11%) |
|---|---|---|---|---|---|---|---|
| 23,949.58 | 19,595.11 | 13,063.41 | 15,240.64 | 15,240.64 | 19,595.11 | 23,949.58 | 23,949.58 |

This process must be repeated for each year's worth of losses.  Thus, in addition to the $154,583.65 in prejudgment interest that accrued between 2001 and 2008 on the damages that occurred in the year 2000 ($217,723.45), Plaintiffs are also entitled to $160,651.74 worth of prejudgment interest that accrued from 2002 to 2008 on the damages that they incurred in the year 2001 ($250,703.02); they are entitled to $84,112.75 worth of prejudgment interest that accrued from 2003 to 2008 on the losses that they incurred in the year 2002 ($146,689.53); and, they are entitled to $2,898.83 worth of prejudgment interest that accrued from 2004 to 2008 on the damages that they incurred in the year 2003 ($5,762.40).

33

After carrying out the necessary computations – which involve first calculating the amount of prejudgment interest for the years in which each respective loss occurred and then calculating the prejudgment interest for all remaining years – the total amount of prejudgment interest that accrued between January 1, 2000 and December 31, 2008 equals $409,595.91.

Finally, it will be necessary to calculate the prejudgment interest for the present year, in which the judgment is entered.  This must be done because there can be no gap between the last day that Plaintiffs receive prejudgment interest and the first day that Plaintiffs begin receiving postjudgment interest.  *See SEB S.A. v. Sunbeam Corp.* 476 F.3d 1317, 1320-21 (11th Cir. 2007) ("[P]rejudgment interest accrues until the date of the judgment after which postjudgment interest begins to accrue.") (citing *Bel-Bel Int'l Corp. v. Community Bank of Homestead*, 162 F.3d 1101, 1110-11 (11th Cir. 1998) and *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 214-15 (Fla. 1985)).  To do this, it is necessary to determine the amount of prejudgment interest that will accumulate each day of the year until the entry of judgment, which is derived by multiplying the total amount of losses ($620,878.40) by the per diem interest rate for the year 2009 (.0002192); and, which equals $136.10.

In other words, Plaintiffs are entitled to collect $136.10 in prejudgment interest for each day that elapses in the year 2009, until the day that the final judgment is issued, which should be added to the $409,595.91 in prejudgment interest that they are entitled to collect for the period between May 22, 2000 (the date of their first loss) and December 31, 2008.[22]

_____

[22]  The undersigned notes that the prejudgment interest is based solely on the amount of actual damages because it is not permissible to "compute[ ] prejudgment interest on the amount of trebled damages, instead of the actual damages" since

3.    Postjudgment Interest

Plaintiffs are entitled to postjudgment interest on the federal RICO claims alleged in Counts I-VI of the Complaint,[23] as well as the state law claims alleged in Counts VIII-X.[24]  The methodology for calculating the postjudgment interest rates for the state law claims follows the federal standard.  *See Ins. Co. of North America v. Lexow*, 937 F.2d 569, 572 n.4 (11th Cir. 1991) ("[I]n awarding postjudgment interest in a diversity case, a district court will apply the federal interest statute, 28 U.S.C. § 1961, rather than the state interest statute.").

The statute that governs the award of postjudgment interest in federal courts provides that such interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a).

The undersigned concludes, contrary to Plaintiffs' assertion otherwise, that Plaintiffs are not entitled to collect postjudgment interest on the amount of damages including prejudgment interest.  Rather, the amount of postjudgment interest is based only on the amount of compensatory damages, which in this case is $620,878.40.  *See*

---

"[p]rejudgment interest should be on awarded only on the amount stolen, not on the amount as trebled under the civil theft statute."  *Sebastiano v. Sclafani*, 984 So. 2d 673, 673 (Fla. 4th Dist. Ct. App. 2008); *accord DeLaughter v. Borden Co.*, 431 F.2d 1354, 1359 (5th Cir. 1970).

[23]  *See* 28 U.S.C. § 1961 ("Interest should be allowed on any money judgment in a civil case recovered in a district court.").

[24]  *See Port-A-Weld, Inc. v. Padula & Wadsworth Const., Inc.*, 984 So. 2d 564, 570 (Fla. 4th Dist. Ct. App. 2008) (citing *Quality Engineered Installation, Inc. v. Higley S., Inc.*, 670 So. 2d 929, 931 (Fla. 1996)) ("[J]udgments automatically bear post-judgment interest by operation of law, whether they say so or not.").

*Becker Holding Corp. v. Becker*, 78 F.3d 514, 517 (11th Cir. 1996) ("Because prejudgment interest serves only to compensate the plaintiff for the deprivation of the use of the principal loss amount for a set period of time . . . ordering postjudgment interest on prejudgment interest would overcompensate for the deprivation.").  Unlike *Becker*, the case that Plaintiffs cite for the proposition that "the interest is to be computed on the entire amount of the final judgment, including any prejudgment interest" is a case from the Middle District of Louisiana and therefore not binding on this Court (DE # 571 at 38) (citing *Richmond Capital Corp. v. Fed. Express Corp.*, 54 F. Supp. 2d 676, 676-77 (M.D. La. 1999)).

      F.    <u>Treble Damages</u>

      Under the plain language of the RICO Act, as well as under Florida's Civil Remedies for Criminal Practices Act, the final judgment must reflect an amount that is three times the amount of actual damages.  *See* 18 U.S.C. § 1964(c); Fla. Stat. § 772.11(1); Fla. Stat. § 772.104(1).  The amount to be trebled should consist solely of Plaintiffs' actual damages, prior to adding the value of prejudgment interest and prior to setting-off the value of Plaintiffs settlements with various Defendants.  The value of the settlements should then be set-off subsequent to trebling.

      The undersigned disagrees with Plaintiffs' assertion that the amount of "actual damages" to be trebled should include prejudgment interest (DE # 571 at 32).  Rather, the combination of trebling Plaintiffs' actual damages together with an award of prejudgment interest adequately compensates Plaintiffs for their losses.  To treble the amount of prejudgment interest awarded would therefore result in an unfair windfall to Plaintiffs.  Although Plaintiffs cited cases from the Southern District of New York in which prejudgment interest was trebled, the undersigned finds those cases

distinguishable from the case at bar, which is more closely aligned with the following cases: First, in *Karl-Heinz Herborg v. Inter-Continental Brokerage Corp.*, 976 F.2d 737 (9th Cir. 1992), the district court entered a default judgment against the defendant on plaintiff's RICO claims and the appellate court ordered the entry of a judgment awarding the plaintiff prejudgment interest solely on the amount of compensatory damages prior to trebling.  Similarly, in *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1167 (E.D.N.Y. 1996), the district court noted that "a trebled award of discretionary pre-judgment interest is inappropriate" because "[t]he award of trebled damages, without trebled pre-judgment interest is adequate to compensate the . . . plaintiffs for their damages."  Three times the amount of Plaintiffs' actual damages ($620,878.40) equals $1,862,635.20.

The undersigned agrees with Plaintiffs that the amount of "actual damages" to be trebled should include the amount of Plaintiffs' total compensatory damages; and, the value of settlements that Plaintiffs have reached with various Defendants in this case should be deducted after trebling.  The United States Courts of Appeals that have considered this issue have concluded that setting-off the amount of settlements prior to trebling would frustrate the policy objectives of the RICO Act and the Florida Civil Remedies for Criminal Practices Act, which are intended to provide a full remedy to plaintiffs, as well as to encourage similarly situated plaintiffs to enforce their rights under the statutes and to deter similarly situated defendants from engaging in similar illicit activity.  *See William Inglis & Sons Baking Co. v. Continental Baking Co.*, 981 F.2d 1023, 1024 (9th Cir. 1992) ("[S]ettlement payments should be deducted from the damages after they have been trebled."); *Sciambra v. Graham News Co.*, 841 F.2d 651, 657 (5th Cir. 1988) ("[W]e agree . . . that the court should treble the amount of damage award . . . *before* deducting the amount of the . . . settlement."); *State of N.Y. v. Hendrickson Bros.,*

*Inc.*, 840 F.2d 1065, 1086 (2d Cir. 1988); *Morley v. Cohen*, 888 F.2d 1006, 1014 (4th Cir. 1989) ("The [settlement] deduction should be made after trebling."); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir. 1987) ("We conclude that setting-off damages *after* trebling is more likely to effectuate the purposes behind RICO.").[25]  Moreover, as Plaintiffs note, deducting the amount of settlements prior to trebling would tend to discourage plaintiffs from attempting to resolve their RICO claims against defendants prior to trial, in an attempt to maximize their recovery under the treble damages provision.

In the context of this case, Plaintiff suffered $620,878.40 in compensatory damages; and, the treble damage award therefore equals $1,862,635.20.  Because Plaintiffs have entered settlement agreements totaling $750,000.00, the monetary award in this case must be reduced by that amount to prevent a windfall to Plaintiffs, which results in a treble damage award of $1,112,635.20.

G.    Joint and Several Liability

The undersigned concludes that all Defendants should be held jointly and severally liable for the damages incurred by Plaintiffs as a result of the fraudulent acts described in the Complaint.

With regard to the RICO Act claims alleged in Counts I-VI, the Eleventh Circuit has held, in the context of a criminal forfeiture, that RICO conspirators are properly held jointly and severally liable for the damages resulting from each other's illegal acts.  *See*

---

[25]  This analysis applies with equal force to Plaintiffs' claims under Florida's Civil Penalties for Criminal Practices Act, which was patterned after the federal RICO Act and is therefore often interpreted in light of decisions construing the federal RICO Act.  *See Acosta v. Campbell*, No. 6:04-CV-761-ORL-28-DAB, 2006 WL 146208, at *5 n.7 (M.D. Fla. Jan. 18, 2006) (citing *Jackson v. BellSouth Communications*, 372 F.3d 1250 (11th Cir. 2004)).

*United States v. McKay*, 285 Fed. Appx. 637, 640 (11th Cir. July 16, 2008).  In fact, "[e]very circuit in the country that has addressed the issue has concluded that the nature of both the civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations." *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (collecting cases).

This result is also applicable to the Florida state law claims alleged in Counts VIII-X because, under Florida law, "[j]oint and several liability exists where two or more wrongdoers negligently contribute to the injury of another by their several acts, which operate concurrently, so that in effect the damages suffered are rendered inseparable." *Albertson's, Inc. v. Adams*, 473 So.2d 231, 233 (Fla. 2d Dist. Ct. App. 1985).  In a case such as this one, where Defendants each filled a defined role in an ongoing fraudulent enterprise that contributed to the damages incurred by Plaintiffs, it is appropriate to impose joint and several liability.  Therefore, based upon a careful review of the record as a whole and for the reasons stated above, it is hereby

H.     Attorneys' Fees and Costs

Finally, the undersigned agrees with Plaintiffs that their recovery should include the value of attorneys' fees and costs incurred in connection with this matter.

First, with regard to Plaintiffs' federal RICO claims (Counts I-VI), the statute expressly provides that the amount of the recovery for any person "injured . . . by reason of a violation of section 1962" shall include "the cost of the suit, including a reasonable attorney's fee . . . ."  18 U.S.C. § 1964(c).  *See also Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1025 (11th Cir. 1996) (noting that "even small individual claims under RICO can be feasible given the possibility of the award of treble damages and attorneys' fees

39

to successful plaintiffs.").  Likewise, successful plaintiffs are entitled to attorneys' fees and costs under Florida's Civil Remedy for Criminal Practices Act, which are the violations alleged in Counts IX and X of the Complaint.  *See* Fla. Stat. §§ 772.11 and 772.104 (providing that the prevailing plaintiff is "entitled to . . . reasonable attorney's fees and court costs in the trial and appellate courts."); *see also Global Fin., LLC v. Pay Pro Card Corp.*, No. 8:07-CV-29-T-17EAJ, 2008 WL 4663900, at *2 (M.D. Fla. Oct. 20, 2008) ("The entry of a default judgment against Defendant entitles the Plaintiff to reasonable attorneys' fees and costs under Fla. Stat. § 772.11(1).").[26]

Accordingly, the undersigned will issue a Final Default Judgment reflecting that Plaintiffs are entitled to an award of reasonable attorneys' fees and costs; and, the Court shall retain jurisdiction to determine the amount of attorneys' fees and costs based upon a motion and additional supporting documentation which shall be filed by Plaintiff within thirty days of the entry of judgment.  Based upon a careful review of the record as a whole and for the reasons stated above, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Default Judgment is **GRANTED** as to Counts I-VI and VIII-X of the Complaint, as follows:

1.    A Final Default Judgment shall be entered in favor of Plaintiffs and against Defendants Mikhail Palterovich, Dmitry Shteyman, Sun State, Continental and LaPlume, jointly and severally, for the sum of $1,522,231.11, which consists of: (a) an award of

---

[26]  While it does not affect the ultimate analysis, the undersigned notes that Plaintiffs have not asserted that they are entitled to attorneys' fees for the common law fraud claim alleged in Count VIII; and, it does not appear that the common law fraud claim gives rise to an award of attorneys' fees.  *See Fin. Bus. Equip. Solutions, Inc. v. Quality Data Sys., Inc.*, No. 08-60769-CIV, 2008 WL 4753710, at *5 (S.D. Fla. 2008); *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith*, 595 F. Supp. 171, 175 (M.D. Fla. 1984).

$1,112,635.20, which represents the treble value of actual damages ($1,862,635.20),
reduced by the value of settlement agreements that Plaintiffs have reached with other
Defendants ($750,000.00); and, (b) an award of $409,595.91, which represents the value
of prejudgment interest that accrued between the dates that the losses occurred and
December 31, 2008.

      2.     Plaintiffs shall also be awarded prejudgment interest at a rate of $136.10
per day for each day between January 1, 2009 and the date that the judgment is entered.
It is further

      3.     Plaintiffs shall be awarded postjudgment interest at the statutory rate to
run from the date that the judgment is entered.

      4.     Finally, Plaintiffs are entitled to an award of attorneys' fees and costs; and,
the Court shall therefore retain jurisdiction to determine the reasonable amount of
attorneys' fees and costs based upon a motion that shall be filed by Plaintiffs, along with
the necessary supporting documentation in accordance with the Federal and Local
Rules, within thirty days of the entry of judgment.

      **DONE AND ORDERED** in chambers in Miami, Florida on August 26, 2009.

_Andrea M. Simonton_
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:
All counsel and *pro se* parties of record, via CM/ECF